No. 15-4019

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

ROBERT F. McDONNELL,

*Defendant-Appellant,*

———————

**On Appeal from the United States District Court for the Eastern District of Virginia, Richmond Division, James R. Spencer, District Judge**

———————

**PRINCIPAL BRIEF OF DEFENDANT-APPELLANT ROBERT F. MCDONNELL**

———————

John L. Brownlee
Daniel I. Small
Christopher M. Iaquinto
Elizabeth N. Jochum
HOLLAND & KNIGHT LLP
800 17th Street N.W.
Suite 1100
Washington, DC 20006
Telephone: (202) 828-1854

Noel J. Francisco
    *Counsel of Record*
Henry W. Asbill
Charlotte H. Taylor
James M. Burnham
Ian Samuel
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
Telephone: (202) 879-3939
Facsimile: (202) 626-1700
njfrancisco@jonesday.com

*Counsel for Defendant-Appellant Robert F. McDonnell*

**ORAL ARGUMENT SCHEDULED FOR MAY 12, 2015**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................... v

INTRODUCTION ................................................................................ 1

JURISDICTIONAL STATEMENT ...................................................... 2

STATEMENT OF THE ISSUES .......................................................... 2

STATEMENT OF THE CASE .............................................................. 4

    I.    The Investigation And Indictment Occur Amid A Frenzy Of
    Media Condemnation ................................................................ 6

        A.    The Government Conducts A Highly Publicized Grand
            Jury Investigation ............................................................ 6

        B.    The Government Indicts Governor McDonnell And Media
            Condemnation Increases .................................................. 7

        C.    The District Court Decides Virtually Every Contested
            Motion In The Government's Favor ................................. 8

    II.    The Trial And Post-Trial Proceedings ..................................... 11

        A.    The Jury Is Seated Without Adequate Voir Dire On Pretrial
            Publicity ........................................................................ 11

        B.    The Trial Proceeds With Detours Into Irrelevant And
            Prejudicial Evidence ...................................................... 13

        C.    Governor McDonnell Is Convicted Of Corruption And
            Acquitted Of Bank Fraud ............................................... 16

        D.    The District Court Denies Governor McDonnell's Motions
            For New Trial Or Acquittal ............................................ 17

    III.    The District Court Describes The Government's Proposed
    Sentence As "Ridiculous Under These Facts." ......................... 18

SUMMARY OF ARGUMENT .............................................................. 19

ARGUMENT ....................................................................................... 24

    I.    Governor McDonnell Is Entitled To Acquittal Or, Alternatively,
    A New Trial ............................................................................. 24

        A.    The Government's Construction Of "Official Act" Is
            Wrong ........................................................................... 25

# TABLE OF CONTENTS
## (continued)

**Page**

1. The Text Of The Federal Bribery Statute Forecloses The Government's Construction ........................................ 27

    (a) The Text ................................................................. 27

    (b) The Supreme Court Has Already Interpreted This Text To Preclude The Government's Construction .............................................. 30

2. The Circuit Courts Have Uniformly Rejected The Government's Construction ............................................... 32

    (a) Eighth Circuit ...................................................... 32

    (b) First Circuit ......................................................... 33

    (c) D.C. Circuit ......................................................... 34

    (d) This Court's Decision In *Jefferson* ............................ 36

3. The Government's Construction Would Criminalize Routine Political Activity ............................................. 38

4. The Court Must Resolve Any Doubt In Governor McDonnell's Favor ....................................................... 40

    (a) Canon Of Constitutional Avoidance ...................... 40

    (b) Federalism ........................................................... 42

    (c) Rule Of Lenity .................................................... 43

B. The Government Did Not Prove That Governor McDonnell Promised Or Performed "Official Action" Under Federal Law ......................................................... 44

1. Email To Counsel And Senior Policy Advisor Jasen Eige ......................................................................... 44

2. Healthcare Leaders Reception ..................................... 45

3. Suggested Meeting With Star ...................................... 46

4. Meeting With Molly Huffstetler ................................. 46

5. Mansion Event ........................................................... 47

# TABLE OF CONTENTS
## (continued)

Page

C.  At The Least, The District Court's Improper Jury
Instructions Require A New Trial ................................... 49

1.  The District Court's "Official Act" Instruction Is
Overbroad And Riddled With Errors ............................. 51

(a)  The District Court's Sweeping Instruction
Allowed The Jury To Conclude That Virtually
Any Action By Governor McDonnell Was
"Official" Action ......................................... 52

(b)  Misstatements Of Law Pervaded The District
Court's "Official Act" Definition ........................... 54

(c)  This Incorrect Instruction Was Highly
Prejudicial ................................................. 57

2.  The District Court's Quid Pro Quo Instructions
Were Erroneous Too ......................................... 59

D.  The Government's Construction Renders The Hobbs Act
And Honest Services Statute Unconstitutionally Vague .............. 63

II.  The District Court Failed To Conduct Adequate Voir Dire On
Pretrial Publicity .................................................. 64

A.  Voir Dire Must Provide "Reasonable Assurance" That Bias
Or Partiality Will Be Discovered ............................... 65

B.  The District Court's Voir Dire Did Not Provide
"Reasonable Assurance" That Bias Would Be Discovered ......... 67

III.  The District Court Erred By Refusing To Sever The McDonnells'
Trials ............................................................. 69

A.  Governor McDonnell Was Entitled To A Separate Trial ........... 70

1.  Governor McDonnell Made The Necessary
Threshold Showing For Severance ........................... 71

2.  The District Court's Refusal To Sever Was Highly
Prejudicial ................................................. 72

B.  The District Court's Basis For Denying Severance Was An
Abuse Of Discretion ............................................ 74

## TABLE OF CONTENTS
### (continued)

Page

IV.   The District Court Made Numerous Prejudicial Evidentiary Errors At Trial ...................................................................... 76

    A.   The District Court Erroneously Excluded All Evidence Explaining Williams's Extraordinary Immunity Deal To The Jury .................................................................. 77

    B.   The District Court Erroneously Admitted Prejudicial Evidence About Governor McDonnell's State Disclosure Forms, While Excluding Expert Testimony Explaining It .......... 80

    C.   The District Court Erroneously Admitted Irrelevant And Prejudicial Hearsay About Governor McDonnell's Supposed Desire For Free Golf ..................................... 82

    D.   The District Court Erroneously Admitted Irrelevant And Prejudicial Evidence About Governor McDonnell's Receipt Of Unrelated Gifts ........................................... 83

    E.   The District Court Erroneously Ordered Governor McDonnell To Surrender The Contents Of Williams's iPhone After The Government Produced It Pursuant To Rule 16 .................................................................... 84

CONCLUSION ........................................................................ 85

CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) OR 32(a)

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page**

## CASES

*Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.,*
515 U.S. 687 (1995) ................................................................. 43

*Bond v. United States,*
134 S. Ct. 2077 (2014) ............................................................ 42

*Buckley v. Valeo,*
424 U.S. 1 (1976) .................................................................... 25

*Citizens United v. Fed. Election Comm'n,*
558 U.S. 310 (2010) ................................................................ 41

*Cleveland v. United States,*
531 U.S. 12 (2000) .................................................................. 42

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council,*
485 U.S. 568 (1988) ................................................................ 40

*Evans v. United States,*
504 U.S. 255 (1992) .........................................................25, 26, 55

*Goins v. Angelone,*
226 F.3d 312 (4th Cir. 2000), *abrogated on other grounds by* 236 F.3d 149
(4th Cir. 2000) ........................................................................ 65

*Gregory v. Ashcroft,*
501 U.S. 452 (1991) ................................................................ 42

*Gregory v. North Carolina,*
900 F.2d 705 (4th Cir. 1990) .................................................... 83

*Hawkins v. Stables,*
148 F.3d 379 (4th Cir. 1998) .................................................... 75

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Holland v. Big River Minerals Corp.*,
181 F.3d 597 (4th Cir. 1999) ........................................................... 4

*Johnson v. Mead Johnson & Co., LLC*,
754 F.3d 557 (8th Cir. 2014) ........................................................... 78

*Jones v. United States*,
529 U.S. 848 (2000) ........................................................... 42

*Kolender v. Lawson*,
461 U. S. 352 (1983) ........................................................... 63

*Margoles v. United States*,
407 F.2d 727 (7th Cir. 1969) ........................................................... 65

*Mathews v. United States*,
485 U.S. 58 (1988) ........................................................... 50

*McConnell v. Fed. Election Comm'n*,
540 U.S. 93 (2003) ........................................................... 38, 39

*McCutcheon v. Fed. Election Comm'n*,
134 S. Ct. 1434 (2014) ........................................................... 41, 42

*McNally v. United States*,
483 U.S. 350 (1987) ........................................................... 25, 26, 32, 42

*Rewis v. United States*,
401 U.S. 808 (1971) ........................................................... 42

*Samantar v. Yousuf*,
560 U.S. 305 (2010) ........................................................... 52

*Sec'y of Labor v. Ohio Valley Coal Co.*,
359 F.3d 531 (D.C. Cir. 2004) ........................................................... 28

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Silverthorne v. United States,*
  400 F.2d 627 (9th Cir. 1968) ........................................................... 67

*Skilling v. United States,*
  561 U.S. 358 (2010) ..................................................................*passim*

*Staples v. United States,*
  511 U.S. 600 (1994) ........................................................................ 43

*United States v. Allen,*
  716 F.3d 98 (4th Cir. 2013) ............................................................ 78

*United States v. Arthur,*
  544 F.2d 730 (4th Cir. 1976) ...............................................59, 60, 62

*United States v. Bakker,*
  925 F.2d 728 (4th Cir. 1991) ...............................................65, 66, 68

*United States v. Basham,*
  561 F.3d 302 (4th Cir. 2009) .......................................................... 78

*United States v. Bass,*
  404 U.S. 336 (1971) ...................................................................42, 43

*United States v. Beckner,*
  69 F.3d 1290 (5th Cir. 1995) .......................................................... 67

*United States v. Belyea,*
  159 F. App'x 525 (4th Cir. 2005) .................................................... 78

*United States v. Birbal,*
  62 F.3d 456 (2d Cir. 1995) .............................................................. 49

*United States v. Blitch,*
  622 F.3d 658 (7th Cir. 2010) .......................................................... 65

# TABLE OF AUTHORITIES
## (continued)

**Page**

*United States v. Brock*,
  501 F.3d 762 (6th Cir. 2007) ........................................................ 4

*United States v. Carona*,
  No. SA CR-06-224-AG, 2008 WL 1970221 (C.D. Cal. May 2, 2008) .................... 74

*United States v. Chen*,
  393 F.3d 139 (2d Cir. 2004) ........................................................ 55

*United States v. Davis*,
  583 F.2d 190 (5th Cir. 1978) ...............................................66, 67, 69

*United States v. Dee*,
  912 F.2d 741 (4th Cir. 1990) ...................................................... 50

*United States v. Derrick*,
  163 F.3d 799 (4th Cir. 1998) ...................................................40, 41

*United States v. Enmons*,
  410 U.S. 396 (1973) ............................................................... 42

*United States v. Fastow*,
  269 F. Supp. 2d 905 (S.D. Tex. 2003) .............................................. 74

*United States v. Frederick*,
  78 F.3d 1370 (9th Cir. 1996) ...................................................... 76

*United States v. Gresko*,
  632 F.2d 1128 (4th Cir. 1980) ..................................................... 50

*United States v. Hairston*,
  46 F.3d 361 (4th Cir. 1995) ....................................................... 40

*United States v. Hands*,
  184 F.3d 1322 (11th Cir. 1999) .................................................... 76

# TABLE OF AUTHORITIES
## (continued)

**Page**

*United States v. Hankish*,
    502 F.2d 71 (4th Cir. 1974) ................................................................ 65

*United States v. Hassan*,
    742 F.3d 104 (4th Cir. 2014) .............................................................. 79

*United States v. Hastings*,
    134 F.3d 235 (4th Cir. 1998) .............................................................. 50

*United States v. Holley*,
    502 F.2d 273 (4th Cir. 1974) .............................................................. 55

*United States v. Hurwitz*,
    459 F.3d 463 (4th Cir. 2006) .............................................................. 63

*United States v. Jefferson*,
    674 F.3d 332 (4th Cir. 2012) ......................................................*passim*

*United States v. Jennings*,
    160 F.3d 1006 (4th Cir. 1998) ..................................................59, 60, 62

*United States v. Lancaster*,
    96 F.3d 734 (4th Cir. 1996) ....................................................22, 65, 68

*United States v. Lanoue*,
    71 F.3d 966 (1st Cir. 1995) ................................................................ 85

*United States v. Lewis*,
    53 F.3d 29 (4th Cir. 1995) ............................................................50, 60

*United States v. Lindh*,
    198 F. Supp. 2d 739 (E.D. Va. 2002) ................................................ 74

*United States v. Loftus*,
    992 F.2d 793 (8th Cir. 1993) ........................................................32, 33

# TABLE OF AUTHORITIES
## (continued)

**Page**

*United States v. Mathis,*
264 F.3d 321 (3d Cir. 2001) ............................................................. 79

*United States v. McLaurin,*
764 F.3d 372 (4th Cir. 2014) ........................................................... 49

*United States v. Medford,*
661 F.3d 746 (4th Cir. 2011) ........................................................... 70

*United States v. Moye,*
454 F.3d 390 (4th Cir. 2006) ........................................................... 50

*United States v. Muntain,*
610 F.2d 964 (D.C. Cir. 1979) ......................................................... 35

*United States v. Ocasio,*
750 F.3d 399 (4th Cir. 2014), *cert. granted*, 83 U.S.L.W. 3251 (U.S. Mar.
2, 2015) (Nos. 14-361, 14A59) ......................................................... 4

*United States v. Parodi,*
703 F.2d 768 (4th Cir. 1983) ............................................. 70, 71, 72, 73

*United States v. Pratt,*
728 F.3d 463 (5th Cir. 2013) ...................................................... 67, 68

*United States v. Queen,*
132 F.3d 991 (4th Cir. 1997) ...................................................... 82, 84

*United States v. Rabbitt,*
583 F.2d 1014 (8th Cir. 1978), *abrogated on other grounds by McNally v.
United States*, 483 U.S. 350 (1987) ........................................ 32, 33, 48

*United States v. Regan,*
937 F.2d 823 (2d Cir. 1991) ........................................................... 55

# TABLE OF AUTHORITIES
## (continued)

**Page**

*United States v. Ricks,*
573 F.3d 198 (4th Cir. 2009) ........................................................................ 63

*United States v. Ring,*
706 F.3d 460 (D.C. Cir. 2013) ............................................ 35, 36, 45, 54, 56

*United States v. Shay,*
57 F.3d 126 (1st Cir. 1995) ........................................................................... 79

*United States v. Shuford,*
454 F.2d 772 (4th Cir. 1971) .............................................. 23, 69, 70, 72, 74

*United States v. Smithers,*
212 F.3d 306 (6th Cir. 2000) ........................................................................ 80

*United States v. Sun-Diamond Growers of Cal.,*
526 U.S. 398 (1999) ............................................................... 21, 30, 31, 37

*United States v. Taylor,*
993 F.2d 382 (4th Cir. 1993) .............................................................. 51, 60, 62

*United States v. Thompson,*
562 F.3d 387 (D.C. Cir. 2009) ...................................................................... 85

*United States v. Tresvant,*
677 F.2d 1018 (4th Cir. 1982) ...................................................................... 49

*United States v. Urciuoli,*
513 F.3d 290 (1st Cir. 2008) .................................................................*passim*

*United States v. Valdes,*
475 F.3d 1319 (D.C. Cir. 2007) .......................................... 29, 34, 35, 36, 53

*Victor v. Nebraska,*
511 U.S. 1 (1994) ......................................................................................... 49

# TABLE OF AUTHORITIES
### (continued)

**Page**

*White v. Honeywell, Inc.*,
 141 F.3d 1270 (8th Cir. 1998) ........................................................ 55

*Yates v. United States*,
 No. 13-7451, slip op. (U.S. Feb. 25, 2015) .................................. 43

### STATUTES & RULES

18 U.S.C. § 201 ....................................................... 20, 26, 27, 28, 37

18 U.S.C. § 1346 ................................................................................ 25

18 U.S.C. § 1951 ................................................................................ 25

28 U.S.C. § 1291 ................................................................................. 2

Va. Code § 2.2-3103 ......................................................................... 43

Fed. R. Crim. P. 16 ..................................................................... 24, 84

Fed. R. Evid. 403 ................................................................. 80, 82, 83

Fed. R. Evid. 404 ................................................................. 82, 83, 84

Fed. R. Evid. 702 ........................................................................ 78, 82

### OTHER AUTHORITIES

A. Barton Hinkle, *McDonnell Family Values*, Richmond Times-Dispatch,
 May 12, 2013, at E-03 ...................................................................... 6

Andrew15, Comment to *Donors Bought Rolex Watch for Virginia Gov.
 McDonnell*, Wash. Post (June 28, 2013) ......................................... 7

Jeff E. Schapiro, *Va.'s Image Now Like That of Maryland, Illinois*, Richmond
 Times-Dispatch (Jan. 22, 2014, 12:00 AM) .................................... 7

# TABLE OF AUTHORITIES
## (continued)

Page

Jim Geraghty, *Virginia's Long Tradition of Expensive Gifts to Governors*, Nat'l Rev. (Aug. 9, 2013) ................................................................. 39

*Jonnie Williams Granted "Blanket Immunity" in McDonnell Case*, NBC29 (July 28, 2014, 9:02 PM) ........................................................ 77

Josh Gerstein, *Why John Edwards Won and Bob McDonnell Lost*, Politico (Sept. 5, 2014, 6:05 PM) ............................................................. 51

Julian Walker, *Va. Legislator Calls on Gov. Bob McDonnell to Resign*, Virginian-Pilot, July 2, 2013 ............................................................ 6

Matt Zapotosky, *McDonnell Petition for Bond Is Denied*, Wash. Post, Jan. 14, 2015, at B3 ................................................................... 34

Matthew Larotunda, *Obama Inauguration's Big Donor Packages Previewed*, ABC News (Dec. 8, 2012, 4:14 PM) ................................................ 45

Michael Pope, *Virginia Lawmakers Cautious About Ethics—And Eggs— After McDonnell's Conviction*, WAMU (Dec. 15, 2014) ......................... 38

Peter Hamby, *Virginia Governor Scandal: "That's Not the Guy We Know,"* CNN (Aug. 20, 2013) ................................................................... 6

Petula Dvorak, *McDonnell's Betrayal of His Wife Is Anything But Moral*, Wash. Post (Aug. 22, 2014) ........................................................... 8

Robert McCartney, *Bob McDonnell Was a Man In Denial about Legal Risks of Taking Gifts*, Wash. Post, Jan. 22, 2014 .................................... 7

Rosalind S. Helderman & Carol D. Leonnig, *McDonnell Rejected Plea Offer to Face One Felony, Spare Wife Any Charges, Avoid Trial*, Wash. Post (Jan. 23, 2014) ............................................................................. 7

Ruth Marcus, *Unfit for His Office*, Wash. Post, July 12, 2013, at A15 ........... 6

# TABLE OF AUTHORITIES
## (continued)

**Page**

U.S. DOJ, *Criminal Resource Manual* § 717 ........................................................ 11

# INTRODUCTION

The Government's case against former Virginia Governor Robert F. McDonnell is built on a boundless definition of bribery that the Supreme Court has rejected, that the statutory text precludes, and that contravenes the decisions of every court to consider it. This definition would, if adopted here, make virtually every elected official in the Fourth Circuit a criminal. Taking the record entirely in the Government's favor, it proved only that Governor McDonnell asked an aide a question, appeared at two events, suggested a meeting, and arranged a meeting. The alleged bribe payor received no grants, no bills, no appointments, no budget items, no permits, and not a dime of state money. Nor did he receive any promises of the same. He got nothing besides a few routine courtesies indistinguishable from the courtesies elected officials across the country reflexively extend to benefactors, donors, and other constituents every single day. Those courtesies are not "official" acts that federal law prohibits exchanging for contributions or gifts because none involve officials invoking their "oversight authority," deploying their "official powers," or altering specific policies of the governments they serve. *United States v. Urciuoli*, 513 F.3d 290, 296 (1st Cir. 2008).

The Government's refusal to acknowledge the basic difference between "official" acts, and every other act an official takes, led it to indict and convict Governor McDonnell for conduct that has never been criminal. The district court aided that venture by giving the Government's proposed jury instructions, which

included an unlimited-and-error-laden definition of "official act." Those instructions enabled the Government to incorrectly argue that all the jury needed to find was that Governor McDonnell took some act "on the issue of Virginia business development," a "capital priority of Bob McDonnell's administration," "in his official capacity as Governor." XI.JA.7438-39. The district court compounded these errors by refusing to conduct proper voir dire despite extensive, negative pretrial publicity, and with myriad other erroneous rulings.

This Court should reject the Government's attempt to mint a new criminal prohibition in this prosecution. The theory alone is dangerous. Its sudden creation to pursue a high-profile target directly attacks the rule of law. Governor McDonnell's convictions should be vacated; at a minimum, he should receive a new and fair trial.[1]

## JURISDICTIONAL STATEMENT

This appeal is from a final judgment of conviction entered on January 13, 2015. II.JA.1045-51. Governor McDonnell timely noticed his appeal, II.JA.1052-53, giving this Court jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

This appeal presents the following questions:

**1.** Whether this Court should vacate Governor McDonnell's convictions because:

---

[1] All record documents are in the Joint Appendix. Citations thereto appear with "Volume #," then "JA," then the specific page number, with pages consecutively paginated across the volumes.

     a.    the Government did not prove that Governor McDonnell engaged or promised to engage in "official acts," as that term is properly defined;

     b.    the district court gave the jury an erroneous definition of "official act"; and

     c.    the district court erroneously failed to instruct the jury that goodwill gifts are not bribes.

**2.**    Whether this Court should vacate Governor McDonnell's convictions because the district court failed to conduct adequate voir dire of potential jurors exposed to massive, negative, and inaccurate pretrial publicity.

**3.**    Whether this Court should vacate Governor McDonnell's convictions because the district court failed to sever his trial from his wife's, which would have allowed him to call her as a critical exculpatory witness.

**4.**    Whether this Court should vacate Governor McDonnell's convictions because the district court:

     a.    excluded all evidence explaining the alleged bribe-payor's unprecedented transactional-immunity deal;

     b.    admitted prejudicial evidence concerning Governor McDonnell's state disclosure forms, but excluded Governor McDonnell's proffered expert testimony explaining those complex forms;

     c.    admitted prejudicial hearsay about Governor McDonnell's supposed general desire for free golf;

      d.      admitted prejudicial evidence of unrelated gifts; and

      e.      confiscated the contents of Williams's iPhone after the Government produced it in discovery before trial.[2]

## STATEMENT OF THE CASE

The Government indicted Governor McDonnell and his wife on January 21, 2014, charging them with a variety of corruption offenses, conspiracy to commit the same, false statements to a bank, and, for her, obstruction of justice. Its basic allegation was that Governor McDonnell had accepted otherwise lawful gifts and personal loans, which became criminal because he was implicitly exchanging them for taking steps to "legitimize" and "promote" the gift-giver's company. I.JA.87 ¶22. Governor McDonnell moved to dismiss the corruption charges, arguing that the Indictment did not state a federal crime because the Government did not allege that he performed or promised to perform any "official acts" under federal law. Two prominent groups—five former Virginia Attorneys General and NACDL—sought to file amicus briefs, but the district court refused to read them. I.JA.319, 334. The

---

[2] Today, the Supreme Court granted certiorari in *Ocasio v. United States*, No. 14-361, to resolve a split between this Court and the Sixth Circuit regarding whether conspiracy to commit Hobbs Act extortion requires an agreement to obtain property from someone outside the conspiracy. *Compare* 750 F.3d 399 (4th Cir. 2014) *with* 501 F.3d 762 (6th Cir. 2007). Williams was an unindicted co-conspirator here. Binding Fourth Circuit precedent currently precludes argument on this issue, but Governor McDonnell raises this issue to preserve it should the Supreme Court reverse this Court in *Ocasio*. *See Holland v. Big River Minerals Corp.*, 181 F.3d 597, 605-06 (4th Cir. 1999).

district court then denied the motion in a two-page Order that provided no guidance on where it drew the "official act" line.  I.JA.491-92.

At the ensuing five-week jury trial, both sides presented their cases according to their different understandings of federal corruption law.  For the Government, this meant proving that Governor McDonnell did five things governors customarily do, without needing to show that he deployed his official powers to assist Jonnie Williams, the then-CEO of a Virginia-based publicly traded company and the alleged bribe-payor.  For Governor McDonnell, this meant showing that, although he did things all governors routinely and reflexively do, none of his acts exercised government power, pushed others to exercise government power, promised to exercise government power, or took action on any specific matters pending before him.  None of his acts thus converted otherwise lawful gifts into illegal bribes.

Despite receiving the parties' proposed jury instructions well before trial, the district court did not resolve this legal dispute until the eve of closing arguments.  Only then did the court inform the parties that it would give the Government's proposed instruction on "official act"—an unprecedented and incorrect instruction that contained no limitations—verbatim.  The Government aggressively capitalized on this improper instruction, repeatedly telling the jury to convict Governor McDonnell regardless of whether he had exercised inappropriate influence over identifiable government decisions.  The jury obliged, convicting Governor McDonnell

on the corruption counts, while acquitting him of the others. Below is a more detailed description of these proceedings.

## I. The Investigation And Indictment Occur Amid A Frenzy Of Media Condemnation.

### A. The Government Conducts A Highly Publicized Grand Jury Investigation.

The Government convened a grand jury in Spring 2013. Grand jury investigations are required to be secret, but this one was broadcast by "leak after devastating leak in the pages of the Washington Post and other newspapers."[3] Many of the detailed leaks were attributed to "law enforcement sources."[4]

These improper disclosures fed a year-long barrage of negative, misleading news articles, TV spots, and blog posts about Governor McDonnell, particularly in the two publications with the broadest circulation in Virginia. For example, on May 12, 2013, the Richmond Times-Dispatch published an op-ed arguing that Governor McDonnell was "[h]iding behind legal technicalities" and "making a mockery" of "family values." A. Barton Hinkle, *McDonnell Family Values*, Richmond Times-Dispatch, May 12, 2013, at E-03. And on July 12, 2013, the Washington Post ran an editorial entitled "Unfit for His Office," claiming that "mountainous evidence" shows Governor McDonnell "has no business continuing in office." Ruth Marcus, *Unfit for*

---

[3] Peter Hamby, *Virginia Governor Scandal: "That's Not the Guy We Know,"* CNN (Aug. 20, 2013).

[4] Julian Walker, *Va. Legislator Calls on Gov. Bob McDonnell to Resign*, Virginian-Pilot, July 2, 2013.

*His Office*, Wash. Post, July 12, 2013, at A15.  Reader opinions were worse, with the top comment on one article proclaiming: "He and his family are on the take!"[5]

> ### B.   The Government Indicts Governor McDonnell And Media Condemnation Increases.

The Government charged Governor McDonnell in January 2014 in a speaking indictment that exposed Governor McDonnell to decades in prison and triggered wall-to-wall press coverage.  For example, the Washington Post immediately opined that Governor McDonnell was "brought down" by "a toxic mix of personal money worries, an assertive wife, a taste for luxury, and a culture of coziness between politicians and rich supporters."  Robert McCartney, *Bob McDonnell Was a Man In Denial about Legal Risks of Taking Gifts*, Wash. Post, Jan. 22, 2014.  The Richmond Times-Dispatch condemned the McDonnells for engaging in "unseemly" conduct like that of notoriously corrupt governors from other states.  Jeff E. Schapiro, *Va.'s Image Now Like That of Maryland, Illinois*, Richmond Times-Dispatch (Jan. 22, 2014, 12:00 AM).  And on the eve of arraignment, the Washington Post ran a misleading, front-page story inaccurately reporting supposedly confidential plea negotiations and portraying Governor McDonnell as unchivalrous and reckless.  *See, e.g.*, Rosalind S. Helderman & Carol D. Leonnig, *McDonnell Rejected Plea Offer to Face One Felony, Spare Wife Any Charges, Avoid Trial*, Wash. Post (Jan. 23, 2014).  Those leaks fueled bitter public condemnation of Governor McDonnell throughout the trial.  *E.g.*:

---

[5] Andrew15, Comment to *Donors Bought Rolex Watch for Virginia Gov. McDonnell*, Wash. Post (June 28, 2013).

"McDonnell could have avoided putting his marriage under a microscope if he'd manned up and taken the plea deal offered to him last year." Petula Dvorak, *McDonnell's Betrayal of His Wife Is Anything But Moral*, Wash. Post (Aug. 22, 2014).

## C. The District Court Decides Virtually Every Contested Motion In The Government's Favor.

The parties spent several months litigating numerous disputed issues, virtually all of which the court resolved in the Government's favor. Among them:

**1.** Governor McDonnell moved to sever his trial from his wife's on two grounds—(1) Mrs. McDonnell would testify on his behalf only in separate trials,[6] and (2) she would block his revelation of critical information on marital-privilege grounds in a joint trial. I.JA.285-312. Governor McDonnell submitted two detailed affidavits under seal summarizing the evidence. I.JA.488-90. Because these affidavits provided a blueprint to Governor McDonnell's defense strategy and contained privileged information, he asked the district court to review them *ex parte*, citing two examples of other district courts doing the same. I.JA.313-18, 335-49. The Government opposed this request, though it cited no contrary examples. I.JA.320-33.

The district court sided with the Government, refusing even to read the affidavits unless the Government immediately received copies. I.JA.350-52. The court further denied Governor McDonnell's alternate request to postpone deciding

---

[6] Mrs. McDonnell refused to testify in a joint trial out of concern that admitting she deceived her husband about Williams would inculpate her on the Government's eventually-dismissed-for-lack-of-evidence obstruction of justice charge. XII.JA.7926 ¶3.

severance from three months before trial (and more than one month before the Government had to produce witness statements to the defense, I.JA.214 § V), until 14 days before trial, when there would be less prejudice to Governor McDonnell from sharing his entire defense strategy, I.JA.487.  After refusing to either read Governor McDonnell's evidence or delay ruling until closer to trial, the district court denied Governor McDonnell's severance motion for lack of evidence.    I.JA.494 ("Defendants have limited their showing of Maureen McDonnell's potential testimony largely to vague and conclusory statements….").

2.    Governor McDonnell moved to exclude evidence concerning his state disclosure forms, pointing out that the Government had neither noticed an expert to explain Virginia law nor alleged that his disclosures violated Virginia law.  I.JA.650-62, 735-49.  The district court rejected those arguments, reasoning that this evidence would not "unfairly prejudice Defendants because there is no suggestion ... that [Governor] McDonnell violated Virginia's ethics laws or reporting requirements." I.JA.760.  The district court then permitted the Government to introduce extensive evidence suggesting just that.  *See infra* at 80-82.

Governor McDonnell also moved to exclude evidence that he had accepted an expensive vacation from a wealthy friend, which Virginia law exempted from disclosure under its "personal friend" disclosure exception.  I.JA.650-62, 735-49.  This evidence had nothing to do with any alleged bribes and was thus irrelevant and prejudicial.  The district court disagreed, speculating that it showed "absence of

mistake" in the "omission of gifts from Williams pursuant to the personal friend exception." I.JA.761. That ruling made no sense because Governor McDonnell never omitted gifts from Williams "pursuant to the personal friend exception." IX.JA.6342-43, X.JA.6969.

**3.**     Prior to trial, Governor McDonnell noticed five expert witnesses, and the Government moved to exclude them all. The district court granted this request in nearly all respects, allowing only limited testimony from one financial expert, who related that Governor McDonnell's financial condition was sound.

In particular, the court excluded Governor McDonnell's proposed expert on Virginia's disclosure rules—Norman Thomas, a former Opinions Counsel at the Virginia Attorney General's Office—who would have rebutted the allegation that Governor McDonnell "concealed" Williams's gifts. The Government argued that the disclosure forms are written in "plain English," such that the jury could interpret them for itself. I.JA.647. The court adopted this argument without elaboration. I.JA.719.

The court also excluded Peter White, an experienced white-collar-criminal practitioner who would have explained Williams's unprecedented immunity agreements. In exchange for Williams's testimony, the Government gave him "transactional immunity" for a still-unknown-number of unrelated, serious tax and securities crimes.[7] As Williams's final deal opaquely states: "The conduct for which

---

[7] Transactional immunity—which is virtually never given—differs from "use immunity" insofar as "transactional immunity protects the witness from prosecution

Williams would receive immunity" includes not only "(1) conduct involving his agreement to provide, and his provision of, things of value to former Virginia Governor Robert F. McDonnell, former First Lady of Virginia Maureen P. McDonnell, and their family members," but also "(2) conduct related to loans Williams received from 2009 to 2012 in exchange for his pledge of Star Scientific stock; and (3) conduct related to Williams's gifts of Star Scientific stock to certain trusts from 2009 to 2012." XI.JA.7918.  (The Government further assisted Williams by intervening in two shareholder suits against him and obtaining stays for the duration of this proceeding.  *See* I.JA.124-53.)  Governor McDonnell argued that this unique deal necessitated expert testimony because it required Williams to admit no wrongdoing, included no judicial oversight, and did not specify which crimes, or even how many crimes, it covered.  The district court rejected these arguments by incorrectly characterizing Williams's deal as a "plea agreement."  I.JA.717.

## II.    The Trial And Post-Trial Proceedings.

### A.    The Jury Is Seated Without Adequate Voir Dire On Pretrial Publicity.

In light of the overwhelming negative pretrial publicity—totaling thousands of articles, many of which could alone prejudice a potential juror, *see* I.JA.254-84 (gathering examples)—both sides requested individual voir dire of jurors who

---

(continued…)

for the offense or offenses involved, whereas use immunity only protects the witness against the government's use of his or her immunized testimony in a prosecution of the witness."  U.S. DOJ, *Criminal Resource Manual* § 717.

admitted knowing about the case. III.JA.1688 (Government: "at least for those individuals that have said that they have very closely or somewhat closely followed the case, it might be advisable for us to do some limited inquiry or bring them up or something so that there's no issue on the record"); *id.* at 1689-90 (defense requesting the same); II.JA.916-17. The district court refused. *Id.* at 1690. Instead it spent hours individually questioning potential jurors about far-less-important topics, including whether "any member of the jury panel or close family member have any training, education, expertise or experience in the field of accounting," *id.* at 1602-12, or whether "any member of the jury panel or a close family member have any training, education, expertise or experience in the area of real estate sales, rentals or brokerage," *id.* at 1633-39.

The district court limited its oral voir dire on the heavily litigated pretrial-publicity issue to two questions. After acknowledging that the "case has generated a lot of media interest," the court asked the approximately 150 prospective jurors to stand up "if you have read, heard or seen something in the media." *Id.* at 1691-92. Almost everyone stood. The district court then asked whether, "[b]ased on what you have heard or read or seen relating to this case, if you are, in your mind, able to put aside whatever it is that you've heard, listen to the evidence in this case and be fair to both sides, then I want you to sit down." *Id.* at 1692. Everyone sat. *See id.* The court announced that it was "satisfied with ... the responses," *id.*, and declined to ask additional questions, despite defense counsel reiterating his request for specific,

individualized inquiry, *id.* (defense: "I can't trust the credibility of that without a further inquiry….").

The district court did individually voir dire a handful of jurors whose answers to the limited, court-selected questions on the juror questionnaire—such as whether they expressed an opinion about the case to someone else, III.JA.1696-1706—gave the defense specific concern. But it refused to include any question, despite both parties requesting it, *see* I.JA.527, asking whether prospective jurors had *formed* an opinion. Governor McDonnell thus had no way to identify which publicity-inundated jurors were potentially biased.

### B. The Trial Proceeds With Detours Into Irrelevant And Prejudicial Evidence.

The trial focused largely on several gifts and loans Williams provided to Governor McDonnell and various family members. That focus included gifts Governor McDonnell knew about (a wedding gift to his daughter Cailin, XI.JA.7917); gifts he did not know about (Mrs. McDonnell's New York shopping, V.JA.3381-84, 3391-95; IX.JA.6055-56); gifts he did not know were related to Williams (the Rolex watch Mrs. McDonnell gave him as a Christmas gift, IV.JA.2274-78; IX.JA.6167, 6175); and gifts having nothing to do with Williams (a vacation for Governor McDonnell's family from another friend, IX.JA.6624). The Government wrung every ounce of prejudice it could from these gifts, most of which (like the shopping, Rolex, and vacation) were not charged conduct. The Government paraded every item Mrs.

McDonnell received, one at a time, in front of the jury, VII.JA.5006-14; passed the Rolex from juror to juror, IV.JA.2276-77; and more than 10 times showed photographs of Governor McDonnell with the watch or in Williams's Ferrari (which Governor McDonnell drove for a few hours), III.JA.1887; IV.JA.2376; V.JA.3180-81; VI.JA.4111; VII.JA.4898, 4911-13, 4918; IX.JA.6631, 6634, 6698, 6702-03; XI.JA.7452.

The Government spent far less time on how Governor McDonnell supposedly corrupted his office, focusing on "five specific actions taken by McDonnell," II.JA.955, that it claimed were the "quo" in his quid pro quo bribery scheme. Those actions were: (1) Governor McDonnell sending an email asking his chief counsel to "see me" about an issue related to Williams, V.JA.3216-19; (2) Governor McDonnell allowing Williams and some of his associates to attend a reception for "Healthcare Leaders," IV.JA.2312-14; (3) Governor McDonnell suggesting that two subordinates conduct a meeting with employees of Williams's company (Star Scientific) that never happened, VI.JA.4208-09, 4227-28, 4230-31; (4) Governor McDonnell requesting that a mid-level staffer meet with Williams, after which the staffer sent Williams a "blow-off" email, V.JA.3058-59, 3068-69, 3075; and (5) Governor McDonnell making neutral comments at a small, closed-to-the-press luncheon where Star gave grants to Virginia universities, IV.JA.2282-84; V.JA.3344-46, 3637. There was no evidence that Governor McDonnell exercised governmental power on Williams's behalf, pressured anyone else to, or sought to induce any actions on any specific matters.

14

Because the Government charged Governor McDonnell and his wife with conspiracy—with their marriage its primary evidence—the McDonnells were forced to reveal that their marriage was deeply troubled.  That included testimony from witnesses about the break-down in the McDonnells' communications, V.JA.3664; VIII.JA.5437-39; X.JA.7034-37; their arguments over personal finances, IX.JA.5983-86, 6031-33; and Mrs. McDonnells' strong emotional attachment to Williams, IV.JA.2941-42; V.JA.3482-89; VIII.JA.5304.  The Government introduced extensive evidence about the marriage, too, calling an FBI agent to present misleading pie charts showing how many nights the McDonnells spent in the same city, X.JA.7268-74, 7297, and showing the jury photos of the McDonnells holding hands after being indicted, IX.JA.6628-30.

Laced throughout were numerous detours of marginal-at-best relevance but clear prejudice.  Those detours included (1) interrogating Governor McDonnell's daughter on the first day of trial about wedding gifts with no connection to Williams, III.JA.1879 (demanding to know "how much wine was donated"), 1880 ("What kind of limo was it?"), 1881 ("Did you pay for the wedding dress?"), 1882 ("Did you and your fiancé pay for your wedding rings?"), *id.* ("[Y]ou did not pay for the engraved silver picture frames provided to the guests?"); (2) Cross-examining Governor McDonnell about when Williams became his "friend,"  IX.JA.6571-72, 6609, 6614; and (3) berating Governor McDonnell about his other friends, IX.JA.6624 ("So your testimony is that you thought that [Mr. Goodwin] was your personal friend as of the

time that he paid $23,000 for your Kiawah Island vacation … [?]"), 6620-21 ("How often did you socialize with Mr. Goodwin? … When?"), 6621 ("[H]ow many times did you call Mr. Goodwin and not discuss business?"), 6622 ("How many children does [Mr. Goodwin] have? … What are their names?").

At the close of the Government's case, and again at the close of evidence, Governor McDonnell sought judgments of acquittal, reiterating his "official act" argument. The district court summarily denied these motions. VII.JA.5172; X.JA.7304.

### C.    Governor McDonnell Is Convicted Of Corruption And Acquitted Of Bank Fraud.

After the close of the evidence, the district court provided its 90-page draft jury instructions to the parties and, two-and-a-half-hours later, conducted a charging conference. The district court refused to limit the definition of "official act" in any relevant way. Its broad instruction allowed the jury to conclude that any routine courtesy Governor McDonnell bestowed upon Williams was the *quo* in a *quid pro quo* bribery scheme. And that is precisely what the Government argued, contending that Governor McDonnell's five acts were all "official" because each related to "Virginia business development," XI.JA.7438-39, and "Mr. McDonnell's involvement with every single one of these things was in his official capacity as Governor," XI.JA.7439. The jury convicted Governor McDonnell of the corruption counts and their derivative conspiracy counts, while acquitting him of the other charges.

D.   **The District Court Denies Governor McDonnell's Motions For New Trial Or Acquittal.**

Post-trial, Governor McDonnell moved unsuccessfully for a judgment of acquittal and for a new trial. The district court agreed that the legal validity of the verdict "hinges on the interpretation of an 'official act' and whether McDonnell's actions constitute such." II.JA.953. It further conceded that bribery cannot "encompass every action taken in one's official capacity," or else "absurd outcomes would assuredly result." *Id.* Yet, to distinguish which acts are "official" (such that they are criminal if part of a quid pro quo) from acts that are not "official" (and thus not criminal *even if* part of a quid pro quo), the court circularly ruled that it "must look to whether a quid pro quo agreement existed." *Id.*

The court also ruled that the jury could draw "permissible inferences" of a quid pro quo based on "the timing of Williams's gifts" vis-a-vis Governor McDonnell's "five specific actions." *Id.* at 955-56. The court found that those "specific actions" were "within the range of actions on questions, matters, or causes pending before McDonnell as Governor," because "Virginia business and economic development was a top priority in McDonnell's administration" and Governor McDonnell "would customarily ... hos[t] events and hav[e] meetings" relating to that broad subject. *Id.* at 956; *see also id.* ("campaign slogan was 'Bob's for Jobs'"). In short, the court reasoned, because Governor McDonnell would "customarily" have meetings and attend events

17

relating to "Virginia business," and because the jury could infer that he did so on Star's behalf, the jury could convict him.

The court also said that Governor McDonnell's subjective intent was "to use his gubernatorial position to influence governmental decisions, specifically attempting to obtain research studies for Star." *Id.* But the court cited no evidence of any such intent; rather it cited only evidence of *Williams's* desires. *See id.* at 954-55 (Williams had "explained to McDonnell" he wanted studies, "asked McDonnell" to help, and "sent a letter to McDonnell" describing his objective). And *Williams's* intent was all the court directed the jury to consider in deciding what acts were "official." XI.JA.7672 (instructing that actions become "official" actions whenever "*the alleged bribe payor reasonably believes* that the public official had influence, power or authority over a means to the end") (emphasis added). The jury was not asked to find that Governor McDonnell intended to help Williams obtain studies or anything else. And of course, Williams never applied for any studies. Nor did any studies ever happen.

## III.    The District Court Describes The Government's Proposed Sentence As "Ridiculous Under These Facts."

The district court pronounced sentence at the close of a hearing that featured, among other things, 11 live witnesses and 443 letters requesting leniency in recognition of Governor McDonnell's 38 years of extraordinary public service and truly exceptional good character. Those witnesses included former Virginia Governor Douglas Wilder, who noted the unfairness of the Government requesting over a

decade in prison for Governor McDonnell while "the progenitor of the bribe ... walks away clean." XI.JA.7843. At the close, the court explained that the Government's requested sentence "would be ridiculous under these facts," *id.* at 7892, and sentenced Governor McDonnell to 24 months' imprisonment, *id.* at 7895.

## SUMMARY OF ARGUMENT

1. The Government's case hinges on whether the following "five specific actions taken by McDonnell," II.JA.955, were "official" under the federal bribery laws:

(1) Governor McDonnell sent an email to his chief counsel asking the counsel to "see me about Anatabloc issues at VCU and UVA." (The counsel did not recall actually seeing him and nothing else happened.) V.JA.3216-19.

(2) Governor McDonnell's wife invited Williams and private doctors recommended by Williams to a reception for "Healthcare Leaders." (Nothing else happened.) *See* IV.JA.2312-14, 2334-36; V.JA.3672.

(3) Governor McDonnell suggested to two subordinates that they meet with Star. (The subordinates disagreed about whether Governor McDonnell made the suggestion, they never met with anyone, and they never heard about it again.) VI.JA.4205-09, 4226-28, 4218-20, 4230-31.

(4) Governor McDonnell asked a subordinate to send a staffer to a meeting with Williams, immediately after which the staffer sent Williams a "blow-off email." (Nothing else happened.) V.JA.3043-44, 3058-59, 3068-69.

(5) Governor McDonnell attended a closed-to-the-press luncheon at the Executive Mansion, paid for by his PAC, that Williams and researchers from the University of Virginia ("UVA") and Virginia Commonwealth University ("VCU") also attended. Williams gave checks to the researchers as planning grants to prepare Tobacco Commission research proposals. (No proposals were ever submitted and nobody contacted the Commission.) IV.JA.2278-79, 2284-85; V.JA.3344-47, 3361-62.

19

The Government offered no evidence showing that Governor McDonnell asked anyone to do anything other than make independent judgments or that he directed anyone to do anything on any specific matter.

To sustain Governor McDonnell's convictions, this Court must hold that all five of these acts were "official" ones, even though none involved inducing any exercise of sovereign power, even though none were any more remarkable than acts that governors unthinkingly take hundreds of times weekly for countless constituents, and even though Williams never came close to receiving any actual benefit from Virginia's government. That is the theory the Government presented to the jury; it is what the court's jury instructions invited the jury to conclude; and it is what the district court held in sustaining Governor McDonnell's convictions. That is thus the theory the Government must defend here.

This theory contravenes settled law. "[T]he bribery statute[s] do[] not encompass every action taken in one's official capacity." *United States v. Jefferson,* 674 F.3d 332, 356 (4th Cir. 2012). To violate federal law, a public official must agree to "be[] influenced in the performance of any official act." 18 U.S.C. § 201(b)(2)(A). That requires more than "trad[ing] ... on the reputation, network and influence that comes with political office," using the "access and attention" that comes with government office, or even "(possibly improper) use of [official] letterhead." *United States v. Urciuoli,* 513 F.3d 290, 296 (1st Cir. 2008). Taking an "official" action requires the *next* step of invoking "oversight authority or threaten[ing] to use official powers."

20

*Id.*

The corruption laws thus distinguish between public officials (1) exercising official powers to favor donors, *i.e.*, making official decisions on government policy or inducing others to do so, and (2) making referrals for donors or taking other actions that do not alter government policy. As the Supreme Court explained in *United States v. Sun-Diamond Growers of California*, "the official acts of receiving the sports teams at the White House, visiting the high school, and speaking to the farmers about USDA policy," while "assuredly 'official acts' in some sense[,] are not 'official acts' within the meaning of the statute." 526 U.S. 398, 407 (1999). This straightforward statement of law is impossible to square with Governor McDonnell's convictions because those acts are indistinguishable from Governor McDonnell's. And the Supreme Court's decisions, the statutory text, every applicable canon of construction, every published decision from every court to consider anything resembling the Government's theory, and basic common sense all foreclose the Government's proposed abrogation of *Sun-Diamond*. Accordingly, this Court should reject the Government's theory and reverse Governor McDonnell's convictions.

At a minimum, however, the Court should vacate Governor McDonnell's convictions because the district court gave unprecedented, erroneous jury instructions over his repeated objections. The court's boundless "official act" definition allowed the jury to conclude that any action Governor McDonnell undertook was "official." The court rejected every proposed limitation, including limits its post-trial opinions

agreed were correct. The court compounded that error by injecting affirmatively erroneous statements into its "official act" definition, including (1) instructions that defined *different* elements of the crimes, and (2) instructions that defined what actions are "official" on the basis of what *Williams* believed. The district court also wrongly refused to instruct the jury on the difference between illegal bribes and lawful goodwill gifts.

  **2.**  The district court committed further reversible error by failing to adequately voir dire potential jurors on exposure to negative pretrial publicity. In *Skilling v. United States*, 561 U.S. 358 (2010), the Supreme Court approved the district court's voir dire in a comparably-publicity-saturated case only because it (1) asked in a questionnaire whether jurors "have any opinion about the guilt or innocence of [the defendant]," *id.* at 371 n.4; and (2) individually examined prospective jurors in-court about exposure to pretrial publicity, *id.* at 373-74, 389. Here, the district court refused to do these things, despite requests by both sides. It instead (1) asked in a questionnaire only whether jurors had expressed an opinion to someone else, I.JA.593; and (2) twice denied in-court requests from both sides for individual voir dire, *see* III.JA.1689 ("I'm not going to do what you suggest."); III.JA.1690 ("I'm not asking these questions."). The court thus failed to "provide a reasonable assurance that prejudice would be discovered if present," *United States v. Lancaster*, 96 F.3d 734, 740 (4th Cir. 1996) (quotation omitted), necessitating a new trial.

**3.** The court further erred by refusing to sever the McDonnells for separate trials. Severance is mandatory "where one defendant's case rests heavily on the exculpatory testimony of his co-defendant, willing to give such testimony but for the fear that by taking the stand in the joint trial he would jeopardize his own defense." *United States v. Shuford*, 454 F.2d 772, 776 (4th Cir. 1971). Governor McDonnell has consistently maintained that his wife concealed many of her interactions with Williams. Mrs. McDonnell would have corroborated that, XII.JA.7926-35 ¶28, but was willing to testify only if her trial was severed. The court's refusal to grant severance to permit this exculpatory testimony—or to *even read* the declarations Governor McDonnell filed before deciding whether it needed the Government's input—was an abuse of discretion.

**4.** Finally, the trial judge made numerous erroneous evidentiary rulings that allowed the Government to smear Governor McDonnell with irrelevant, prejudicial evidence and prevented Governor McDonnell from effectively impeaching the Government's star witness, including: (1) barring Governor McDonnell from introducing evidence explaining Williams's unprecedented transactional-immunity deal; (2) allowing the Government to introduce confusing and prejudicial evidence concerning Governor McDonnell's state-mandated disclosure forms, while barring Governor McDonnell from presenting expert testimony explaining that evidence; (3) allowing the Government to introduce a hearsay email discussing Governor McDonnell's supposed desire for extravagant golf, which the district court has

acknowledged was erroneously admitted; (4) admitting evidence showing that Governor McDonnell accepted an expensive vacation from an unrelated friend; and (5) wrongly ordering Governor McDonnell to relinquish evidence the Government produced under Rule 16.

If the Government's legal theory is correct, then this is a case with inflammatory "quid," no express agreement, and jury instructions that make practically all of Governor McDonnell's actions "quo." In that world, virtually everything depended on Governor McDonnell's credibility. Where the evidence is circumstantial and credibility-based, evidentiary errors like these are extremely prejudicial. These errors—which the Government exploited to great effect—were thus textbook examples of harmful, reversible evidentiary error. Each warrants a new trial.

## ARGUMENT

### I.    Governor McDonnell Is Entitled To Acquittal Or, Alternatively, A New Trial.

Governor McDonnell's conviction "hinges on the interpretation of an 'official act.'" II.JA.953. In the Government's view, an "official act" is anything an official customarily does relating to any broad subject. As the district court recognized, the Government's position is that Governor McDonnell could be convicted for emailing about, or attending events with, a Virginia CEO because he "customarily" did such things and "Virginia business" was his "top priority." *Id.* at 956.

This limitless construction conflicts with the Supreme Court's decisions, the statutory text, and the decisions of every court to consider it. The Court should reject this theory and vacate Governor McDonnell's convictions, all of which depend on it.

## A.    The Government's Construction Of "Official Act" Is Wrong.

The honest-services fraud statute and the Hobbs Act are vague and open-ended. *See* 18 U.S.C. § 1346 (honest services fraud) ("'scheme or artifice to defraud,'" defined to include "a scheme or artifice to deprive another of the intangible right of honest services"); 18 U.S.C. § 1951(b)(2) (Hobbs Act) ("'extortion'" through "obtaining of property from another, with his consent ... under color of official right"). Neither statute explicitly criminalizes "bribery" or references "official acts." Recognizing the potential for prosecutorial abuse of such vague prohibitions, the Supreme Court has interpreted them to prohibit exchanging "official acts" for payments, *Evans v. United States*, 504 U.S. 255, 268 (1992), and has explained that they reach only the core of bribery. They are, in other words, limited to the "most blatant and specific attempts of those with money to influence governmental action." *Buckley v. Valeo*, 424 U.S. 1, 28 (1976).

The Court made this clear in *Skilling v. United States*, 561 U.S. 358 (2010), which unanimously rejected the Government's last attempt to exploit the vagueness of honest services fraud, holding that honest-services fraud "criminalizes *only* the bribe-and-kickback *core* of the pre-*McNally* case law." *Id.* at 409 (second emphasis added). The Court rejected the Government's more expansive theories because those theories

were not "core applications of the honest-services doctrine." *Id.* at 410. And despite the Court's cabining the statute, three justices *still* believed it was unconstitutionally vague. *Id.* at 425 (Scalia, Thomas, Kennedy, JJ., concurring in the judgment). Same for the Hobbs Act: the Court ruled that "extortion" includes only the narrow, common-law definition of bribery—an official accepting "payment in exchange for a specific requested exercise of his official power." *Evans*, 504 U.S. at 258. And likewise, three justices believed expanding "extortion" to capture core bribery marked "a stunning expansion of federal criminal jurisdiction into a field traditionally policed by state and local laws." *Id.* at 290 (Thomas, Scalia, JJ., Rehnquist, C.J., dissenting).

It is not plausible that when the Supreme Court interpreted these provisions to criminalize "core" bribery, it intended to adopt the broadest possible conception of what constitutes bribery. Yet the Government is requesting precisely that. Rather than restrict itself to "the bribe-and-kickback core of the pre-*McNally* case law," *Skilling*, 561 U.S. at 409, the Government has invoked the definition of "official act" for *federal*-official bribery, 18 U.S.C. § 201(a)(3), and expanded its meaning beyond anything that any court has ever endorsed—for either federal officials or state officials—in order to prosecute the chief executive of a sovereign state. That construction would, if adopted, swap one unconstitutionally unlimited interpretation for another and would, in turn, revive the very void-for-vagueness problem *Skilling* solved. This Court should reject it.

### 1.     The Text Of The Federal Bribery Statute Forecloses The Government's Construction.

The Government's position, which the district court adopted, is that the definition of "official act" in the statute outlawing bribes to federal officials applies here. That statute prohibits being improperly "influenced in the performance of any official act," defined as:

> [A]ny decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit.

18 U.S.C. § 201(a)(3), (b)(2)(A). The Government contends this text criminalizes everything officials customarily do that relates to any conceivable "matter." Under the Government's view, there is no legal difference between meeting with a major donor and awarding that donor a state contract—"[w]hatever it was, it's all official action." XI.JA.7439. The Government is wrong.

### (a)     The Text.

The statutory definition in § 201(a)(3) requires that a government official promise to exercise, or induce others to exercise, actual governmental power. That is, the official must make a decision or commitment on the sovereign's behalf on a specific matter—such as by obtaining a visa, awarding funding, or signing a bill—or induce someone else to. The text makes this clear.

*First*, the statute requires that officials be "influenced in the performance of any official act." 18 U.S.C. § 201(b)(2)(A). The official thus must "perform" official

action.  It is not enough to think about taking official action or have a subordinate gather information that might relate to future official action.  The official must, rather, "perform" official action or induce someone else to.  Prefatory steps are not themselves the "performance" of official action.  *See, e.g., Sec'y of Labor v. Ohio Valley Coal Co.*, 359 F.3d 531, 535 (D.C. Cir. 2004) (noting ordinary meaning of "perform" is "to carry out or bring about: accomplish, execute") (quotation omitted).

*Second*, the definition of "official act" reinforces this point by explaining that the official must do more than take action *pertaining* to a matter; rather, the official must make a "decision *on*" or take "action *on*" the matter.  When an official arranges a meeting, attends an event, or asks a question, he has not taken action "on" anything.  To take action "on" a matter, the official must do something to *influence* its disposition.  Setting up a meeting for a benefactor is no different from listening to the benefactor's concerns—a prefatory step that does not itself take "action" "on" whatever "matter" the benefactor cares about.

*Third*, the "matter" or "decision" must be a specific "decision[] that the government actually makes" (who gets a contract), *Jefferson*, 674 F.3d at 357 (quotation omitted), rather than some miscellaneous decision (who to call).  The statute limits "official" acts to decisions or actions that involve "question[s]," "matter[s]," "cause[s]," "suit[s]," "proceeding[s]," or "controvers[ies]" that may "by law" be "brought" before the "official, in his official capacity."  18 U.S.C. § 201(a)(3).  As the *en banc* D.C. Circuit has explained, that "six-term series" of words "refers to a class of

questions or matters whose answer or disposition is determined by the government." *United States v. Valdes*, 475 F.3d 1319, 1324 (D.C. Cir. 2007) (en banc).

Miscellaneous decisions like what events to attend are not "questions or matters" that come before an "official, in such official's official capacity" because they are not decisions the government makes. It is not enough for Governor McDonnell to appear at an event that promotes Anatabloc. He must instead take "action" "on" some specific policy concerning Anatabloc, thereby implicating an identifiable "decision[] that the government actually makes." *Id.* at 1325. In other words, he do something more specific and more connected to his official powers than generically boosting "Virginia business." The Government is thus wrong to claim that the text criminalizes every customary action related to any broadly-conceived "matter" like "(i) Virginia business development, (ii) the use of state government to promote and obtain research studies for Anatabloc[], or *even simply (iii) whether to have or attend [a particular] meeting.*" I.JA.411 (emphasis added).

The language limiting the range of cognizable "decisions" or "actions"— coupled with "on"—thus solves an otherwise-substantial "overbreadth problem." *Valdes*, 475 F.3d at 1329. If "on" just means "relating to" and "matter" includes things like "Virginia business development," then everything governors do falls within this statutory definition. When governors attend *any* event, shake *any* hand, or make *any* speech, they take actions related to "business development"—most governors' top priority. The Government's theory would expand an otherwise-precise statutory

definition to swallow all that conduct.  If the statute were such a crude catch-all, then Congress's "insistence upon an 'official act,' carefully defined," *Sun-Diamond*, 526 U.S. at 406, would make no sense.

*Finally*, the text makes clear that use of government personnel or resources is not itself "official action."  Public officials routinely ask their receptionists to answer the telephone.  But that is not an "official act," even if the official directs the receptionist to be vigilant about answering contributors' phone calls.  Such actions must still satisfy the statutory definition.

### (b)    The Supreme Court Has Already Interpreted This Text To Preclude The Government's Construction.

Consistent with this analysis, the Supreme Court has rejected the Government's every-act-counts interpretation, recognizing that it would lead to "absurdities." *Sun-Diamond*, 526 U.S. at 408.  The Court held in *Sun-Diamond* that the Government's construction "would criminalize ... the replica jerseys given [to the President] by championship sports teams each year during ceremonial White House visits"; "a high school principal's gift of a school baseball cap to the Secretary of Education ... on the occasion of the latter's visit to the school"; and "providing a complimentary lunch for the Secretary of Agriculture in conjunction with his speech to the farmers concerning various matters of USDA policy." *Id.* at 406-07.  Even if those gifts were given in exchange "for" the official's acts of "receiving the sports teams at the White House, visiting the high school, and speaking to the farmers," *id.* at

407, *they are not criminal*: "[T]hose actions—while they are assuredly 'official acts' in some sense—are not 'official acts' within the meaning of the statute." *Id.* They are taken in an *official capacity*, but implicate no *official power*. Textually, they involve no "decision" or "action on" a "question, matter, cause, suit, proceeding or controversy" pending or likely to become pending before the official.

The Government's construction would convert what *Sun-Diamond* says are *not* "official acts" *into* "official acts," causing the very "absurdities" it criticized. 526 U.S. at 407-08. "[S]peaking to [ ] farmers," for example, is certainly a customary practice of the Secretary of Agriculture, and "USDA policy" is plainly a top priority of his. *Id.* at 407. If the Secretary receives a free lunch for giving that speech, on the Government's construction, he violates the gratuity statute; and if a jury finds a *quid pro quo*, he commits bribery. Neither the Government nor the district court has ever distinguished Governor McDonnell's acts from these "absurdities."

Nor has the Government addressed *Sun-Diamond*'s general admonition that, given the phalanx of precisely-targeted ethics laws, "statute[s] in this field that can linguistically be interpreted to be either a meat axe or a scalpel should reasonably be taken to be the latter." *Id.* at 412. The Government's construction is not a "meat axe"; it is a chainsaw. "[N]ot only does the text here not require that result; its more natural reading forbids it." *Id.*

### 2.    The Circuit Courts Have Uniformly Rejected The Government's Construction.

Every circuit court to consider the Government's position has rejected it.

### (a)    Eighth Circuit.

In *United States v. Rabbitt*, 583 F.2d 1014 (8th Cir. 1978), *abrogated on other grounds by McNally v. United States*, 483 U.S. 350 (1987), Missouri's House Speaker "offered, for a fee ... , to introduce [an architectural] firm" to state officials, including its "Chief of Design and Construction," who "might be able to secure architectural contracts for it." *Id.* at 1020 & n.5. The court held this conduct was not criminal: "[W]hile Rabbitt's influence obviously helped these architects obtain state jobs, no testimony established that any state contracting officer awarded any contract ... because of Rabbitt's influence." *Id.* at 1028. As the court later explained, it reversed Mr. Rabbitt's conviction because he "promised only to introduce the firm to influential persons" and "did not promise to use his official position to influence those persons." *United States v. Loftus*, 992 F.2d 793, 796 (8th Cir. 1993).

*Rabbitt* confirms the distinction between taking action to *influence* a government decision and affording *access*. It was not criminal for Mr. Rabbitt to introduce bribe-payors to officials "and thereby gain them a friendly ear," even though their ultimate goal was "obtain[ing] state jobs." 583 F.2d at 1028. Mr. Rabbitt took official action in a *colloquial* sense, but not in the *statutory* sense. He did not exercise government power or attempt to influence other officials to do so. Taking "official" action

required the further step of "us[ing] his official position to influence those persons."
*Loftus*, 992 F.2d at 796.

Here, Governor McDonnell did not "use his official position to influence [any]
persons." *Id.* His staff understood he wanted "nothing more" than attendance at a
meeting. V.JA.3043-44, 3068. That is not criminal under *Rabbitt*.

### (b)    First Circuit.

The Government's theory also collides with Judge Boudin's opinion in *United
States v. Urciuoli*, 513 F.3d 290 (1st Cir. 2008). There, the court considered the
convictions of hospital executives who made payments to a state senator in exchange
for three types of conduct: (1) the legislator "tr[ied] to 'kill' certain bills" and took
action "with respect to pending legislative matters," *id.* at 292; (2) he met with insurers
and "delivered a barely veiled warning of potential legislative trouble" if they did not
settle a dispute favorably to the executives, "deliberately" "exploit[ing]" the "leverage"
of official powers, *id.* at 296; and (3) he contacted "mayors and other local officials
urging them to comply with Rhode Island law" in a way that benefited the bribe-
payors' hospital. *Id.* at 294.

The First Circuit reversed because, while the first two categories of conduct
were criminal, the third was not. On the first, it violates the law to pay a state senator
for the "official acts" of voting on or trying to "kill" certain bills. *Id.* at 293. On the
second, the legislator "use[d] his legislative powers as a threat to extract favorable
treatment for [the bribe-payor]," thereby "misusing his official power over

legislation." *Id.* at 297. But on the third—lobbying mayors—there was "no indication that [he] invoked any purported oversight authority or threatened to use official powers in support of his advocacy." *Id.* at 296. Merely "trad[ing] ... on the reputation, network and influence that comes with political office" or using the "access and attention" that comes with an official title, did not qualify as official action. *Id.*

    *Urciuoli* rested on the critical difference between acts that use (or threaten to use) "official power[s]," *id.* at 295-97, versus "trad[ing]" on the "reputation," "network," or prestige that "comes with political office," *id.* at 296. The latter assures "access and attention," but does not affect government decisions, *id.*, and is not an "official act." Because the district court "instructed the jury that the statute extended" beyond "formal exercises of official power," the court reversed. *Id.* at 295.

    Here, as in *Urciuoli*, none of Governor McDonnell's actions involved "threa[ts] to use official powers in support of" Williams. *Urciuoli*, 513 F.3d at 296. The essence of the charges was, rather, that Governor McDonnell was providing Williams with a "halo effect" or "credibility" via association. XI.JA.7413. Or as journalists who watched the trial put it, he was "lending" Williams "the prestige of the governor's office." Matt Zapotosky, *McDonnell Petition for Bond Is Denied*, Wash. Post, Jan. 14, 2015, at B3. Under *Urciuoli*, that is not criminal.

## (c)    D.C. Circuit.

    Nor can Governor McDonnell's conviction be squared with the D.C. Circuit's en banc decision in *Valdes*, 475 F.3d 1319, which built on earlier precedent limiting

"official act." Those decisions hold that "official" acts are ones that influence actual governmental policies.

In *Valdes*, a policeman took payments in exchange for searching a police database. *Id.* at 1321-22. The Government argued there, as here, that the bribery statute "should be construed broadly," to cover "essentially any action" that "implicates the duties" of public officials. *Id.* at 1322. Rejecting that argument, the court held the policeman had not taken "official acts," because, although searching databases fell within his official duties, he had not exercised "inappropriate influence on decisions that the government actually makes." *Id.* at 1325. Or as the D.C. Circuit later explained, the policeman had made a "purely informational inquiry," which is different from seeking "to influence" a governmental decision. *United States v. Ring*, 706 F.3d 460, 470 (D.C. Cir. 2013).

*Valdes* followed *United States v. Muntain*, 610 F.2d 964 (D.C. Cir. 1979), which involved a HUD official paid to sell group car insurance policies to labor unions he met in his job. The official "combine[d] the promotion of the automobile insurance with trips taken at government expense for the purpose of conferring with labor officials ... concerning official business." *Id.* at 966-67. There, too, the court rejected the Government's theory that "any acts within the range of an official's public duties" are "official acts." *Id.* at 967. "To the extent that [defendant's] use of his official position to promote a purely private venture created an appearance of impropriety, his conduct is reprehensible, but it is not criminal." *Id.* at 967-68.

In keeping with these decisions, D.C. district courts carefully instruct juries on "official act." In *Ring*, Judge Huvelle instructed that the term "official act" "refer[s] to a class of questions or matters whose answer or disposition is determined by the government"; that "[i]t is not illegal to give a thing of value to a public official merely to build a reservoir of good will that might ultimately affect one or more unspecified acts now or in the future"; and that "[m]ere favoritism, as evidenced by a public official's willingness to take a lobbyist's telephone call or to meet with a lobbyist," and "sharing information with the lobbyist or helping to develop a lobbying strategy," "is not an official act." II.JA.1080-83. Here, the district court rejected all similar limitations. *See infra* at 52-54, 59-63.

Governor McDonnell's acts may have been part of his "official duties," but they exerted *no* influence, much less "inappropriate influence," on any "decisions that the government actually makes." *Valdes*, 475 F.3d at 1325.

### (d)     This Court's Decision In *Jefferson*.

Against all this, the Government has argued that this Court's decision in *Jefferson* resolves this case. But *Jefferson* does not address the issues here at all. There, Congressman Jefferson had attempted to inappropriately influence numerous "decisions that the government actually makes," *Valdes*, 475 F.3d at 1325, by, among other things, obtaining a letter of endorsement to secure an Army contract, 674 F.3d at 342; pressuring Export-Import Bank officials to fund a briber-payor's company, *id.* at 343; and obtaining travel visas for bribe-payors, *id.* at 347.

Far from endorsing the Government's claim that every action Governor McDonnell took "in his official capacity" was "official action," XI.JA.7439, *Jefferson* reiterated that "the bribery statute does not encompass every action taken in one's official capacity." 674 F.3d at 356. Such an "act must yet adhere to the definition confining an official act to a pending 'question, matter, cause, suit, proceeding or controversy.'" *Id.* (quoting 18 U.S.C. § 201(a)(3)). In other words, not all settled practices constitute official acts. Such practices *can* be "official acts," but *only* if they also involve "the performance of" an "action" or "decision" "on" an actual, identifiable pending "matter" or "question." *Jefferson* merely rejected the "broad assertion that *Sun-Diamond* supersedes *Birdsall*," 674 F.3d at 356, the Supreme Court decision holding that *some* settled practices can be official acts.

Governor McDonnell has never disputed that. He has consistently maintained that his actions—while *obviously* settled practices of governors—were not "official" because they did not attempt to influence "'decisions that the government actually makes.'" *Id.* at 357 (quotation omitted). That distinction reflects the obvious difference between a Governor vaguely asking his counsel to "see me about Anatabloc issues at VCU and UVA" (this case) and a Congressman directly lobbying the Export-Import Bank to give a bribe-payor specific "financial assistance" (674 F.3d at 342). *Jefferson* never rejects *that* distinction; it expressly affirms it.

### 3.    The Government's Construction Would Criminalize Routine Political Activity.

Finally, if adopted, the Government's construction would upend the political process.  Elected officials' jobs "routinely and customarily include[] arranging meetings and hosting events," II.JA.817, which means those officials would commit felonies whenever they ask a subordinate to meet with a donor or invite a donor to a high-profile event, so long as a jury concludes the official did so "at least in part in exchange" for the donor's contributions.  XI.JA.7671.  As one Virginia lawmaker put it:  "'Technically speaking, I cannot go to a Rotary Club breakfast and eat $7 worth of eggs if somebody asks me to set up a meeting with the DMV.'"  Michael Pope, *Virginia Lawmakers Cautious About Ethics—And Eggs—After McDonnell's Conviction*, WAMU (Dec. 15, 2014).

Nor are these possibilities hypothetical; they are *routine*.  In *McConnell v. Federal Election Commission*, 540 U.S. 93 (2003), the Court described facts like: "White House coffees that rewarded major donors with access to President Clinton"; "courtesies extended to an international businessman" whose donations were "motivated by his interest in gaining the Federal Government's support for an oil-line project in the Caucasus"; and donor programs that "promised 'special access to high-ranking ... elected officials, including governors, senators, and representatives.'"  540 U.S. at 130.  "[B]oth parties promised and provided special access to candidates and senior Government officials in exchange for large soft-money contributions," *id.*, while

"national party committees actually furnish[ed] their own menus of opportunities for access ... , with increased prices reflecting an increased level of access," ranging from "bimonthly conference calls" to "private dinners" or "retreats" with legislators, *id.* at 151. These practices all involved the open "peddling [of] access" exchanged explicitly for campaign contributions, which the Court distinguished from the criminal sale of "actual influence." *Id.* at 150.[8]

Not only that, but elected officials frequently use staff to ward off favor-seekers. Arranging a meeting with a subordinate is a well-worn technique for politely *rejecting* a request. As Governor McDonnell's longest-serving aide explained, "there's just a general rule that the boss gets to give good news and the staff gives the bad news." VIII.JA.5271. Meetings with aides—which politicians offer everyone, *see, e.g.,* IV.JA.2926—are how politicians *avoid* taking official acts. That is why the only staffer who actually met with Williams during the supposed conspiracy sent him a "blow-off" email, V.JA.3081, why Governor McDonnell's counsel told Williams's attorney that the Governor would not help him, *id.* at 3215-16, and why Williams never got anything from Virginia's government during a two-year-long "conspiracy" that, if real, was the most unsuccessful bribery scheme in history.

---

[8] Other examples abound. For instance, past Virginia governors of both parties routinely accepted expensive, legal-under-state-law gifts, while spending time with, or providing access to, those furnishing the gifts. *See, e.g.,* Jim Geraghty, *Virginia's Long Tradition of Expensive Gifts to Governors,* Nat'l Rev. (Aug. 9, 2013) (citing Virginia Public Access Project website).

Governor McDonnell has repeatedly noted the serious implications of the Government's theory. The Government has brushed them aside by proclaiming that this case does not involve campaign contributions. But that is irrelevant. Campaign contributions can be bribes just as much as gifts, and taking "official acts" in exchange for contributions is a felony. *See United States v. Derrick*, 163 F.3d 799, 816-17 (4th Cir. 1998); *United States v. Hairston*, 46 F.3d 361, 372 (4th Cir. 1995). No court has ever suggested that the definition of "official act" fluctuates depending on the type of bribe. The Government has thus effectively conceded that its construction empowers federal prosecutors to investigate and prosecute every official who accepts contributions and makes referrals. That may or may not be good policy. But Congress would have to speak *much* more clearly than it has spoken here to take such a revolutionary, constitutionally questionable step.

### 4. The Court Must Resolve Any Doubt In Governor McDonnell's Favor.

Numerous canons require the Government's interpretation to be unambiguously correct. As demonstrated above, it is not.

### (a) Canon Of Constitutional Avoidance.

If one construction of a statute "would raise serious constitutional problems," courts must construe it to "avoid" those "problems unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988). The Government's construction raises

(at least) two such problems.

*First*, due process requires that criminal statutes supply "sufficient definiteness that ordinary people can understand what conduct is prohibited." *Skilling*, 561 U.S. at 402 (quotation omitted). But the Government's construction requires state officials to (1) divine that the federal corruption statutes contain a judicially engrafted "official act" element, (2) review a separate statute's definition of that element, (3) realize that, despite canons requiring narrow interpretations, *this* statute has its broadest possible meaning, (4) recognize that this broad meaning applies in Richmond even though appellate courts in Boston, St. Louis, and Washington, D.C. have rejected it, and (5) figure this out even when the "criminal" conduct is expressly not criminal under the state laws that state officials rely upon to order their affairs. Such a construction plainly does not supply "sufficient definiteness that ordinary people can understand what conduct is prohibited." *Id.* (quotation omitted). *See also infra* at 63-64.

*Second*, the Government's construction would criminalize activity the Supreme Court has held is constitutionally protected. Again, "campaign contributions ... , no less than any other payments," can be bribes. *Derrick*, 163 F.3d at 816-17. If meetings and public appearances are "official acts," the Government's theory has outlawed most political fundraising. *See supra* at 38-40. But the Supreme Court has admonished that "[i]ngratiation and access ... are not corruption." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 360 (2010). Only payments "to control the exercise of an officeholder's official duties" run afoul of these laws, *McCutcheon v. Fed. Election*

*Comm'n*, 134 S. Ct. 1434, 1450 (2014), which is why "government regulation may not target the general gratitude a candidate may feel toward those who support him or his allies, or the political access such support may afford," *id.* at 1441.

**(b)    Federalism.**

This is a prosecution by the Federal government of the highest executive officer in a sovereign State for conduct his State's laws do not criminalize.  That is a serious intrusion into state self-governance, and courts should not lightly assume Congress authorized it.  It is a "well-established principle that 'it is incumbent upon the federal courts to be certain of Congress' intent before finding that federal law overrides' the 'usual constitutional balance of federal and state powers.'"  *Bond v. United States*, 134 S. Ct. 2077, 2089 (2014) (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991)).  Thus, rather "than construe the [mail fraud] statute in a manner that leaves its outer boundaries ambiguous and involves the Federal Government in setting standards of disclosure and good government for local and state officials," the Court has insisted upon any other "rational reading[]" available.  *McNally*, 483 U.S. at 359-60.  Similar concerns for maintaining the federal-state balance have led the Supreme Court to reject sweeping interpretations of the Travel Act, *Rewis v. United States*, 401 U.S. 808, 812 (1971); the precursor to the felon-in-possession statute, *United States v. Bass*, 404 U.S. 336, 348-50 (1971); the arson statute, *Jones v. United States*, 529 U.S. 848, 858 (2000); the mail fraud statute, *Cleveland v. United States*, 531 U.S. 12, 24-25 (2000); and the Hobbs Act, *United States v. Enmons*, 410 U.S. 396, 411-12 (1973).

The Government's theory would dramatically upset that federal-state balance. At the relevant time, it was expressly not criminal in Virginia for state officials to accept unlimited gifts, Va. Code § 2.2-3103(8)-(9), including "gifts from sources on a basis so frequent as to raise an appearance of the use of his public office for private gain." Va. Code § 2.2-3103(9) ("Violations of this subdivision shall not be subject to criminal law penalties."); *see also id.* § 2.2-3103(8). This Court need not decide whether Congress has the power to override Virginia's ethical rules for its officials. What matters here is that such a breathtaking exercise of federal power would require Congress to "convey[] its purpose clearly." *Bass*, 404 U.S. at 349. It has not.

### (c)    Rule Of Lenity.

Finally, it is a cardinal rule that "an ambiguous criminal statute is to be construed in favor of the accused." *Staples v. United States*, 511 U.S. 600, 619 n.17 (1994). This rule of lenity flows from the premise that "fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed." *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 704 n.18 (1995) (quotation omitted). As the Supreme Court explained just last week, in "determining the meaning" of statutory text, "it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite." *Yates v. United States*, No. 13-7451, slip op. at 19 (U.S. Feb. 25, 2015) (plurality opinion) (quotation omitted). The

Government's novel construction of these vague statutes is not "clearly and definitely" correct; rather, it is clearly incorrect.

### B. The Government Did Not Prove That Governor McDonnell Promised Or Performed "Official Action" Under Federal Law.

If the Court rejects the Government's construction, Governor McDonnell is entitled to an acquittal. Here, there is little dispute over the material facts. The Government's case "hinges on the interpretation of an 'official act'" and whether the "five specific actions taken by McDonnell" meet that definition. II.JA.953, 955. They do not.

### 1. Email To Counsel And Senior Policy Advisor Jasen Eige.

The linchpin of the Government's case was an 11-word email from Governor McDonnell to his chief counsel. As the Government told the jury: "The best evidence in the case is the [ ] e-mail exchange." XI.JA.7616.[9] In full, that email stated: "'Please see me about Anatabloc issues at VCU and UVA. Thx.'" V.JA.3217. Mr. Eige's complete response was: "'Will do. We need to be careful with this issue.'" *Id.* That is all. Nothing else happened; indeed, neither recalled any follow-up discussion. The email contains no indication that Governor McDonnell wanted Mr. Eige to do *anything*. And indeed, Mr. Eige testified that, around this time, he called Williams's attorney and told him the Governor would *not* provide assistance.

---

[9] The Government emphasized this email partly because Governor McDonnell sent it around the same time he emailed Williams to discuss a loan, along with sending other emails on other topics. *See* IX.JA.6311-15. But nothing about that timing somehow converted this concise communication into an official act.

V.JA.3215-16 (called to "shut [Williams's] request down"). This 11-word email—the "best evidence in the case"—was not "official action." At most, it was a "purely informational inquiry." *Ring*, 706 F.3d at 470.

### 2. Healthcare Leaders Reception.

Numerous witnesses testified about the Healthcare Leaders Reception, which over 150 people attended. *See, e.g.,* IV.JA.2697-2700, V.JA.3711-19, VI.JA.4477-81. Yet nobody said Governor McDonnell mentioned Williams or Star at this event. Nor has the Government identified any specific "matter" or "question" that this event even arguably implicated. The Government has focused on the fact that, in greeting everyone, Governor McDonnell welcomed Dr. Paul Ladenson, the head of endocrinology at Johns Hopkins and a paid consultant to Star. IV.JA.2336. But in acknowledging Dr. Ladenson, Governor McDonnell never mentioned Star; he simply welcomed Dr. Ladenson as a distinguished physician (which he obviously was) from out-of-state. V.JA.3716. If merely permitting Williams to be one of the many thousands of Virginians to attend one of hundreds of events at the Executive Mansion was *itself* an official act, every President who has sold tickets to his inauguration or invited benefactors to the White House Christmas Party is a potential felon too.[10]

---

[10] Matthew Larotunda, *Obama Inauguration's Big Donor Packages Previewed*, ABC News (Dec. 8, 2012, 4:14 PM).

### 3. Suggested Meeting With Star.

Governor McDonnell possibly suggested that two subordinates meet with people from Star. The subordinates disagreed about whether he actually suggested a meeting, VI.JA.4219, 4230-31, but even if the subordinate who remembered the suggestion is correct, this is all Governor McDonnell did: He consumed an Anatabloc pill—which he took several times daily—said it was "working well for him, and that he thought it would be good for ... state employees, and then he ... asked us if we would meet with them." VI.JA.4227. Governor McDonnell did not ask his subordinates to do anything substantive. He never mentioned studies and, indeed, these subordinates had nothing to do with UVA, VCU, or the Tobacco Commission. Nor did Governor McDonnell's cryptic comments mention any other specific "question" or "matter." The subordinates never met with Star, and Governor McDonnell never mentioned it again. VI.JA.4219-20, 4230-31. There was no official action.

### 4. Meeting With Molly Huffstetler.

The only staffer who met with Williams during the course of the alleged conspiracy was Molly Huffstetler. This meeting was not about anything specific that Williams wanted Ms. Huffstetler to do. During it, Williams said nothing that Ms. Huffstetler understood "to be an ask." V.JA.3075. And within two hours of the meeting, she sent Williams a polite "blow-off" email. V.JA.3058, 3068-69. Ms.

Huffstetler repeatedly testified that Governor McDonnell never encouraged her to make *any* decision in Williams's favor; she never even spoke with the Governor:

> Q[:]  What did you understand the desires of the Governor and the First Lady to be specific to this issue?
>
> A[:]  At the time of the note, nothing more than attending the meeting.

V.JA.3044.

> Q[:]  When you wrote this email, what did you understand your job to be going forward ... ?
>
> A[:]  Nothing at the time of the written email.

V.JA.3058.

> Q[:]  So after this meeting ... you still had no idea what [Mrs. McDonnell's] desires, if any, were with respect to Mr. Williams and Star.  Is that fair?
>
> A[:]  Shy of attending the meeting, no.

V.JA.3080.  In sum, Governor McDonnell never "interfere[d] with [the] decision-making process by [Ms. Huffstetler or her] colleagues in [her] office."  V.JA.3071.

**5.    Mansion Event.**

Governor McDonnell did not take official action at the Mansion Event either. He merely attended part of the luncheon, at which Star gave $200,000 in grants to state universities (UVA and VCU).  He arrived late, welcomed the attendees, and asked a few questions.  IV.JA.2283; *see also* V.JA.3344-46 (UVA researcher: Governor McDonnell asked whether "there was some scientific validity" to the studies, whether "there was any reason to explore this further," whether this could be "good for the Commonwealth" and engaged in "more of an interrogative type ... of questioning").

His "interrogative" questions were not an attempt to influence any identifiable "matter" or "question." No witness related that Governor McDonnell asked anyone to do anything. To the contrary, Star's president testified that, in response to Williams's comment that he hoped the Governor would support an application to the Tobacco Commission, Governor McDonnell said he had "limited decision-making power" in that area. VI.JA.3927. That is politician-speak for "no."

*    *    *

In sum, Governor McDonnell asked to have one person attend one meeting and exercise independent judgment, which she did. That is not a crime. The Government has claimed otherwise by describing Governor McDonnell's actions as getting Williams "to first base." II.JA.926. But Mr. Rabbitt's efforts to "gain [the architectural firms] a friendly ear" was the first step toward their "obtain[ing] state jobs." *Rabbitt*, 583 F.2d at 1028. And in *Urciuoli*, the senator meeting with mayors was the first step toward the official action of increasing ambulance runs. 513 F.3d at 292, 295. In this case, Governor McDonnell's acts were the first steps to nowhere.

Courts have long recognized that providing procedural access might be (in intent or in effect) the "first base" en route to a substantive decision. But that does not turn the access itself—the introduction, meeting, or phone call—into "official" action. Access merely allows the government process to work; it does not corrupt it, and so "is not easily described as a deprivation of honest services, actually or

potentially harmful to the citizens." *Id.* at 295. The corruption laws are not broken so long as the officials responsible for making governmental decisions exercise independent judgment—as the evidence shows happened, and as the failure to do anything for Williams confirms. That is particularly true where, as here, none of the allegedly "official" acts involved a specific matter or question that could come before Governor McDonnell "in his official capacity." The federal corruption laws do not criminalize "first base"; they criminalize clear attempts to score. Viewed "in the light most favorable to the government," *United States v. Tresvant*, 677 F.2d 1018, 1021 (4th Cir. 1982), the evidence shows Governor McDonnell never did that. This Court should therefore enter a judgment of acquittal.

### C. At The Least, The District Court's Improper Jury Instructions Require A New Trial.

As with all purely legal questions, this Court reviews de novo whether the jury instructions misstated the law. *United States v. McLaurin*, 764 F.3d 372, 379 (4th Cir. 2014). That review takes all the instructions into account and asks whether the lay jurors reviewing this case's evidence and hearing this case's complete instructions could have convicted the defendant for legal conduct. *See, e.g.*, *United States v. Birbal*, 62 F.3d 456, 462 (2d Cir. 1995) (court must assure itself there is not a "'reasonable likelihood that the jury understood the instructions to allow conviction based on insufficient proof'" (quoting *Victor v. Nebraska*, 511 U.S. 1, 6 (1994)). Because jurors are not legal experts, jury instructions are facially erroneous when they do not explain

49

important limits on criminal liability. *See, e.g.*, *United States v. Dee*, 912 F.2d 741, 745 (4th Cir. 1990) (error to not instruct on an important limit); *United States v. Gresko*, 632 F.2d 1128, 1134-35 (4th Cir. 1980) (same). And because courts cannot know why a particular jury convicted a particular defendant, "reversal is required when a case is submitted to a jury on two or more alternate theories, one of which is legally ... inadequate" and "the jury returns a general verdict." *United States v. Moye*, 454 F.3d 390, 400 n.10 (4th Cir. 2006) (en banc). It is, after all, typically "impossible to say that the error in submitting the legally inadequate ground to the jury was harmless beyond a reasonable doubt." *United States v. Hastings*, 134 F.3d 235, 242 (4th Cir. 1998).

Further, because the purpose of jury instructions is to provide a complete picture of the governing law, defendants are "entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." *Mathews v. United States*, 485 U.S. 58, 63 (1988). It is therefore reversible error to not instruct on legally correct proposed limitations, unless those limitations are "substantially covered by the court's charge to the jury" or the Court can be sure that "failure to give the requested instruction" did not "seriously impair[] the defendant's ability to conduct his defense." *United States v. Lewis*, 53 F.3d 29, 32 (4th Cir. 1995). In short, courts must *tell* the jury about limits on criminal liability; courts cannot simply give a "general instruction" that "implie[s]" them. *Id.* at 33-34.

Here, at a minimum, a new trial is warranted. The "official act" and "quid pro quo" instructions—both going to the heart of Governor McDonnell's defense—were

incorrect and overbroad.  It is hard to imagine clearer reversible error than a district court giving incorrect instructions at the Government's request, followed by prosecutors repeatedly invoking those incorrect instructions to urge convictions for lawful conduct.  Indeed, given what happened, it is no surprise the jury *thought* the central question was:  "Would the McDonnells have received these gifts if Bob McDonnell weren't governor?"[11]  That is an obviously incorrect standard, which this Court has flatly rejected:  "Any payment to a public official ... is made because of the public office he holds."  *United States v. Taylor*, 993 F.2d 382, 385 (4th Cir. 1993).

### 1.    The District Court's "Official Act" Instruction Is Overbroad And Riddled With Errors.

While Governor McDonnell did not dispute the basic facts surrounding his "five specific actions," his principal defense was that none were "official acts" under federal law.  It was therefore critical that the jury be carefully instructed on this element.  But instead, at the Government's urging, the district court gave an unprecedented and misleading instruction that strung together a series of random passages from the Government's hand-picked cases.  In full:

> The term official action means any decision or action on any question, matter, cause, suit, proceeding, or controversy, which may at any time be pending, or which may by law be brought before any public official, in such public official's official capacity. Official action as I just defined it includes those actions that have been clearly established by settled practice as part of a public official's position, even if the action was not taken pursuant to responsibilities explicitly assigned by law.  In other

---

[11] Josh Gerstein, *Why John Edwards Won and Bob McDonnell Lost*, Politico (Sept. 5, 2014, 6:05 PM) (quoting a juror).

words, official actions may include acts that a public official customarily performs, even if those actions are not described in any law, rule, or job description. And a public official need not have actual or final authority over the end result sought by a bribe payor so long as the alleged bribe payor reasonably believes that the public official had influence, power or authority over a means to the end sought by the bribe payor. In addition, official action can include actions taken in furtherance of longer-term goals, and an official action is no less official because it is one in a series of steps to exercise influence or achieve an end.

XI.JA.7671-72. This instruction was deeply flawed.

> **(a)** **The District Court's Sweeping Instruction Allowed The Jury To Conclude That Virtually Any Action By Governor McDonnell Was "Official" Action.**

The district court's "official action" definition was the legal equivalent of a Rorschach inkblot. After quoting what is, at best, a complex statutory definition, the court defined that definition as "includ[ing]": (1) "those actions that have been clearly established by settled practice as part of a public official's position"; (2) "acts that a public official customarily performs, even if those actions are not described in any law, rule, or job description"; (3) acts over which the official lacks "actual or final authority over the end result sought by a bribe-payor so long as the alleged bribe-payor reasonably believes that the public official had influence, power or authority over a means to the end"; and (4) acts that are "one in a series of steps to exercise influence or achieve an end." The word "includes" is "a term of enlargement, and not of limitation," *Samantar v. Yousuf*, 560 U.S. 305, 316 n.10 (2010) (quotation omitted), and the district court's explanation of what the statutory definition "includes" captured practically everything officials do.

The trial court worsened its erroneously overbroad instruction by rejecting every reasonable limit, including limits that its own post-trial opinions relied on. For example, the district court agreed that "mere '[i]ngratiation and access' may not alone create a quid pro quo agreement within the meaning of the bribery statutes." II.JA.954. Yet it rejected Governor McDonnell's proposed instruction that "mere ingratiation and access are not corruption." I.JA.753. Similarly, the court agreed the Government needed to prove Governor McDonnell "attempted to use his gubernatorial position to influence governmental decisions." II.JA.956. Yet it rejected Governor McDonnell's proposal that "[t]he questions you must decide are both whether the charged conduct constitutes a 'settled practice' *and* whether that conduct was intended to or did in fact influence a specific official decision the government actually makes." I.JA.753.

The district court likewise rejected well-established limitations drawn directly from settled precedent. For example, it refused to instruct that "the fact that an activity is a routine activity, or a 'settled practice,' of an office-holder does not alone make it an 'official act,'" *id.*—a proposal drawn directly from *Jefferson*'s holding that "the jury could not rely exclusively on [] settled practices." 674 F.3d at 357. It likewise refused to instruct the jury on the central holding of *Valdes*—that the six statutory terms defining "official action" "refer to a class of questions or matters whose answer or disposition is determined by the government." I.JA.753. And it rejected numerous limitations drawn from the instructions Judge Huvelle imparted in

*Ring*—for example, that a "government official's decisions on who to invite to lunch, whether to attend an event, or whether to attend a meeting or respond to a phone call are not decisions on matters pending before the government." *Id.*

> **(b)** **Misstatements Of Law Pervaded The District Court's "Official Act" Definition.**

In defending this instruction, the Government has argued that it is "nearly identical" to the instruction this Court approved in *Jefferson*. That is false:[12]

| *McDonnell* Instruction | *Jefferson* Instruction |
| --- | --- |
| "And a public official need not have actual or final authority over the end result sought by a bribe payor so long as the alleged bribe payor reasonably believes that the public official had influence, power or authority over a means to the end sought by the bribe payor." XI.JA.7672. | "Moreover, an act on a particular question or matter may still be official even if the public official did not have authority to make a final decision or take binding action on the issue." II.JA.1143. |
| "In addition, official action can include actions taken in furtherance of longer-term goals, and an official action is no less official because it is one in a series of steps to exercise influence or achieve an end." XI.JA.7672. | *None.* |

The district court injected numerous legal errors absent from *Jefferson*.[13]

---

[12] The only portion of *Jefferson*'s "official act" instruction this Court actually approved is its settled practice instruction. *See* 674 F.3d at 353, 357.

[13] Even if the instructions were identical to *Jefferson*, it would be irrelevant. It is black-letter law that "[j]ury instructions should be drawn with reference to the

*First*, the district court made "official action" turn on what the bribe-payor "reasonably believes." That concept is absent from the *Jefferson* instructions, which merely explained that officials can take "official acts" without having "authority to make a final decision or take binding action." This district court, by contrast, instructed that a bribe-payor's *subjective* beliefs can convert *non*-official acts *into* official ones. It cannot be, however, that non-official actions became "official" just because the Government's transactionally-immunized witness thought they were.

The trial court purported to ground this instruction on cases like *Evans*, which hold that "'fulfillment of the *quid pro quo* is not an element of the offense.'" II.JA.1107 (quoting *Evans*, 504 U.S. at 268). But that principle is part of defining the quid pro quo—a completely different element of the crime, which the district court defined elsewhere. XI.JA.7669-70. This language means an official breaks the law if he promises to take "official acts" in exchange for payment, regardless of whether he keeps his promise. That principle has nothing to do with *what constitutes* an "official

---

(continued…)

particular facts of the case on trial." *United States v. Holley*, 502 F.2d 273, 276 (4th Cir. 1974) (quotation omitted). Appellate courts regularly reverse trial courts for relying on instructions from broadly similar cases when those instructions fail to address the issues in the case at hand. *See United States v. Regan*, 937 F.2d 823, 828 (2d Cir. 1991) (reversing because "a charge that is adequate and proper in one case may not play the same role in another case involving a different set of facts"); *White v. Honeywell, Inc.*, 141 F.3d 1270, 1279-80 (8th Cir. 1998); *see also United States v. Chen*, 393 F.3d 139, 147 (2d Cir. 2004) ("We do not suggest that a version of these instructions would be appropriate in every misapplication of bank funds case."). *Jefferson* involved different facts, different defenses, and different legal issues. It thus required different instructions.

act." The Government has marshaled no authority for defining "quo" (official act) using the definition of "pro" (an exchange). Nor could it, since courts are not permitted to mix, match, and rewrite the elements of a crime.

*Second*, the district court instructed that "official action can include actions taken in furtherance of longer-term goals" and that actions are "official" whenever the bribe-payor believes they exert "influence" over a "means" to an "end." But virtually anything could be in "furtherance" of some goal, as Judge Huvelle's *Ring* instructions illustrate, explaining that "sharing information with the lobbyist or helping to develop a lobbying strategy does not constitute an official act." II.JA.1083. Yet those practices *do* exert "influence" over a "means" to an "end."

*Finally*, the district court instructed that "an official action is no less official because it is one in a series of steps to exercise influence *or* achieve an end." XI.JA.7672 (emphasis added). That instruction was wrong for at least four reasons: (1) It defined "official action" circularly, presupposing the jury has already determined the action is "official." (2) It instructed that actions *become* "official" if they are "steps" toward an *actual* "official act"—expanding "official act" to include every prefatory step. (3) It instructed that actions are official if they are "steps" to "achieve an end," which once again sweeps in every prefatory step. (4) It instructed that actions are "official" if the jury decides they are "steps to exercise influence." But practically everything—attending a donor's birthday party, touting a home-state

56

business, writing a thank you note—is a "step to exercise influence." It would be absurd to claim those are all official acts.

The Government has argued that these latter two instructions come from *Jefferson*. II.JA.1107 (citing 674 F.3d at 359). But even if these elastic instructions accurately paraphrased *Jefferson*—which they do not—the section of *Jefferson* the Government has invoked comes *after* that opinion's discussion of "official acts." It expounds a different element of the offense—the "quid pro quo" (or exchange). *Jefferson*, 674 F.3d at 358 ("The instruction at the center of this challenge relates to the 'quid pro quo' element."). The district court thus once again conflated and confused two separate elements, each with different requirements: one for defining the objective "official act" (which has nothing to do with subjective intent), and the other for defining the subjective intent required to establish the "exchange" (or "pro"). That conflation effectively erased the "official act" requirement and created an entirely new crime.

### (c)    This Incorrect Instruction Was Highly Prejudicial.

The prejudice of erroneously instructing on Governor McDonnell's central defense is obvious, but the Government dispelled any doubt about prejudice by repeatedly exploiting these errors. The Government told the jury all it needed to find was that Governor McDonnell took action "in his official capacity as Governor" "on the issue of Virginia business development, which everyone who testified about it said was a [top] priority of Bob McDonnell's administration." XI.JA.7438-39. The

Government told the jury that under "the Court's instructions on the law," if Governor McDonnell said a "kind word about Virginia business," posed for any of "the photos, 400-and-some photos the defense put in evidence of making comments at different ribbon cuttings and so forth," or did "exactly as he had done hundreds of times before ... in exchange for money, it's a crime"—even if Governor McDonnell was doing "exactly as he would have done anyway." XI.JA.7439-40. In short, the Government declared: "Whatever it was, it's all official action." XI.JA.7439.

In its rebuttal—the last thing the jury heard—the Government went further. The defense's closing arguments tried to salvage an acquittal by focusing on the statutory definition that preceded the court's incorrect definition of "official act." XI.JA.7543-50. But the Government told the jury to ignore that, seizing upon the instruction that "official action" "*includes those actions*" that the incorrect expanding-instruction described. XI.JA.7608 (emphasis added). The Government thus opened its rebuttal: "[Defense counsel] talked about defining quo .... But what he failed to mention is that official action, as the judge is going to instruct you, includes those actions that have been clearly established by settled practice as part of a public official's position .... In other words, official actions may include acts that a public official customarily performs, even if those actions are not described in any law, rule or job description." *Id.* The Government argued that "action can be include [sic] actions taken in furtherance of longer term goals, and an official action is no less official because it is one in a series of steps to exercise, influence, or achieve an end."

*Id.* Given that Governor McDonnell *never disputed* his actions were settled practices, this argument's only purpose was focusing the jury *solely* on the incorrect instructions.

### 2. The District Court's Quid Pro Quo Instructions Were Erroneous Too.

The district court exacerbated these errors by refusing to include well-established limitations in its "quid pro quo" instruction. "Not every gift, favor or contribution to a government or political official constitutes bribery." *United States v. Arthur*, 544 F.2d 730, 734 (4th Cir. 1976). In particular, "a good will gift to an official to foster a favorable business climate, given simply with the generalized hope or expectation of ultimate benefit on the part of the donor, does not constitute a bribe." *United States v. Jennings*, 160 F.3d 1006, 1013 (4th Cir. 1998) (quotation omitted). The district court nonetheless refused Governor McDonnell's requests to tell the jury that "[a] gift or payment given with the generalized hope of some unspecified future benefit is not a bribe." I.JA.751, 756; X.JA.7340, 7352. The district court also refused to instruct the jury that, "if the payments were made to retain the official's services on an as-needed basis, you must still find beyond a reasonable doubt that the official accepted the payments in exchange for agreeing to perform a specific type of official acts," X.JA.7354, 7363—straight from *Jennings*, 160 F.3d at 1014 ("[A]ll that must be shown is that payments were made with the intent of securing a specific *type* of official action or favor in return."). Because a central defense theory was that Governor McDonnell believed Williams was simply trying to cultivate goodwill, the refusal to

give these instructions "seriously impaired the defendant's ability to conduct his defense." *Lewis*, 53 F.3d at 32.

Gifts given to an official "'because of his office' or ... 'motivated by the public office involved' ... [are] not evidence of wrong doing." *Taylor*, 993 F.2d at 385. That is true *even* where the gift-giver hopes to influence the official's future actions. After all, on some level, "*[a]ll* payments to elected officials are intended to influence their official conduct." *Id.* (emphasis added). And public officials are, of course, generally aware of these motives: "[N]o politician who knows the identity and business interests of his campaign contributors is ever completely devoid of knowledge as to the inspiration behind the donation." *Arthur*, 544 F.2d at 734 (quotation omitted). Bribery requires *more* than a gift-giver's desire to influence actions and an official's awareness of that desire. The official must know that things of value were given *in exchange* for the official promising to "engage in some *specific* act (or omission) or course of action (or inaction)." *Jennings*, 160 F.3d at 1019 (emphasis added).

The defense repeatedly argued at trial that Governor McDonnell viewed Williams's generosity as legitimate goodwill gifts given with, at the worst, "the generalized hope or expectation of ultimate benefit." Governor McDonnell never knew that Williams—who never personally asked him for anything—wanted specific official actions. *See, e.g.*, IX.JA.6420 ("Q[:] What do you think Jonnie Williams wanted from you? A[:] He never told me. People want different things…. I think he wanted to be friends with me…. He wanted to see his business grow."). And campaign

60

contributions—potential "quid" all the same—are a routine part of political life: "[M]y rule of thumb is every contributor wants something. The reason they donate is they expect something." VIII.JA.5908. Yet the district court refused to tell the jury about the established legal principles governing this conduct.

That refusal was especially improper because the district court's other instructions were a litany of things the Government did *not* have to prove. After defining bribery as "a quid pro quo," XI.JA.7669, the court told the jury that bribery exists "whether or not the payor actually provides the thing of value and whether or not the public official ultimately performs the requested official action or intends to do so." *Id.* The court instructed that the quid pro quo agreement need not be stated "in express terms," XI.JA.7670; that "it makes no difference that the public official may also have had another lawful motive for ... accepting the thing of value, XI.JA.7671; that "[t]he government need not prove that the thing of value caused the public official to change his position," *id.*; and that "[i]t is also not a defense that the official action was actually lawful, desirable, or even beneficial to the public," *id.*. *See also* XI.JA.7682-83 (reiterating same for Hobbs Act). In other words, the district court told the jury that it could find a quid pro quo agreement even if (1) there was no quid, (2) there was no quo, (3) Governor McDonnell never intended to provide a quo, (4) the quid pro quo agreement was never stated, (5) there was also a lawful motive for accepting the quid, (6) Governor McDonnell never changed his position on any issue as a result of the quid, and (7) all of the Governor's actions were consistent with

good-faith performance of his public duties and actually benefited Virginians.

Bribery schemes fitting this description are extraordinarily difficult to distinguish from a public official accepting goodwill gifts and then making honest decisions free from inappropriate influence. It was thus essential that the district court explain what types of conduct are *not* illegal. Yet the court refused *every* limitation on its otherwise-all-encompassing instructions.

The court's refusal to do so was clearly harmful. The Government conceded there was no express agreement or explicit promise to take official action. XI.JA.7614. And there was substantial evidence that Governor McDonnell had no implicit agreement either. Williams conceded that Governor McDonnell never *said* he would do anything specific, IV.JA.2260-61 (Williams agreeing Governor McDonnell never said "'I guarantee you I'll get that done,' or anything like that"). He asserted, rather, only vague hopes for unspecified "help" at some indeterminate time. *See, e.g.*, III.JA.2234 ("Q[:] Okay. Why did you agree to loan $50,000 and give $15,000 to the Governor? A[:] I needed—I needed his help."); IV.JA.2294 ("I thought I had an understanding she was helping me, they were helping me with my company ... "); IV.JA.2321-22 ("Q[:] Well, why are you loaning the money? A[:] I'm loaning him money to help me."). There was thus substantial evidence that Williams was giving goodwill gifts.

The district court's refusal to instruct the jury on the limitations in *Arthur*, *Taylor*, and *Jennings* "effectively deprived the jury of the opportunity to consider

[Governor McDonnell's] defense." *United States v. Hurwitz*, 459 F.3d 463, 482 (4th Cir. 2006). For that reason, too, reversal is required. *See id.*; *see also, e.g.*, *United States v. Ricks*, 573 F.3d 198, 203-04 (4th Cir. 2009) (reversing for not instructing on theory of defense).

### D.    The Government's Construction Renders The Hobbs Act And Honest Services Statute Unconstitutionally Vague.

Finally, if the Government's construction is correct, the Hobbs Act and honest services statute are unconstitutionally vague. For a statute to survive a vagueness challenge, it must pass two tests: "'[A] penal statute [must] define the criminal offense [1] with sufficient definiteness that ordinary people can understand what conduct is prohibited and [2] in a manner that does not encourage arbitrary and discriminatory enforcement.'" *Skilling*, 561 U.S. at 402-03 (quoting *Kolender v. Lawson*, 461 U. S. 352, 357 (1983)). The Government's construction flunks both.

*First*, as explained above, the Government has identified nothing that put Governor McDonnell on notice that his actions violated federal law. *See supra* at 41. *Second*, the breadth of the Government's construction would "encourage arbitrary and discriminatory enforcement." *Skilling*, 561 U.S. at 402-03 (quotation omitted). On the Government's unbounded view, "official act" includes essentially everything an official does—discussing an issue, attending an event, making a referral, or giving a speech. If that is correct, then prosecutors can pick their targets, since officials routinely do such things in close proximity to accepting contributions, travel, or other

63

benefits.

This case vividly illustrates the risk of discriminatory prosecution. One of the Government's primary witnesses was Mrs. McDonnell's former Chief of Staff, Mary-Shea Sutherland. Ms. Sutherland, a public official, did favors for Williams that were more extensive than anything Governor McDonnell did. Ms. Sutherland arranged meetings, V.JA.3420-21, attended Star-sponsored research symposia on official time, V.JA.3407, 3428, assisted Williams in planning an event at the Mansion, V.JA.3443-48, and had private meetings with Williams, V.JA.3464. And Ms. Sutherland did these things at the same time that Williams bought her a designer dress, V.JA.3388-90, flew her around on his private jet, V.JA.3491, 3521, treated her to a stay and spa treatment at a luxury hotel, V.JA.3491, and promised her a lucrative job at his company that would commence right after the mansion event she helped plan, V.JA.3496-98; *see generally* XI.JA.7923-25. Yet the Government's arguments lionized Ms. Sutherland, XI.JA.7416 ("there was an air about her that you could tell when she worked for these people, she was the only adult in the room"), at the same time they accused Governor McDonnell of "wrapping him[self] in the flag of the Commonwealth" after he "stomped on it by selling out his office," XI.JA.7471.

## II. The District Court Failed To Conduct Adequate Voir Dire On Pretrial Publicity.

As detailed *supra* at 11-13, virtually every potential juror admitted having read or heard about the case. Despite that exposure to overwhelmingly negative publicity,

the district court limited voir dire on this issue to asking the prospective jurors *en masse* to sit down if they felt they could be fair. That perfunctory voir dire violated Governor McDonnell's "Sixth Amendment right to an impartial jury," *United States v. Lancaster*, 96 F.3d 734, 738 (4th Cir. 1996), requiring a new trial with a properly vetted jury.

### A. Voir Dire Must Provide "Reasonable Assurance" That Bias Or Partiality Will Be Discovered.

The Sixth Amendment requires that trial courts conduct sufficient voir dire to "provide a reasonable assurance that prejudice would be discovered if present." *Lancaster*, 96 F.3d at 740 (quotation omitted). In high-publicity cases, "trial courts must be vigilant to ensure that jurors are not biased and trials are not compromised by media attention." *United States v. Bakker*, 925 F.2d 728, 734 (4th Cir. 1991). Empanelling an impartial jury requires "a careful *voir dire*." *Id.*; *see also United States v. Blitch*, 622 F.3d 658, 665 (7th Cir. 2010).

"'[T]he court *must ascertain* if any jurors who had been exposed to such publicity had read or heard the same. *Such jurors who respond affirmatively must then be examined, individually and outside the presence of the other jurors, to determine the effect of the publicity.*'" *United States v. Hankish*, 502 F.2d 71, 77 (4th Cir. 1974) (quoting *Margoles v. United States*, 407 F.2d 727, 735 (7th Cir. 1969)) (emphases added).[14] Courts cannot accept

---

[14] The Government has tried to distinguish *Hankish* on ground that it involved publicity that arose *during* trial. II.JA.1114. But that distinction makes no difference to the court's obligation to ascertain the effects of publicity; hence this Court's reliance on *Hankish* in the *pre*trial publicity context, too. *See, e.g., Goins v. Angelone*, 226

assurances of impartiality at face value. Rather, the court must determine "whether the juror can lay aside any impression or opinion due to the exposure" since the "juror is poorly placed to make a determination as to his own impartiality." *United States v. Davis*, 583 F.2d 190, 197 (5th Cir. 1978); *see also Bakker*, 925 F.2d at 734 (individual questioning is the "proper way" to impanel a jury).

This level of inquiry is what the Supreme Court approved in *Skilling*. There, the Court rejected the challenge to voir dire only after finding that the trial court: (1) "initially screened venire members by eliciting their responses to a comprehensive questionnaire," *Skilling*, 561 U.S. at 388; (2) "examined each prospective juror individually, thus preventing the spread of any prejudicial information to other venire members," *id.* at 389; (3) "repeatedly admonished that there were 'no right and wrong answers to th[e] questions,'" *id.* (citation omitted); and (4) accorded the parties "an opportunity to ask follow-up questions of every prospective juror brought to the bench for colloquy," *id.* The Court held that "[t]his face-to-face opportunity to gauge demeanor and credibility, coupled with information from the questionnaires regarding jurors' backgrounds, opinions, and sources of news, gave the [trial] court a sturdy foundation to assess fitness for jury service." *Id.* at 395. And three justices *still* dissented: "The District Court's inquiry lacked the necessary thoroughness and left

---

(continued…)

F.3d 312, 325 (4th Cir. 2000), *abrogated on other grounds by* 236 F.3d 149, 160 (4th Cir. 2000) (en banc).

serious doubts about whether the jury empanelled to decide Skilling's case was capable of rendering an impartial decision based solely on the evidence presented in the courtroom." *Id.* at 427 (Sotomayor, Stevens, Breyer, JJ., dissenting in part).

Appellate courts thus regularly vacate convictions where the trial court relied "solely on a juror's assertion of impartiality." *United States v. Pratt*, 728 F.3d 463, 470 (5th Cir. 2013). In *Davis*, for example, the Fifth Circuit held it was inadequate to merely ask prospective jurors to raise their hands "if [they] felt the publicity impaired [their] ability to render an impartial decision" without examining "each panel member individually regarding the opinions held because of the publicity." 583 F.2d at 196. The trial court "should have determined what in particular each juror had heard or read and how it affected his attitude toward the trial, and should have determined for itself whether any juror's impartiality had been destroyed." *Id.*; *see also, e.g.*, *United States v. Beckner*, 69 F.3d 1290, 1293-94 (5th Cir. 1995); *Silverthorne v. United States*, 400 F.2d 627, 638 (9th Cir. 1968).

## B. The District Court's Voir Dire Did Not Provide "Reasonable Assurance" That Bias Would Be Discovered.

Here, the district court's voir dire on pre-trial publicity was wholly inadequate. It is clear that "pretrial publicity about the case raised a significant possibility of prejudice." *Pratt*, 728 F.3d at 470 (quotation omitted); *see generally* I.JA.254-84 (gathering examples). And it is equally clear "that the district court's voir dire

procedure failed to provide a reasonable assurance that prejudice would be discovered." *Pratt*, 728 F.3d at 470 (quotation omitted).

As noted *supra* at 22, the trial court asked no individual questions about bias resulting from pretrial publicity and forbade the parties from doing so either. All the court did was ask prospective jurors standing over 100 feet away to collectively stand if they had heard about this case, and then sit if they thought they could be fair. It is difficult to imagine less useful voir dire than the *en masse*, peer-pressure-maximizing, stand-up-sit-down method the trial court deployed. Unlike in *Bakker*, the court did not question "potential jurors about exposure to pre-trial publicity including specific media reports, about exposure to the opinions of others, [or] about the juror's personal opinions about the case." 925 F.2d at 733. Nor did the court "follow[] up with each [prospective juror] individually to uncover concealed bias," as in *Skilling*. 561 U.S. at 395. There was no "face-to-face opportunity to gauge demeanor and credibility." *Id.* Rather, the trial court "simply [took] venire members who proclaimed their impartiality at their word"—here, by silently sitting. *Id.* at 394. That blind reliance on each "juror's assertion of impartiality," *Pratt*, 728 F.3d at 470, did not provide "reasonable assurance" that bias would be discovered. *Lancaster*, 96 F.3d at 740 (quotation omitted).

The Government has defended this cursory process by citing the juror questionnaire. But in contrast to the *Skilling* questionnaire—which asked detailed questions about potential jurors' opinions, *see* 561 U.S. at 371 n.4—the court-prepared

questionnaire here did not ask what specific publicity prospective jurors had seen or heard, what they remembered, or, most importantly, whether they had formed opinions about guilt or innocence. The only opinion-oriented question it asked was whether prospective jurors had "expressed an opinion about this case or about those involved to anyone," I.JA.593—a question that was clearly under-inclusive since many people have strong opinions they keep to themselves.

In sum, "[t]he court should have determined what in particular each juror had heard or read and how it affected his attitude toward the trial, and should have determined for itself whether any juror's impartiality had been destroyed." *Davis*, 583 F.2d at 196. It did not. Governor McDonnell is therefore entitled to a new trial.

## III. The District Court Erred By Refusing To Sever The McDonnells' Trials.

Trying co-defendants together is a doctrine of judicial economy, whereas the right to be judged on the basis of all available evidence goes to the core of criminal justice. That is why, "if a 'substantial degree of prejudice' springs from a joint trial, a severance is mandated." *United States v. Shuford*, 454 F.2d 772, 776 (4th Cir. 1971). Here, the Government charged Governor McDonnell and his wife with conspiring; thus, Mrs. McDonnell's testimony was critically important to her husband's defense. That is particularly true given the district court defining "official act" to capture every act Governor McDonnell took, which made the entire case turn on whether the jury inferred a corrupt agreement. The district court's refusal to grant severance so Mrs. McDonnell could provide exculpatory testimony about that critical issue was error.

And its refusal to *even read* Governor McDonnell's evidence in support of severance abused its discretion.  This, too, requires reversal.

### A.    Governor McDonnell Was Entitled To A Separate Trial.

Severance is mandatory "where one defendant's case rests heavily on the exculpatory testimony of his co-defendant, willing to give such testimony but for the fear that by taking the stand in the joint trial he would jeopardize his own defense." *Shuford*, 454 F.2d at 776.  Obtaining a severance based "on the asserted need for a co-defendant's testimony," *United States v. Parodi*, 703 F.2d 768, 779 (4th Cir. 1983), requires a defendant to show:  "(1) a bona fide need for the testimony of his co-defendant[,] (2) the likelihood that the co-defendant would testify at a second trial and waive his Fifth Amendment privilege[,] (3) the substance of his co-defendant's testimony[,] and (4) the exculpatory nature and effect of such testimony."  *United States v. Medford*, 661 F.3d 746, 753 (4th Cir. 2011) (quoting 703 F.2d at 779).  Once the defendant satisfies these requirements, the court considers (1) "the significance of the testimony in relation to the defendant's theory of defense," (2) "the extent of prejudice caused by the absence of the testimony," (3) "judicial administration and economy," (4) "the timeliness of the motion," and (5) "the likelihood that the co-defendant's testimony could be impeached."  *Parodi*, 703 F.2d at 779.  Governor McDonnell satisfied this test.

### 1. Governor McDonnell Made The Necessary Threshold Showing For Severance.

Governor McDonnell satisfied the four threshold factors. As to the first, third, and fourth factors, Mrs. McDonnell's counsel provided a declaration explaining that her testimony would have exculpated Governor McDonnell by refuting the assertions that (1) the McDonnells conspired to corruptly accept gifts and loans in exchange for abusing Governor McDonnell's office, XII.JA.7927-34 ¶¶5-9, 11-15, 17, 19, 21-24; (2) Governor McDonnell was aware of many of Williams's gifts to Mrs. McDonnell, XII.JA.7927 ¶¶5-6; (3) Governor McDonnell agreed to help obtain studies, XII.JA.7931-34 ¶¶16, 18-20, 24; and (4) Mrs. McDonnell solicited certain gifts and loans, XII.JA.7928-29 ¶9, 7933-34 ¶¶22, 25-26. Given "the exculpatory nature" and "substance" of this testimony, the declaration easily demonstrated Governor McDonnell's "bona fide need." *Parodi*, 703 F.2d at 779.

*Second*, Governor McDonnell had a "bona fide need" because his wife was the *only person* who could offer that exculpatory evidence. *Id.* Other than Williams, only she could testify about their conversations, and only she could corroborate her husband's accounts of their interactions. Her corroboration would have completely changed the dynamic of a trial throughout which the Government portrayed Governor McDonnell as a liar who threw his wife under the bus. *See* XI.JA.7627 ("[m]ost sad of all, his wife getting blamed"), XI.JA.7631 ("what makes more sense is that Governor McDonnell is willing to throw his wife under the bus").

*Finally*, Governor McDonnell satisfied the fourth *Parodi* factor because it was "like[ly] that [Mrs. McDonnell] would testify at [his] trial and waive [her] Fifth Amendment privilege." 703 F.2d at 779. Governor McDonnell only needed to show a "reasonable probability ... that the proffered testimony would, in fact, materialize," *Shuford*, 454 F.2d at 778, and Mrs. McDonnell's counsel expressly indicated that she would likely testify in a severed trial, regardless of whether her trial was first or second. *See* XII.JA.7926-27 ¶¶3-4, 7935 ¶28.

## 2.    The District Court's Refusal To Sever Was Highly Prejudicial.

Governor McDonnell satisfied *Parodi*'s second stage too. Mrs. McDonnell's testimony would have been highly significant "in relation to [his] theory of defense." *Parodi*, 703 F.2d at 779. For example, her testimony confirmed that he never accepted anything with the understanding that he would assist Williams, *see* XII.JA.7931-34 ¶¶16, 18-20, 24, and corroborated Governor McDonnell's testimony that he did not know about many of her interactions with Williams, XII.JA.7927-34 ¶¶5-9, 11-15, 17, 19, 21-24.

Further, depriving Governor McDonnell of his wife's testimony caused substantial "prejudice." *Parodi*, 703 F.2d at 779. The Government cast Mrs. McDonnell as its central villain. It argued, for instance, that she asked Williams to take her on an expensive shopping trip, I.JA.88 ¶23; III.JA.2222-23; promised to seat Williams next to Governor McDonnell at an event, I.JA.88 ¶24; III.JA.2222; asked

Williams for a $50,000 loan, and to pay for catering at her daughter's wedding, I.JA.88-89 ¶¶26-27; III.JA.2230-31; was a conduit for correspondence from Williams, I.JA.92 ¶41, 96 ¶54, 99-100 ¶64; IV.JA.2251-52; IX.JA.6640, 6665-66; asked Williams for the Rolex, I.JA.95 ¶50, 101 ¶68; IV.JA.2274; organized the lunch at the Mansion, I.JA.92 ¶40, 95 ¶51, 97 ¶58, 97-98 ¶60; IV.JA.2278-82, V.JA.3442-48; coordinated with Williams on inviting guests to the Healthcare Leaders Reception, I.JA.97-98 ¶60, 102-3 ¶74; IV.JA.2334-36; and asked Governor McDonnell's counsel to follow-up with Williams, I.JA.103-4 ¶¶76-78; V.JA.3211-14. Given Mrs. McDonnell's omnipresence in the Government's allegations, her testimony was essential to refute them.

Considerations of "judicial administration and economy," *Parodi*, 703 F.2d at 779, pale in comparison. There were only two defendants, such that severing would mean just two trials instead of one. And Mrs. McDonnell's case would likely have been resolved *without* trial had the Government prosecuted her husband first.

Finally, Mrs. McDonnell's testimony was not likely subject to impeachment. *Parodi*, 703 F.2d at 779. Much of her testimony would have concerned conversations with Williams. Given Williams's extraordinary immunity deal—and his incredible inability to recall basic facts—her testimony would have been at least as believable as his. She also would have corroborated Governor McDonnell, with their testimony pitted against Williams. "In a situation where the elusive quality of credibility is of

such importance, the jury should have the benefit of all relevant testimony likely to shed light on the situation." *Shuford*, 454 F.2d at 777.

In short, Mrs. McDonnell's testimony would have been pivotal. But because there was no severance, she did not testify. As in *Shuford*, "the denial of the severance, resulting in withholding this witness' testimony on such [] critical point[s], so tipped the scales against [Governor McDonnell] that he failed to receive a fair trial." *Id.*

### B. The District Court's Basis For Denying Severance Was An Abuse Of Discretion.

Rather than conduct this analysis, the district court refused to even read the declarations Governor McDonnell filed. Because the declaration of Mrs. McDonnell's attorney exposed the defendants' entire trial strategy, Governor McDonnell asked the court to review it *ex parte*. This was necessary to "minimize any burdens on [the] defendant's Sixth Amendment right to prepare and present a full defense at trial." *United States v. Lindh*, 198 F. Supp. 2d 739, 744 (E.D. Va. 2002). It was also what two prior district courts managing criminal charges involving spouses had done. *See United States v. Carona*, No. SA CR-06-224-AG, 2008 WL 1970221, at *1 (C.D. Cal. May 2, 2008); *United States v. Fastow*, 269 F. Supp. 2d 905, 906-07 (S.D. Tex. 2003).

The court, however, refused to even read the declarations unless they were first provided to the Government. It further refused Governor McDonnell's alternative request to reconsider severance at a later date when the prejudice would be mitigated.

I.JA.487. And it did so even though the Government did not produce *any* witness-interview reports (or *Brady* material) until over a month later. *See* I.JA.213 § IV (Jencks/*Giglio* materials not produced until "45 calendar days before trial"). The Government fully recognized and aggressively exploited this advantage, shielding *its* strategy for as long as possible despite demanding that Governor McDonnell reveal his three months before trial. *See* I.JA.173 (attacking a so-called "thinly veiled attempt" by the defense to ascertain the Government's "legal theory of the case ... in advance of trial") (quotation omitted).

The district court's error is particularly clear in light of its refusal to accept a declaration from Governor McDonnell's counsel detailing maritally-privileged communications. Governor McDonnell intended to introduce marital communications, but his wife intended to block their introduction in a joint-trial. Sharing privileged information with an adversary waives the privilege. *See, e.g.*, *Hawkins v. Stables*, 148 F.3d 379, 384 n.4 (4th Cir. 1998). By requiring Governor McDonnell to disclose maritally-privileged materials in order to invoke marital privilege as a basis for severance, the district court required Governor McDonnell to *waive* privilege in order to *invoke* it.[15]

---

[15] Mrs. McDonnell waived marital privilege during trial, long after the district court refused to consider that evidence.

IV.    **The District Court Made Numerous Prejudicial Evidentiary Errors At Trial.**

Finally, the district court made numerous erroneous evidentiary rulings. While none of these errors matter if this Court agrees with Governor McDonnell about the meaning of "official act," they were extremely prejudicial under the Government's legal theory. That is because, even under the Government's theory, this case was all otherwise-legal quid, marginal quo, and only ephemeral pro via "knowing winks and nods." XI.JA.7614. In other words, the district court's broad "official act" instruction made everything turn on whether there was an implicit "agreement" to exchange, say, an 11-word email for a loan. The entire case thus depended on whether the jury believed Governor McDonnell, or credited Williams's claim to have a wink-and-nod-based understanding that Governor McDonnell would "help."

In circumstantial, credibility-intensive cases, "[e]vidence that tend[s] to erode [the defendant's] credibility and to prejudice the jury against him [can have] a substantial—perhaps overpowering—impact on the jury's deliberations." *United States v. Hands*, 184 F.3d 1322, 1332 (11th Cir. 1999) (citing four cases). That is why the Government fought so hard to win these evidentiary battles, and it is why courts routinely reverse convictions for errors like these, particularly where "the chief witness was an informant of questionable credibility." *Id.* at 1331 (quotation omitted). Each of these errors supplies an independently sufficient basis for reversal. Collectively, they demand it. *See, e.g., United States v. Frederick*, 78 F.3d 1370, 1381 (9th

Cir. 1996) ("Where, as here, there are a number of errors at trial, a balkanized, issue-by-issue harmless error review is far less effective than analyzing the overall effect of all the errors in the context of the evidence introduced at trial against the defendant.").

### A. The District Court Erroneously Excluded All Evidence Explaining Williams's Extraordinary Immunity Deal To The Jury.

The Government gave Williams transactional immunity not only for potential public corruption charges and lying to federal agents, but also for unrelated securities and tax crimes exposing him to decades in prison and tens of millions of dollars in fines and restitution. *See* XI.JA.7918. Granting transactional—rather than use—immunity is "exceedingly rare."[16] Granting a *second* transactional immunity deal on the eve of trial for *unrelated and unspecified* crimes is unheard of. Governor McDonnell thus sought to introduce expert and lay testimony to explain the scope, meaning, and value of Williams's deal. That was necessary because Williams's immunity letter never explained what "transactional immunity" means, or even what specific crimes Williams was being immunized for. XI.JA.7918; *supra* at 10-11. The district court, however, rejected every effort by Governor McDonnell to elucidate this deal. Those decisions were based on incorrect legal premises and were abuses of discretion. *See*

---

[16] *Jonnie Williams Granted "Blanket Immunity" in McDonnell Case*, NBC29 (July 28, 2014, 9:02 PM) ("white collar practitioners have noted that in their 15, 20, 25 year careers they've never seen it").

*United States v. Basham*, 561 F.3d 302, 326 (4th Cir. 2009) ("An error of law [underpinning an evidentiary ruling] is, by definition, an abuse of discretion.").

*First*, the court erroneously excluded the testimony of Peter White, an expert who would have explained transactional immunity, its value, and its uniqueness. *See* I.JA.717-18. That testimony satisfied the "liberal" *Daubert* standard. *Johnson v. Mead Johnson & Co., LLC*, 754 F.3d 557, 562 (8th Cir. 2014). As an experienced defense lawyer and former EDVA prosecutor, Mr. White's testimony was reliable. And it was relevant to helping the jury understand Williams's deal so it could assess his credibility.

The court gave two reasons for rejecting this testimony, both legally erroneous. First, the court ruled that *United States v. Allen*, 716 F.3d 98 (4th Cir. 2013), holds that expert testimony is inadmissible to explain plea agreements. I.JA.717. But Williams did not enter a plea agreement. He had a transactional immunity agreement far more opaque than any plea deal. While an average juror could understand a promise to seek 3-years' imprisonment instead of 10, one could not readily understand what transactional immunity—or this particular deal—actually entailed. More importantly, blanket rules regarding expert testimony are "erroneous as a matter of law" because *Daubert* requires "a particularized determination in each case." *United States v. Belyea*, 159 F. App'x 525, 530 (4th Cir. 2005). The court ignored that analysis.

The district court also held that Mr. White's testimony was inadmissible under Fed. R. Evid. 702 because it evaluated credibility. *See* I.JA.717-18. That is wrong. Mr. White would have explained Williams' immunity deal so *the jury* could assess

78

credibility. *See* I.JA.770. While courts properly exclude expert witnesses who opine on whether a witness is credible, "a court may not exclude expert testimony simply because it concerns a credibility question." *United States v. Shay*, 57 F.3d 126, 134 (1st Cir. 1995). For example, in *United States v. Mathis*, the Third Circuit found an abuse of discretion for excluding an expert witness who would not have told the jury whether a witness "was lying or telling the truth" but would have provided "information that ... might cause the jury to evaluate [the witness] in a different light." 264 F.3d 321, 340 (3d Cir. 2001). Here, Mr. White would not have opined on whether Williams was lying. *See* I.JA.770. He would have simply explained the technical aspects of Williams's otherwise-inscrutable deal, so the jury could understand it.

*Second*, the court excluded all lay testimony about the historic singularity of Williams's deal. The court barred defense counsel from cross-examining an FBI Special Agent about it, VII.JA.5064, even though that testimony would have aided the jury. *See United States v. Hassan*, 742 F.3d 104, 136 (4th Cir. 2014). The court even forbade defense counsel from asking *Williams himself* about his "understanding" of whether his deal was "unusual." IV.JA.2778. Williams' own understanding was obviously admissible, since his incentive to lie is stronger if he understands that he received a better deal than any other witness in modern history.

*Finally*, these errors were prejudicial, since this testimony was the *only* way to explain Williams's deal. Absent this evidence, it was virtually impossible to fully cross-examine Williams, who claimed he did not even know what his deal meant. For

example, when asked about transactional immunity: "I don't know—I don't know that part right there."  IV.JA.2777; *see also* IV.JA.2782 ("I didn't understand it very well.").  And when asked what other crimes he was immunized for, he claimed befuddlement.  *See* IV.JA.2780 ("Q[:] And so that could include tax violations with respect to the trusts ... ?  A[:] I don't know if it included taxes or not.").  Williams even claimed he did not "know if [he] asked for" his immunity deal, IV.JA.2510, testified that his other crimes were "not something I was worried about," IV.JA.2510-11, and proudly declared "I don't think there was any criminal activity there," IV.JA.2511.  These were all preposterous claims a recalcitrant witness could never make about a plea agreement.  Yet Governor McDonnell was prevented from introducing *any* evidence enabling the jury to see that.  Given the centrality of Williams's testimony, this error was severely prejudicial, *see, e.g.*, *United States v. Smithers*, 212 F.3d 306, 317 (6th Cir. 2000), and warrants a new trial.

**B.  The District Court Erroneously Admitted Prejudicial Evidence About Governor McDonnell's State Disclosure Forms, While Excluding Expert Testimony Explaining It.**

The court simultaneously (1) over Governor McDonnell's Rule 403 objection, *see* I.JA.650, 735, allowed the Government to introduce evidence regarding his Statements of Economic Interest ("SOEIs"), a complex disclosure form that Virginia officials file annually, and (2) barred Governor McDonnell from presenting expert testimony explaining that form.  I.JA.719.  These interrelated decisions were error.

The SOEI evidence was highly prejudicial but only marginally relevant, given the district court's ruling and instruction that "there is no suggestion, and there will be none at trial, that [Governor] McDonnell violated Virginia's ethics laws or reporting requirements." I.JA.760. The Government raised Governor McDonnell's SOEIs with no fewer than 6 government witnesses. V.JA.3030-36, 3183-3208, 3278-93, 3297, 3807-08; VI.JA.3858-66, 3882-83, 4112-19. It harped on the topic repeatedly during his cross-examination, devoting more than 40 transcript pages to SOEI-related issues. IX.JA.6620-24, 6666-96; X.JA.6757-58, 6859-66. The Government suggested throughout the trial that Governor McDonnell's disclosures were improper even when they *complied* with Virginia law. *Compare, e.g.*, X.JA.6866 (Question: "[N]owhere on this form does it say Mr. Williams gave your wife a $50,000 personal loan, right?"), *with* IX.JA.6695 (Governor McDonnell's Answer: "[T]he form doesn't require anything but the occupation or principal business of the donor."). In closing, the Government argued that Governor McDonnell violated the "purpose" of Virginia's disclosure laws by not volunteering information he did not have to disclose: "The purpose of those SOEI forms, as even he agreed to on the stand, was so that the citizens of Virginia could assess for themselves the financial interest between their elected officials and donors and gift givers," yet "[Governor] McDonnell was not disclosing [certain things] on the SOEI." XI.JA.7621. This was all an effort to confuse the jury into seeing concealment where none existed.

It is unclear why the court or the Government believed this evidence was even legally relevant. If Governor McDonnell's forms complied with Virginia law—as the court ruled—then they are not evidence of wrongdoing and should have been excluded. But at a minimum, Governor McDonnell should have been permitted to introduce expert testimony to explain what they required. The SOEI form includes twelve separate schedules and is filled with legal jargon, *see* XI.JA.7899 (blank SOEI Form); its requirements and purposes are far from clear. Expert testimony was necessary to rebut the insinuation that Governor McDonnell acted *corruptly* by completing the forms *correctly*. Yet the court barred expert testimony, while letting the Government use this evidence however it wanted. I.JA.721. That heads-I-win, tails-you-lose dichotomy violated Rules 403 and 702.

## C. The District Court Erroneously Admitted Irrelevant And Prejudicial Hearsay About Governor McDonnell's Supposed Desire For Free Golf.

The district court likewise abused its discretion by allowing the Government to introduce, over objection, an email from Adam Zubowsky (who did not testify) to a McDonnell aide describing past actions Mr. Zubowsky had supposedly taken to organize free golf for Governor McDonnell. *See* XI.JA.7921; IX.JA.6706-08. In its post-trial rulings, the district court acknowledged that this email was inadmissible hearsay. II.JA.972. It was also prejudicial character evidence admitted in violation of Rule 404(b). *See United States v. Queen*, 132 F.3d 991, 995-96 (4th Cir. 1997). The district court, however, erroneously held that this error was harmless. II.JA.972.

This email purported to summarize Governor McDonnell's desire for his assistant to "find out who we known [sic] in these cities, that owns golf courses and will let [him] and [his] family play for free, or at a reduced cost" and to then "[p]ut everything into a nice briefing, so when you meet with him, you have ever[y] offer you can think of, on paper," as well as "go to the golf course websites, brief off the general info, and also copy and paste it into the briefing form, so he can pick based on the type/description of the course." XI.A.7921. The Government squeezed all the prejudice from this email it could, thundering at Governor McDonnell about "getting briefing books with golf courses and picking out which one you wanted to go for free or at a reduced cost?" IX.JA.6708. This email was central to portraying Governor McDonnell as a greedy politician on the take. Particularly given the Government's myopic focus on the "three grand in golf gear and food he rang up on Jonnie Williams' tab at Kinloch," XI.JA.7445, this evidence was not "harmless beyond a reasonable doubt." *Gregory v. North Carolina*, 900 F.2d 705, 710 (4th Cir. 1990).

### D. The District Court Erroneously Admitted Irrelevant And Prejudicial Evidence About Governor McDonnell's Receipt Of Unrelated Gifts.

Over Governor McDonnell's objection, *see* I.JA.650, 735, the district court violated Rule 404(b) and Rule 403 by allowing the Government to introduce irrelevant, prejudicial evidence concerning Governor McDonnell's acceptance of an expensive vacation from a wealthy friend that Governor McDonnell (properly) did not disclose on his SOEI. *See* V.JA.3287-93.

For evidence to be admissible under Rule 404(b), it "must be relevant to an issue other than character," *Queen*, 132 F.3d at 995, such as intent or absence of mistake, Fed. R. Evid. 404(b)(2). The court admitted this evidence because it showed "[Governor] McDonnell's knowledge of the personal friend exception to Virginia's SOEI reporting requirements" and thus his "absence of mistake" in using that exception to conceal gifts from Williams. I.JA.760. But Governor McDonnell *never* invoked that exception for Williams's gifts. IX.JA.6342-43; X.JA.6969. The court's stated basis for admitting this evidence was thus incorrect. What the Government *really* introduced this evidence to show was, again, that Governor McDonnell was a greedy politician who took lavish vacations no juror could afford, which he did not disclose. That, too, was factually inaccurate and extremely prejudicial.

### E. The District Court Erroneously Ordered Governor McDonnell To Surrender The Contents Of Williams's iPhone After The Government Produced It Pursuant To Rule 16.

Finally, the district court erred when it ordered Governor McDonnell to relinquish a forensic image of Williams's iPhone that the Government produced pursuant to Fed. R. Crim. P. 16. In that order—which Governor McDonnell attempted to appeal at the time, *see* II.JA.993-94—the court ordered him to surrender this evidence after sealed, ex parte, collusive litigation between the Government and Williams. The court identified no exception to Rule 16 requiring this evidence's surrender, basing its Order on its "inherent supervisory power over grand jury proceedings." II.JA.1269. After trial, however, the district court concluded that this

evidence was not actually grand jury material, holding that the Government's original request for Williams's iPhone "does not reveal some 'secret aspect' of the inner workings of the grand jury." II.JA.1044. The court therefore effectively agreed that the legal basis it cited for confiscating the iPhone was erroneous. If Governor McDonnell receives a new trial, he is entitled to this evidence, which almost certainly contains *Brady* and *Giglio* material. *See United States v. Thompson*, 562 F.3d 387, 397 (D.C. Cir. 2009). Likewise, if any of that evidence proves material, its confiscation requires a new trial. *See, e.g.*, *United States v. Lanoue*, 71 F.3d 966, 973-80 (1st Cir. 1995).

## CONCLUSION

This case is not about whether Governor McDonnell should win an election. It is about whether he committed a federal crime. Bad judgment is not always criminal, and, as shown above, it was not here. But even if the evidence *could have* amounted to a crime, the Government overreached on every other issue—from persuading the court to adopt patently erroneous jury instructions, to prosecuting a married couple in a joint trial, to purchasing Williams's testimony with an unprecedented transactional-immunity deal, to bombarding the jury with prejudicial evidence unrelated to guilt or innocence of the charged offenses. Each of these errors deprived Governor McDonnell of his right to a fair trial and is sufficient basis to reverse. Governor McDonnell respectfully asks the Court to vacate his convictions or, at the least, reverse for a new trial.

Dated:  March 2, 2015                    Respectfully submitted,


                                         /s/ Noel J. Francisco
                                         Noel J. Francisco
                                         Henry W. Asbill
                                         Charlotte H. Taylor
                                         James M. Burnham
                                         Ian Samuel
                                         JONES DAY
                                         51 Louisiana Avenue, N.W.
                                         Washington, DC 20001
                                         Telephone: (202) 879-3939
                                         Facsimile: (202) 626-1700
                                         njfrancisco@jonesday.com

                                         John L. Brownlee
                                         Daniel I. Small
                                         Christopher M. Iaquinto
                                         Elizabeth N. Jochum
                                         HOLLAND & KNIGHT LLP
                                         800 17th Street N.W.
                                         Suite 1100
                                         Washington, DC 20006
                                         Telephone: (202) 828-1854
                                         Facsimile: (202) 955-5564

                                         *Counsel for Defendant-Appellant*
                                         *Robert F. McDonnell*

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**No. 15-4019**          **Caption:** *United States v. Robert F. McDonnell*

## CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) OR 32(a)
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

I certify that this brief complies with the type-volume limitation of Fed. R.

App. P. 32(a) and the Court's Order dated February 2, 2015 granting the parties leave

to file opening and response briefs of not more than 21,000 words.   This brief is

written in Garamond, a proportionally spaced font, has a typeface of 14 points, and

contains 20,993 words (as counted by Microsoft Word 2007), excluding the parts of

the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).


/s/ Noel J. Francisco
Noel J. Francisco

*Counsel for Defendant-Appellant*
*Robert F. McDonnell*

## CERTIFICATE OF SERVICE

I certify that on March 2, 2015, the foregoing document was served on all parties or their counsel of record through the CM/ECF system.

/s/ Noel J. Francisco
_____

Noel J. Francisco

*Counsel for Defendant-Appellant*
*Robert F. McDonnell*