IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

―――――――――――

No. 15-4019

―――――――――――

UNITED STATES OF AMERICA,

*Appellee,*

v.

ROBERT F. MCDONNELL,

*Appellant.*

―――――――――――

Appeal from the United States District Court
for the Eastern District of Virginia
at Richmond
*The Honorable James R. Spencer, Senior United States District Judge*

―――――――――――

BRIEF OF THE UNITED STATES

―――――――――――

Dana J. Boente
United States Attorney

Richard D. Cooke
Ryan S. Faulconer
Michael S. Dry
Jessica D. Aber
Assistant United States Attorneys
600 East Main Street, Suite 1800
Richmond Virginia 23219
804-819-5400

Raymond Hulser
Acting Chief, Public Integrity Section

David V. Harbach, II
U.S. Department of Justice
Criminal Division
Public Integrity Section
1400 New York Ave., N.W.,
Ste. 12100
Washington, D.C. 20005
202-514-1412

*Attorneys for the United States of America*

## Table of Contents

**Page**

Table of Authorities ................................................................. vi

Introduction ............................................................................. 1

Issues Presented ..................................................................... 3

Statement of the Case ............................................................. 4

    A.    Defendant faced significant personal financial difficulties throughout his administration…………………………………………..5

    B.    Defendant learned early in his administration that Williams wanted state government assistance…………………………………..6

    C.    April 2011: After a shopping spree for defendant's wife, Williams reiterated to defendant what he wanted……………………7

    D.    May 2011: Defendant approached his staff about potential state government assistance for Williams at the same time the McDonnells solicited and received financial assistance from Williams……………………………………………………………………9

    E.    June 2011: The first lady went to Roskamp, the McDonnells purchased Star stock, and Williams put his request for state government assistance in writing…………………………………....12

    F.    July 2011: Star began to make defendant's support for state government assistance clear to researchers, and the McDonnells vacationed at Williams's estate in the lead-up to a meeting "on" the studies at the governor's mansion. ………………………..14

    G.    August 2011: The defendant directed his subordinate to attend the meeting "on" the studies, approved the Anatabloc launch at the governor's mansion, and attended the event designed to persuade university researchers, all while continuing to receive undisclosed benefits from Williams…………………………………....17

i

H.      September through December 2011: The launch had an effect, but Williams needed more help from defendant……………………22

I.       January and February 2012: As Williams negotiated another secret $50,000 loan with defendant, defendant took action for Williams because "Gov wants to get this going w VCU MCV."……………...24

J.      March 2012: Williams provided the $50,000 loan, and defendant took action on Williams's desired inclusion of Anatabloc in the state employee health plan……..……………………………..31

K.     May through September 2012: Williams provided another $20,000 loan and another expensive vacation, while Williams continued to seek defendant's action on state studies and other government assistance……………………………………………….32

L.      Throughout the scheme, defendant concealed the bribes from the state officials he sought to influence on Williams's behalf……..34

M.    Trial and Sentencing……………………………………………...35

Summary of Argument.........................................................................35

Argument...........................................................................................39

I.     Sufficient evidence easily showed that defendant agreed to perform official acts as needed in exchange for luxury goods and money.............................39

A.     Standard of Review ..........................................................39

B.     Analysis ..........................................................................39

1.     Section 201(a)(3)'s definition of official action is broad but not unlimited…………………………………………..41

2.     Controlling precedent defining "official action" supports the verdict here……………………………………………43

a.    *Jefferson*……………………………………………43

b. *Birdsall*…………………………………………...45

3. Courts routinely find acts similar to defendant's to be official actions without encompassing all actions an official takes………………………………………47

4. The evidence here easily supported the jury's finding on official action………………………………………48

   a. August 1 meeting………………………………51

   b. August 30 mansion event……………………...52

   c. Eige email exchange…………………………...53

   d. Healthcare leaders event………………………54

   e. Meeting with Secretary Hicks-Thomas……………..55

5. Defendant's arguments are meritless…………………………56

   a. Defendant and his amici's efforts to restrict the official-action standard are misguided.………………………...56

   b. Defendant's reliance on *Sun-Diamond* is misplaced.…57

   c. Defendant's citations to various outlier, out-of-circuit cases do not help him……………..…………………58

   d. Defendant's conviction poses no threat to democratic values………..…………………………………60

   e. Bribery law is not unconstitutionally vague as applied to defendant.………………………………...…62

   f. Defendant's other arguments should be rejected………62

iii

II.   The district court's jury instructions quoted verbatim the statutory
      language defining an official act and applied settled law ...........................63

      A.    Standard of Review ..........................................................63

      B.    Analysis ...................................................................64

III.  The district court did not abuse its discretion in conducting voir dire ..........69

      A.    Standard of Review ..........................................................69

      B.    Analysis ...................................................................71

IV.   The district court properly tried the defendants together .............................76

      A.    Standard of Review ..........................................................76

      B.    Analysis ...................................................................76

V.    The district court's evidentiary rulings were proper under the law ..............83

      A.    Standard of Review ..........................................................83

      B.    Analysis ...................................................................83

            1.    No cumulative evidence was necessary to cross-examine
                  Williams……………………………………………………84

            2.    Defendant's concealment of transactions involving Williams
                  by omitting them from his SOEIs was admissible and not an
                  appropriate subject for expert testimony…………………….85

            3.    Defendant's direction to staff to find him free golf was
                  admissible……………………………………………………87

            4.    Evidence of defendant's efforts to avoid reporting other free
                  golf was intrinsic and admissible……………………….…88

5.    Defendant's requested fishing expedition into Williams's iPhone is not an independent basis for relief....................89

Conclusion ........................................................................90

Statement Regarding Oral Argument ..................................91

Certificate of Compliance ..................................................92

Certificate of Service ........................................................93

# Table of Authorities

**Page**

### United States Supreme Court

*Abramski v. United States*, 134 S. Ct. 2259 (2014)………..…………………………..62

*Alderman v. United States*, 394 U.S. 165 (1969)………………………………………79

*United States v. Birdsall*, 233 U.S. 223 (1914)………………………………………*passim*

*Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337 (1952)………………...…62

*United States v. Brewster*, 408 U.S. 501 (1972)………………………………………42

*Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010)…. …………60, 61

*Dixson v. United States*, 465 U.S. 482 (1984)…………………………………………42

*Evans v. United States*, 504 U.S. 255 (1992)……………………………………... 40, 65

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010)………………………...62

*Mu'Min v. Virginia*, 500 U.S. 415 (1991)………………………………………….....70

*Rosales-Lopez v. United States*, 451 U.S. 182 (1981)…………………………….69

*Salinas v. United States*, 522 U.S. 52 (1997)……………………………………...…63

*Skilling v. United States*, 561 U.S. 358 (2010)…………………………………*passim*

*United States v. Sun-Diamond Growers of Cal.*, 526 U.S. 398 (1999)……….57, 58

*Zafiro v. United States*, 506 U.S. 534 (1993)……………………………...……76

### United States Courts of Appeals

*Goins v. Angelone*, 226 F.3d 312 (4th Cir. 2000)………………………………...……75

*Russell v. Absolute Collection Servs.*, 763 F.3d 385 (4th Cir. 2014)…………..…89

*RZS Holdings AVV v. PDVSA Petroleo S.A.,* 506 F.3d 350 (4th Cir. 2007)……....79

*United States v. Allen*, 716 F.3d 98 (4th Cir. 2013)………………………………84

*United States v. Bailey*, 112 F.3d 758 (4th Cir. 1997)……………………………70

*United States v. Bakker*, 925 F.2d 728 (4th Cir. 1991)……………………71, 74, 75

*United States v. Biaggi*, 853 F.2d 89 (2d Cir. 1988)……………………………....47

*United States v. Briley*, 770 F.3d 267 (4th Cir. 2014)……………………………42

*United States v. Carson*, 464 F.2d 424 (2d Cir. 1972)…………………………61, 65

*United States v. Davis*, 457 F.3d 817 (8th Cir. 2006)……………………………85

*United States v. Dimora*, 750 F.3d 619 (6th Cir. 2014)…………………………60

*United States v. Dinkins*, 691 F.3d 358 (4th Cir. 2012)…………………………76

*United States v. Fowler*, 932 F.2d 306 (4th Cir. 1991)……………………….…86

*United States v. Ganim*, 510 F.3d 134 (2d Cir. 2007))……………………….65, 66

*United States v. Gomez-Jimenez*, 750 F.3d 370 (4th Cir. 2014)…………………39

*United States v. Hager*, 721 F.3d 167 (4th Cir. 2013)………………………....64

*United States v. Hairston*, 46 F.3d 361 (4th Cir. 1995)…………………………42

*United States v. Hamilton*, 701 F.3d 404 (4th Cir. 2012)…………………………40

*United States v. Hankish*, 502 F.2d 71 (4th Cir. 1974)……………………………75

*United States v. Holzer*, 816 F.2d 304 (7th Cir. 1987)……………………………60

*United States v. Iskander*, 407 F.3d 232 (4th Cir. 2005)…………………………83

*United States v. Jefferson*, 674 F.3d 332 (4th Cir. 2012)…………………….*passim*

*United States v. Jeffery*, 631 F.3d 669 (4th Cir. 2011)……………………………69

*United States v. Jennings*, 160 F.3d 1006 (4th Cir. 1998)…………….40, 50, 66, 67

*Johnson v. United States*, 734 F.3d 352 (4th Cir. 2013)…………………………41

*United States v. Johnson*, 587 F.3d 625 (4th Cir. 2009)…………………………88

*United States v. Lancaster*, 96 F.3d 734 (4th Cir. 1996)…………………………70

*United States v. Lespier*, 725 F.3d 437 (4th Cir. 2013)…………………………..85

*United States v. Loftus*, 992 F.2d 793 (8th Cir. 1993)……………………………59

*United States v. Mathis*, 264 F.3d 321 (3d Cir. 2001)……………………………85

*United States v. Moore*, 525 F.3d 1033 (11th Cir. 2008)…………………………47

*United States v. Napue*, 834 F.2d 1311 (7th Cir. 1987)…………………………79

*United States v. Olano*, 507 U.S. 725 (1993)……………………………………83

*United States v. Otuya*, 720 F.3d 183 (4th Cir. 2013)……………………………88

*United States v. Parodi*, 703 F.2d 768 (4th Cir. 1983)…………....76, 79, 80, 81, 82

*United States v. Patterson*, 150 F.3d 382 (4th Cir. 1998)………………………...67

*United States v. Powers*, 59 F.3d 1460 (4th Cir. 1995)…………………….....88

*United States v. Quinn*, 359 F.3d 666 (4th Cir. 2004)……………………………40

*United States v. Rabbitt*, 583 F.2d 1014 (8th Cir. 1978)……………………..59, 60

*United States v. Rahman*, 83 F.3d 89 (4th Cir. 1996)……………………………64

*United States v. Ring*, 706 F.3d 460 (D.C. Cir. 2013)…………………..…39, 47, 60

*United States v. Rosen*, 716 F.3d 691 (2d Cir. 2013)………………………47, 62

*United States v. Runyon*, 707 F.3d 475 (4th Cir. 2013)………………………...84

*United States v. Smithers*, 212 F.3d 306 (6th Cir. 2000)…………………………85

*United States v. Urciuoli*, 513 F.3d 290 (1st Cir. 2008)…………………………59

*Valdes v. United States*, 475 F.3d 1319 (D.C. Cir. 2007)…………………………58

*United States v. Whitfield*, 695 F.3d 288 (4th Cir. 2012)…………………………63

*United States v. Zayyad*, 741 F.3d 452 (4th Cir. 2014)…………………………..85

## Other Courts

*Rex v. Vaughan*, 98 Eng. Rep. 308 (1769) ……………………...……………58, 61

*United States v. Jefferson*, No. 1:07cr209 (E.D. Va. 2010)...………...……………66

## Statutes

18 U.S.C. § 201(a)(3)…………………………………………………..*passim*

18 U.S.C. § 1343………………………………………………….……35

18 U.S.C. § 1349………………………………………………………35

18 U.S.C. § 1951…………………………………………………………..35

***Rules***

Fed. R. App. P. 28(a)(9)(A))…………………………………………..41
Fed. R. Crim. P. 17(c)……………………………………...............89
Fed. R. Evid. 801(d)(2)……………………………………...............87
Fed. R. Evid. 404…………………………………….............87, 88

## Introduction

Over the course of nearly two years while serving as governor of Virginia, defendant Robert F. McDonnell engaged in a bribery scheme with his wife and Jonnie Williams, Sr., a Virginia businessman.  Defendant and his wife solicited and secretly accepted more than $177,000 in luxury goods and money in exchange for using the power of defendant's office to help Williams's company, Star Scientific, obtain state government assistance for its dietary supplement, Anatabloc.

Before accepting the payoffs from Williams, defendant learned on a six-hour flight that Williams wanted "independent testing in Virginia" of Anatabloc at state medical schools and needed defendant's help in moving that forward.  A2210-11.  Defendant later learned from a letter Williams sent him that Williams wanted the studies performed at the University of Virginia and Virginia Commonwealth University.  SA28-47.

In exchange for Williams's payoffs, defendant used his gubernatorial powers to assist Williams and advance Star's goal of obtaining state studies.  For example, less than ninety minutes after driving Williams's Ferrari home from a Williams-sponsored vacation, defendant ordered a subordinate to attend a meeting that was, as the defendant put it, "on the Star Scientific anatablock [sic] trials planned in va at vcu and uva."  SA80.  Defendant also hosted Star at the governor's mansion for

1

a product launch that defendant knew was designed to convince state researchers—also in attendance—to study Anatabloc.

Six months after the launch, after Williams inquired why he had not received the studies, defendant's wife sat in an SUV with defendant and emailed a cabinet official about the studies, stating that "Gov want to get this going w VCU MCV." SA154. Within a week, and six minutes after emailing Williams about a secret $50,000 loan negotiation, defendant himself sent the same official an email: "Pls see me about anatabloc issues at VCU and UVA." SA157. And later, less than two weeks after receiving the $50,000 loan, defendant met with a cabinet secretary who had authority to help decide what drugs would be covered in the state employee health plan, pulled Anatabloc out of his pocket, told the cabinet secretary "it would be good for [] state employees," and "asked" the cabinet secretary to meet with Star. A4227.

Defendant attempts to escape criminal liability by arguing that his exercises of gubernatorial power to aid Williams's business were not "official actions" under bribery law. But this case provides even stronger evidence of official action than in *United States v. Jefferson*, 674 F.3d 332 (4th Cir. 2012). Here, defendant directed his action toward subordinate state employees within the branch of government that he controlled as governor, while in *Jefferson* a congressman took action through meetings, letters, and the like directed at other government agencies

2

or foreign governments. Using instructions materially indistinguishable from those in *Jefferson*, and presented with compelling evidence defendant barely mentions in his brief, the jury found that defendant accepted payoffs from Williams as part of a corrupt, bad-faith, and fraudulent *quid pro quo*. For the reasons discussed below, that verdict is unquestionably sound.

## Issues Presented

1.      Was there sufficient evidence to establish that defendant agreed to perform official actions, as needed, in exchange for the stream of benefits he accepted from Williams?

2.      Did the district court abuse its discretion in limiting "official action" to the statutory definition in 18 U.S.C. § 201(a)(3) and otherwise explaining that term using settled legal principles in language from this Court's cases?

3.      Did the court abuse its discretion in conducting voir dire on pretrial publicity when the court granted the parties a 99-item questionnaire, asked the entire venire about exposure to media coverage, and permitted defendant to question every specific juror he identified as cause for concern?

4.      Did the court abuse its discretion in declining to sever the trials of defendant and wife when they were charged together in a conspiracy and defendant provided no more than bare conclusory assertions regarding the exculpatory nature of his codefendant's potential testimony at separate trials?

5.     Did the court abuse its discretion in ruling on the handful of evidentiary challenges defendant raises in this five-week trial?

## Statement of the Case

Defendant Robert F. McDonnell was the 71st Governor of Virginia. Before he entered into the bribery scheme in this case, the economic fallout from a severe recession led him to make promoting Virginia businesses a centerpiece of his one-term administration. Although past administrations routinely promoted state businesses, A4487-89, Virginia business and economic development were "why [defendant] got elected" and "the priority" of defendant's administration. A3785-86, 4092. To further those businesses' causes, defendant and his subordinate staff held meetings with other state officials, hosted events on state property, and otherwise exerted defendant's influence. A3589-92, 3786-87, 4093-97. These actions were sometimes unilateral, and at other times directed toward the various arms of state government over which defendant wielded ultimate control, from agencies overseeing state employees' health plans to universities conducting state-sponsored research.

As he took office, defendant was also experiencing his own financial duress, racking up tens of thousands of dollars in credit card debt and struggling to make payments on mortgaged-to-the-hilt beach houses owned with one of his sisters. The money and luxury goods that Jonnie Williams began to offer defendant and his

4

wife were all too welcome, and in return, defendant used his governmental powers to help Williams obtain state government assistance.

### A.    Defendant faced significant personal financial difficulties throughout his administration.

In December 2009, a month before defendant's inauguration, his wife complained, "Bob is screaming about the thousands I'm charging up in credit card debt.  We are broke, have an unconscionable amount in credit card debt already, and this Inaugural is killing us!!"  SA1.  When defendant was inaugurated in January 2010, the McDonnells owed nearly $75,000 in credit-card debt, an amount that soon grew to $90,000 by September 2010.  SA176, 177.  Before receiving Williams's largesse, defendant routinely resorted to credit-card convenience checks and balance transfers to forestall the consequences of the debt.  A5712-18, 5728-32, 6582-90.

Compounding the credit-card debt, two beach houses that defendant owned with his sister were losing $40,000-$60,000 annually when defendant took office. A6202.  To help cover the mortgage payments and expenses, defendant borrowed $60,000 from his father in 2007 and another $50,000 from him in 2008.  A6504. In late 2009 and early 2010, defendant borrowed $50,000 from a physician. Unlike his later loans from Williams, this loan was memorialized in writing, at an interest rate of 7.5% interest, and required monthly payments of $1,001.90. A6505-06, 6511-12.

5

In early 2011, after every bank from which defendant sought refinancing for the houses rejected him, the McDonnells and defendant's sister owed $11,557.23 in monthly loan payments. A6530-31; SA238. As a senior vice president at Bank of America explained, "Governor, I have completed my research and as you suspected we find ourselves in a precarious position with regard to loan to value and the ability to refinance." SA239; A6530.

By 2012, MoBo, the entity defendant formed with his sister to operate the beach properties, had outstanding loan balances that had increased each year to $2,474,730. SA189. And that same year, MoBo's net cash disbursements, which were negative every year from 2009 to 2012, reached a four-year low of approximately $104,431 in the red. SA188.

## B. Defendant learned early in his administration that Williams wanted state government assistance.

Jonnie R. Williams, Sr., was the CEO of Star Scientific, Inc., a Virginia-based company that created a dietary supplement, Anatabloc, from an alkaloid in tobacco plants called anatabine. Before defendant's gubernatorial campaign, Williams and defendant did not know each other, and they were not friends. But in October 2010, Williams and defendant spent over six hours together on Williams's Learjet flying from California to Virginia. A6036-37. During the flight, Williams explained to defendant that he wanted "independent testing in Virginia" of Anatabloc. A2203-04, 2211. The flight gave Williams "five or six hours with the

6

Governor to explain to him what I had discovered here in Virginia and to explain to him that I needed his help and—in moving this forward." A2210. Defendant had a similar recollection of the flight: Williams talked "[e]xtensively" about Anatabloc, even "had a PowerPoint," and "was kind of marching through his exhibits." A6037-40.

As Paul Perito, Star's president, explained at trial, the studies Williams discussed with defendant on the flight were vital to Star's business plan. Star needed extensive testing of Anatabloc to have it classified by the FDA as a pharmaceutical, permitting claims about the drug's effectiveness in treating disease, rather than as a nutraceutical, for which no such claims can be made. A3888, 3893-97. Because Star could not afford drug testing for Anatabloc through all three FDA testing phases, it needed outside research and funding. A3907. And "[r]esearch done by an independent entity is always more valued," particularly if it came at "two highly reputable institutions" like the University of Virginia ("UVA") and Virginia Commonwealth University ("VCU"). A3906-07.

### C.    April 2011: After a shopping spree for defendant's wife, Williams reiterated to defendant what he wanted.

On April 13, 2011, at the first lady's request, Williams bought her nearly $20,000 in luxury clothing during a shopping spree in New York City. A2222, 2225. The haul from Williams included two pairs of Louis Vuitton shoes, a Louis Vuitton purse, an Armani jacket with two matching dresses, two Oscar de la Renta

dresses, a Louis Vuitton trench coat, and an Oscar de la Renta sweater.[1]  A2223-24, 5005-06, 5010-13.  Defendant knew his wife had been shopping with Williams, knew that the purpose was to purchase dresses for defendant's daughter's upcoming wedding, stayed in the same hotel room as his wife, and saw the shopping bags.  A6051-52, 6553, 6556.  Defendant also knew when he, his wife, and Williams met in New York shortly before the inauguration that Williams paid for a $5,000 bottle of cognac and offered to buy an expensive inauguration gown for defendant's wife.  A6556.  And defendant knew his wife had a history of making inappropriate requests for money.  *Id.*

A scant five days after the shopping spree, the McDonnells then invited Williams and his wife to the governor's mansion for a private dinner.  At that dinner on April 29, Williams discussed the Virginia studies of Anatabloc that he wanted and an upcoming fundraiser at the Roskamp Institute, a Star-affiliated entity in Florida already studying Anatabloc.  A6068-70, 6560.  Williams was "pitching this, or selling this to the Governor."  A2228.  Defendant "had heard a lot of this before when I was on the plane with him in October" 2010 and thought that "if they want to do clinical trials in Virginia, … that would be a good thing."  A6069, 6071.  During the dinner, Williams also met defendant's daughter, Cailin,

---

[1] Also on April 13, 2011, defendant and his wife incurred a $400 upfront fee on a $10,000 balance transfer from one credit card to another to avoid a 7.75% interest rate.  A5728-30.

for the first time, and she mentioned her upcoming wedding, then about five weeks away.  A6066.

**D.    May 2011: Defendant approached his staff about potential state government assistance for Williams at the same time the McDonnells solicited and received financial assistance from Williams.**

Two days after the private dinner, on Sunday, May 1, 2011, the first lady forwarded defendant an email about Star Scientific and typed "Home Run Potential" into the subject line.  SA3.  Defendant wrote the name of his cabinet secretary for health and human services, Dr. William Hazel, on a printed copy of the article.  SA12-15; A3742-43, 4879-80.  This email about Star was followed immediately by a flurry of activity by defendant and his wife gauging Williams's interest in the McDonnells' beach properties as well as among defendant's staff discussing potential assistance to Williams.

For example, within an hour of the "Home Run" email, defendant texted his sister and asked for information about loans and bank options for the MoBo beach properties.  SA178.  A few hours later, the first lady spoke to Williams on the phone for more than 40 minutes, and in the half-hour following that conversation, sent two emails with information about the beach properties to Williams and his wife, after which Williams and the first lady spoke again.  SA178, 4, 5.  That night, defendant emailed his daughter and asked her to send him information about the remaining payments he owed on her wedding catering contract.  SA7.

9

The next day, May 2, 2011, Williams spent more than two hours at the mansion. SA6. While he was there, the first lady called (but did not reach) defendant; she also exchanged seven phone calls with the defendant's sister who co-owned the beach properties as well as that sister's husband, who helped run the beach properties. SA179; A4285-89. While Williams was at the mansion, the first lady said, "The Governor says it's okay for me to help you and—but I need you to help me. I need you to help me with this financial situation." A2231. The first lady told Williams that one of her daughters "was about to be married and they had a balance on the reception bill of approximately $15,000 or so. And she said she needed to borrow $50,000. And she said she would help me," so Williams replied, "Okay, I'll do it." *Id.*

On Thursday, May 5, 2011—three days after the first lady solicited the first $65,000 from Williams—defendant met with Dr. Hazel, and shortly thereafter, defendant's assistant forwarded Hazel the Star Scientific "Home Run Potential" article defendant had printed just four days before. SA8-9, 12-13; A3742-43, 4879-81.

Four days later, on May 9, 2011, defendant's scheduler emailed Dr. Hazel and stated, "[T]he Governor said that he sent you some material on the RosKamp Institute" (the Star-affiliated entity) and asked for Hazel's thoughts because "[w]e are currently evaluating having the Governor go down to Florida to speak to this

10

group." SA16. Hazel responded that defendant had "mentioned this to me on Thursday," May 5, 2011. *Id.*

As events later showed, defendant repeatedly approached Dr. Hazel—who oversaw about a third of the state's budget—about Anatabloc even though Hazel found Williams's claims about his product to be "unbelievable," referred to Williams as "the Tic-Tac Man," and thought Anatabloc lacked "any value." A3734, 3740, 3745-46.

Although ultimately neither defendant nor Hazel would go to Roskamp, on May 17, the first lady scheduled the June 1 event at Roskamp on her calendar. SA17, 19; A3315, 3740-42.

Six days later, on May 23, 2011, Williams brought a $50,000 check payable to the first lady to fulfill the loan he had agreed to make three weeks before, and Williams also brought a $15,000 check payable in blank to cover the catering costs defendant owed for his daughter's wedding. A2231-33, 2236-37. That same day, Williams spoke with defendant to "make sure the Governor knew about these checks." A2655. Williams agreed to provide the loan because "I needed [defendant's] help," and "I know that he controls the medical schools here in Virginia. And so I needed his help with the testing of this to help me implement this into the system, and I needed the credibility that comes with that office and with the state of Virginia for letting people know about the benefits of

11

Anatab[loc]."  A2234.  Neither this loan nor any later loan that Williams gave the McDonnells was memorialized in writing.  A6829.

Just five days later, on May 28, 2011, defendant acknowledged the loan: "Johnnie [sic].  Thanks so much for all your help with my family.  Your very generous gift to Cailin was most appreciated as well as the golf round tomorrow for the boys.  Maureen is excited about the trip to fla [at the Roskamp Institute] to learn more about [Anatabloc] and to see Celeste."  SA20.  Williams understood defendant's reference to "all your help with my family" to refer both to the wedding catering check and "the money that I have just loaned, too."  A2657.

On May 29, 2011, defendant, his two sons, and his future son-in-law spent more than 7 hours golfing, eating, and buying merchandise at Williams's exclusive, gated golf club.  SA22-24.  Even though Williams was not with them, he footed the $2,380.24 tab.  SA21, 194.  And although the club permitted guests to pay, defendant never offered.  A2146-47.

E.    **June 2011: The first lady went to Roskamp, the McDonnells purchased Star stock, and Williams put his request for state government assistance in writing.**

At the June 1 event at Roskamp, the first lady offered to host the product launch of Anatabloc at the governor's mansion.  A2249.  A financial writer described the event immediately afterwards: "Star Scientific CEO Jonnie Williams introduced the First Lady of Virginia, Virginia Governor Bob McDonnell's wife

12

Maureen, and in a brief talk, she offered the Governor's Mansion for the launch of Anatabloc that Star is packaging and readying to go to market." A3257.

While the first lady was in Florida, she placed an order for more than $30,000 in Star Scientific stock, telling the stockbroker, who was also a family friend, that she was going to speak to defendant about financial information the stockbroker needed to open the account. A4000-04; SA26, 180. The first lady then completed the purchase when she gave a check to the stockbroker on June 4 at Cailin's wedding. A4010-11.

A couple of weeks later, Williams again outlined for defendant his plan to have studies of Anatabloc performed at Virginia medical schools. In a cover letter dated June 16, 2011, and beginning, "Dear Governor McDonnell," Williams briefly described studies of Anatabloc already underway and quickly moved to his goal. "I am suggesting that you use the attached protocol to initiate the 'Virginia study' of Anatabloc at the Medical College of Virginia [VCU] and the University of Virginia School of Medicine, with an emphasis on endocrinology, cardiology, osteoarthritis and gastroenterology." SA29.[2]

Defendant had a "good sense" of the June 16 letter, "knew what the letter said," and read the portions that referred to the studies at UVA and VCU. A6121,

---

[2] Because Williams was trying to hide the scheme, he concealed from Star leadership not only this letter but also the April shopping spree, the $50,000 loan, and the $15,000 wedding gift. A2380, 3901.

6605-06, 6639. Although defendant claimed at trial that the letter "came out of the blue," A6606, he nonetheless did the same thing he had done with the "Home Run Potential" article about Star his wife sent him a month before: he forwarded it to Hazel. A6121, 6639.

Later in June 2011, Williams flew defendant's children to an event at the Homestead resort and played golf there with defendant for four hours. A2257-59, 6610. As Williams testified, he was "trying to move this forward every opportunity I get." A2259. By contrast, Hazel refused to be seated next to Williams at the event when another cabinet official asked him to because Hazel "didn't need to get the Anatabloc sale again." A3747.

A few days after the Homestead event, Williams sent two new golf bags, two new pairs of golf shoes, and a new set of golf clubs to defendant and one of defendant's sons. A2153-57, 6611-12. Defendant claimed at trial that the golf equipment, like the June 16 letter, came "out of the blue." A6612.

**F.    July 2011: Star began to make defendant's support for state government assistance clear to researchers, and the McDonnells vacationed at Williams's estate in the lead-up to a meeting "on" the studies at the governor's mansion.**

By July 2011, defendant and Williams had discussed potential funding for the Virginia studies through the state-funded Tobacco Commission, which defendant told Williams "would be a good source of funding for something like this." A2260. And in July 2011, Williams hired as a lobbyist Jerry Kilgore, a

14

former Virginia attorney general who ran for governor on the same ticket with defendant during his attorney-general run. A4339, 4347. When Williams first met with Kilgore, Williams told him "that the Governor and the First Lady both supported his product and supported—would support getting research on his product," including for state funding. A4348. Kilgore also reinforced that Williams needed "to get a Virginia research institution" like UVA or VCU to make a grant application "more palatable to the Commission." A4352.

At trial, Kilgore described the "bully pulpit" effect that gubernatorial support could have on other state entities like a state university or the Tobacco Commission, even in actions more subtle than direct control over a particular decision. A4374-75. Defendant's chief of staff corroborated Kilgore, explaining that defendant could exert influence over those institutions even when he had no direct, formal role in their decisionmaking. A4100-01, 4103-04. This no doubt derived at least in part from defendant's authority to appoint all of the members of the boards that oversaw UVA and VCU, as well as a majority of the individuals who served on the Tobacco Commission. A4099, 4102.

Also in July 2011, the state researchers Star wanted to study its product learned that defendant supported Williams. For example, after being contacted by another doctor who worked for Star, Dr. John Clore, an associate vice president for clinical research at VCU, informed his colleagues that "Mr. Williams is a very

15

good friend with the Governor and the Governor would like to sponsor these trials as evidence of Virginia's commitment to research and entrepreneurship."  A3090, 3096-97; SA51.  Star then invited Clore and other researchers to a July 23 event in Gibson Island, Maryland, at which Star solicited applications for $25,000 planning grants to assist the researchers in submitting full study proposals to the Tobacco Commission.  SA52; A3098-3103.  At the conclusion of the event, Clore again alerted his colleagues: "The Governor would like to use tobacco funds to support virginia research demonstrating the state[']s commitment to support research to reduce healthcare costs in the commonwealth."  SA55; A3104-05.

Meanwhile, from July 28-31, 2011, Williams gave the McDonnells free use of his multimillion-dollar Smith Mountain Lake vacation home and, at the first lady's request, paid $2,268 to rent a boat and spent more than $600 for his Ferrari to be delivered from three hours away for their use.  A1999-2001, 3778, 6632-33; SA83, 194.  On the day Mrs. McDonnell left for the vacation, her chief of staff scheduled a meeting on her calendar with Williams for August 1, 2011.  SA56.  At the end of the vacation, defendant drove Williams's Ferrari on the three-hour trip home, while the first lady, who was in the passenger seat, took 21 photographs of defendant smiling and driving the Ferrari.  SA57-77, A6633-35.  During the drive, defendant and the first lady both texted and called Williams, and the first lady emailed one of the photos to Williams.  SA78-79, 181-84; A6633-34.

16

At 11:29pm, approximately 90 minutes after defendant arrived in Richmond, he emailed Dr. Hazel, his cabinet secretary, and directed him to have a deputy "attend a short briefing [tomorrow] at the mansion about 10 am with first lady on the Star Scientific anatablock [sic] trials planned in va at vcu and uva." SA80.

### G.    August 2011: The defendant directed his subordinate to attend the meeting "on" the studies, approved the Anatabloc launch at the governor's mansion, and attended the event designed to persuade university researchers, all while continuing to receive undisclosed benefits from Williams.

At 6:28am on August 1, 2011, the morning after defendant's email directive above, Dr. Hazel replied, "Will do," and complied, sending his deputy, Molly Huffstetler, to the meeting with Williams and the first lady. SA80. Huffstetler had picked up on Hazel's negative view of Williams and also called him the "Tic-Tac Man." A3042, 3746. But it was "important" to Huffstetler "that the request for the meeting had come from the governor"; indeed, she would not have attended otherwise. A3042-43, 3059. Before the meeting, Huffstetler promised to convey that "we will do what we can to carry out the desires of the Governor and First Lady." SA81. During the meeting (and in the first lady's presence), Williams mentioned the clinical trials at UVA and VCU, Dr. Clore, Roskamp, the planning grants, and possible Tobacco Commission funding "by request of Gov." A3048-53.

Immediately after Huffstetler left, at Williams's request, Dr. Clore was summoned to a meeting with the first lady at the executive mansion. A2272-73. Williams explained that "Dr. Clore was important, and he could cause studies to happen at VCU's medical school as well as other doctors," and "it was important to instill in him that this was important." A2273. Williams let Clore know "with Maureen McDonnell sitting there how important this was to Virginia, to the Governor. This was important." *Id.*

While Williams was at the mansion, defendant and the first lady exchanged two phone calls. SA185. At the conclusion of the meetings, after Clore left, the first lady noticed a Rolex watch on Williams and asked him to buy one for defendant, which Williams agreed to do and ultimately did. A2274-26. Within fifteen minutes of Clore's departure, the first lady placed an event on her electronic calendar for what would ultimately become the August 30, 2011, Anatabloc launch at the governor's mansion. SA185.

The next day, August 2, 2011, the first lady purchased more shares of Star Scientific stock. SA49. Two days later, she sent defendant another email about Anatabloc with a quote predicting Anatabloc would be very successful. SA84. And the day after that, she emailed the author of the quote and asked him to send another article "as an attachment like you did in the first email so I would be able to print out a clean copy for my husband." SA89.

18

Just over a week later, on August 13, 2011, defendant again played golf with his son at Williams's club without Williams, this time racking up $868.99. SA186. The next day, Williams purchased the $6,500 Rolex for defendant and at the first lady's request had it engraved, "71st Governor of Virginia." SA99; A2276.[3] Two days after that, immediately after a three-minute call from the first lady to defendant, defendant's travel aide emailed the first lady's chief of staff to ask for information about the upcoming Anatabloc launch at the Mansion. SA187. The next morning, on August 17, 2011, defendant's travel aide emailed the first lady's chief of staff to say defendant would be attending the Anatabloc event. SA101.

In the following weeks, defendant's subordinate state employees planned and coordinated the Anatabloc launch event in consultation with Star personnel. The first lady told the mansion director that the event "was to launch Anatabloc" and that it pertained to "encouraging universities to do research on the product." A3608. At Star's request, mansion staff sent invitations to the event to Clore from VCU and a colleague from UVA, Dr. John Lazo. A3112, 3337. The invitation bore the Governor's seal and read, "Governor and Mrs. Robert F. McDonnell request the pleasure of your company at a luncheon." SA105. Lazo testified that the event "looked like it was something that was official," and that "[i]t was part of

---

[3] Like the Ferrari, the first lady took 11 photos of defendant smiling and wearing the Rolex, and one of those photos was sent by text message to Williams. SA113-23, 174-75; A2376.

19

my regular job as Associate Dean, I thought, so I did not take any official time off." A3338. Clore testified that he, too, agreed it appeared to be "an official government event" and that he did not take leave to attend. A3113.

As defendant's chief of staff explained, it was "very common" for the governor's mansion to be used to host events to promote Virginia business and economic development, and defendant's administration "probably had more events at the Mansion than any other administration" that longtime staff members could recall. A4093. Moreover, mansion events "had to be approved by the Governor and the Governor's Chief of Staff," and the planning would be done by state employees on official time. A3591-92. Indeed, one of the mansion director's "main functions" and "primary jobs" as a state-paid employee was to coordinate such events. A4093.

Perito, Star's president, saw the value in the launch of Anatabloc at the mansion: "I saw that it could create potentially better word of mouth, which is very important in the marketing of a nutraceutical. I saw that potentially it could cause the attendees to think seriously about the science. And clearly, at some point in time, I knew that among the attendees would be professors and researchers from UVA School of Medicine and from VCU Medical School. And they were key because we had started to focus, or were moving to focus, on attempting to get a grant from the Tobacco Commission." A3905-06.

20

On the other hand, defendant's senior policy advisor Jasen Eige and chief of staff Martin Kent "were concerned about the launch of Anatabloc being at the Mansion" and "didn't want it at the Mansion." A4368. Even though neither Eige nor Kent knew about Williams's payments to the McDonnells, they still "were concerned about this public launch event" and "didn't think that was an appropriate use of state property or the Mansion, particularly." A3159-61, 3201-02, 4141. Learning of their concerns from Kilgore, Star's lawyer, Williams responded, "Well, the First Lady and the Governor want it at the Mansion. So we're going to have it at the Mansion." A4368.

On August 30, 2011, defendant and his wife hosted the product launch for Anatabloc at the mansion. A2278-79, 3892. As the mansion director testified, "Anatabloc [was] placed in front of each place setting at the event," which was unprecedented: the staff "hadn't placed any products in front of people's plates before like that." A3612.

Defendant knew the purpose of the event was not ceremonial, but was rather to help Williams obtain the studies. On the briefing form that described the event and listed its attendees, defendant handwrote asterisks next to Clore's and Lazo's names. SA107-08; A4123-24, 6649-50. At the event, defendant spoke favorably of Williams's product, and Williams handed out seed grant money to Clore and Lazo. A2283-84. Defendant's senior policy advisor, Eige, and his deputy

21

secretary of commerce attended. A6298. All of this, defendant testified, "was really part of the job creation focus." A6298.[4]

Williams "was on cloud nine" at the launch, and Perito thought "it gave a type of gravitas to the event that the Governor of the Commonwealth were supporting a local company, he and his wife, and that it might resonate with state officials—other state officials and might resonate with Dr. Clore and Dr. Shupnick [sic] [a UVA doctor with whom Lazo worked], since they were keys to getting other scientists involved. If—if they thought that the Governor was behind it and the First Lady was behind it, and that we had all this good science, overwhelming science, vis-à-vis safety, I thought that that would be—have a propitious impact on the future sales of the product in Virginia." A3930.

## H.    September through December 2011: The launch had an effect, but Williams needed more help from defendant.

The event accomplished Williams's goals for it, because it made defendant's support of Williams's product crystal clear to university officials. Clore testified that the event "was designed to make a big splash." A3115. In describing the event to his colleagues, Lazo mentioned defendant's presence. "I mean, it is the Governor. I thought it was appropriate to mention that he was there. It was the

---

[4] Defendant made time to attend the event even though in the preceding week an earthquake in Virginia had forced a nuclear power plant to shut down, Hurricane Irene had devastated the state's east coast, and the Great Dismal Swamp was on fire. A2243, 6654.

invitation from him, too, so in a sense I was just completing the story that I was invited or we were invited, UVA was invited by the Governor and wife and both were there." A3350. When Lazo spoke with one of those UVA officials, Sharon Krueger, he said that "the tenor of the meeting [at the mansion] was that it would be great if we could show that tobacco was a useful product. And I think the Governor and Ms. McDonnell both were extolling that as something that would be a good thing for the Commonwealth." A3354-55. The significance of the Governor's support was not lost on Krueger either. She later wrote a pro/con list about UVA's potential involvement with the studies. The first "pro" was "[p]erception to Governor," and the first "con" was "[p]olitical pressure from Governor and impact on future UVA requests from the Governor." SA109; A4321.

Ultimately, Star gave eight planning grants totaling $200,000 to researchers at UVA and VCU. A3951-52, 4306-07. And on November 29, 2011, Krueger and other UVA officials participated on a conference call with Star's representatives, including Perito, to discuss a potential Tobacco Commission application. A4317-20; SA110-12. During the call, Krueger thought that if UVA went ahead with the proposal, they should "[l]et McDonnell know" because he might "look favorab[ly]" on unrelated UVA funding requests. *Id.* But following the call, Perito concluded that the UVA officials were unprepared and that he was worried

23

they had "lost support" from the universities for the studies. A3933-34. He relayed his reaction to Williams, who "was furious and said, 'I can't understand it. The Governor and his wife are so supportive of this and suddenly the administration has no interest.'" A3934. Williams then went back to the McDonnells in early 2012.

### I.   January and February 2012: As Williams negotiated another secret $50,000 loan with defendant, defendant took action for Williams because "Gov wants to get this going w VCU MCV."

When Williams spoke to the first lady in early 2012 about an additional loan, she "said the Governor wanted to know how the studies were going at UVA." A2308. Williams complained, "They're slow," and the first lady called back, relaying that defendant "was furious … that it was bogged down in the administration." *Id*. She said, "The Governor wants the contact information of the people that your company is dealing with at University of Virginia." A2309. Williams "was pleased that they were—someone was going to follow through with it." *Id*. Around this time, defendant again played golf with his sons at Williams's exclusive club, charging $1,368.91 to Williams's tab. SA194.

On January 19, 2012, while Williams was at the mansion, the first lady handed Williams the phone so that he could discuss MoBo's troubled finances with MoBo's manager, in the hopes that Williams would consider buying the struggling beach properties. SA188; A4291-92. Although Williams declined to buy the

McDonnells' houses, he "agreed to help them with money" and did so "[b]ecause

they are helping me."  A2307.

Defendant first spoke to Williams about the additional loan in a phone call

on February 3, 2012, and, according to defendant, Williams proposed lending stock

to the McDonnells, allowing them to "get a margin loan from a brokerage."

A6221.  During the call, defendant told Williams he "had his own disclosure

issues" and reflected that concern by captioning the notes he took during the call

"Reportability."  A2323; SA244.

Following that conversation, the McDonnells again took action to help

Williams.  For example, Dr. Hazel was scheduled to host a reception on February

29, 2012, to recognize healthcare leaders in Virginia.  So the first lady called

Williams "and said, you know, invite all the doctors that you want to invite to the

Healthcare Leaders, to the meeting."  A2312.  In keeping with that invitation, on

February 3, 2012, the same day that Williams spoke to defendant about the loan,

one of Williams's employees emailed a list of doctors to the first lady for the

event.  SA139-40.  At 10:46pm on February 7, 2012, Mrs. McDonnell forwarded

to the mansion director a revised invite list that included Star invitees.  SA141-45,

A3620-23.  According to the mansion director, many of the names appeared to

come from a printout that had both defendant's and Mrs. McDonnell's handwriting

on it, including immediately adjacent to one another on a page referencing top

25

UVA and VCU officials. A3623-26; SA220. And in an email that the mansion director sent on February 8, she noted, "The First Lady and Governor were going over the list last night for the healthcare industry event. The Governor wants to make sure" that "[h]ead officers at VCU/MCV, UVA" were among those invited. A3626-27; SA146.

Also on February 8, following up on his conversation with the first lady, Williams forwarded to her names and contact information of UVA officials with whom Star had spoken in November 2011 about "UVA's role in submitting an application to the VA Tobacco Commission to fund" the studies that Williams wanted. A2309-10; SA147.

On February 9, the first lady forwarded the contact information to defendant and Eige. SA147. The subject line of the email read, "Anatabine [the compound in Anatabloc] clinical studies—UVA, VCU, JHU," and the first lady wrote, "Here's the info from Jonnie. He has calls in to VCU & UVA & no one will return his calls." A6734-35; SA147. Eige responded late the same day and said, "Lets talk next week when you return." SA154. The next morning, while sitting next to defendant in the back of an SUV, the first lady shot back in an email: "Pls call Jonnie today get him to fill u in on where this is at. Gov wants to know why nothing has developed w studies after Jonnie gave $200,000. I'm just trying to talk

26

w Jonnie  Gov wants to get this going w VCU MCV.  Pls let us know what u find

out after we return.  Jonnie's cell is [redacted].  Thanks, -mm."  SA154; A6744-45.

Eige understood the request to "get this going" as a request to "[s]omehow

reach out and see if there—if we couldn't elicit some type of response from these

two universities."  A3214.  Even without knowing about Williams's payments to

the McDonnells, Eige "didn't think that was an appropriate activity for the

Governor's Office, for the Governor to be involved with for the staff."  *Id.*

Meanwhile, at 11:56pm on February 16, 2012, defendant wrote to Williams,

"Johnnie [sic].  Know u have been slammed.  Do u want me to call your lawyer on

the certificates and the documents.  Thanks for all your help.  Gov."  SA156.

Defendant's reference to the "certificates" related to what he and Williams had

discussed on their February 3 call as an alternative to a cash loan, and when he sent

his email, defendant "figured we needed to have money for MoBo operations

probably by no later than early March."  A6312, 6748; SA156.

Six minutes after defendant emailed Williams about the prospective loan,

defendant emailed Eige using defendant's gmail account and wrote, "Pls see me

about anatabloc issues at VCU and UVA.  Thx."  SA157.  Within four minutes,

Eige responded to defendant, "will do.  We need to be careful with this issue."

SA158.  Eige testified that "this was just not something the Governor's Office

27

should be involved with" and that it was not "an appropriate use of our time or our—our authority." A3218.

On cross-examination, defendant was asked, "at this point, you know that Mr. Williams wants your assistance in getting UVA and VCU to agree to help with the studies, right?" A6750. Defendant replied, incredibly, "No." A6750.

In February 2012, Williams asked Kilgore, Star's lawyer, "why we weren't moving forward with the Tobacco Commission, and [Kilgore] said, 'Well, UVA and VCU haven't stepped up to the plate yet. So we can't move forward.'" A4373. Williams "was not happy about that." A4373. Williams "again reminded" Kilgore that defendant and his wife "supported his research and they wanted to find a way to help the research." A4373.

Eige called Kilgore "again to say that, you know, 'I don't think we should be pressuring UVA and VCU on this research,'" and Kilgore responded, "What are you talking about?" A4374. Eige replied, "Well, I've been asked by the Governor to call and put—you know, show support for this research, and I'm just—I just don't think we should be doing it." A4374. Kilgore, who like Eige was unaware of the financial relationships between Williams and defendant, testified that there was nothing inherently illegal about the governor supporting research and that the governor's support was helpful. A4375. Kilgore told Eige, "We'd like to have the support. We'd like to have the Governor's support" for the Anatabloc research

"with any of Virginia's universities." A4375. But Eige "said he was uncomfortable with the Governor doing it." A4376. Kilgore relayed Eige's concerns to Williams, who responded that the governor and first lady supported the research and he wanted their help. *Id.*

On February 29, 2012, defendant and Williams met at 1:30pm in the governor's private conference room to discuss ways that Williams could provide money to defendant by transferring Star stock, and defendant took notes on proposals for how Williams could help financially. A6767-68; SA245. One option Williams proposed was giving defendant 50,000 shares, allowing defendant to use them as loan collateral, with defendant returning the shares within four years. A6770. Another option had defendant paying Williams back within four years the value of the 50,000 shares at a price of $2.20, which at the time were trading at $3.75. A6771-72. In other words, Williams was offering to accept $110,000 in repayment for shares then worth $187,500.

Reportability again came up, and Williams "said that I'd just as soon keep this between us and no one know this." A2332. Defendant "said that was fine with him. And that's why no lawyers were contacted." A2332-33. Williams "didn't want anyone to know that I was helping the Governor financially with his problems while he was helping our company." A2333-34, 2342, 2351. Ultimately, Williams and defendant decided that a straight $50,000 loan was the

better course because there was no way to conduct a stock transfer from Williams

without it being disclosed.  A2346-47.

That evening, to the dismay of Secretary Hazel, the healthcare leaders

reception featured doctors whom Williams invited and wanted to study his product.

A2312-14, 3635-36, 3756.  The reception costs for Williams's guests were covered

with taxpayer dollars.  A3638-41; SA160-61.  Williams's guests included at least

one VCU researcher whom Williams actively solicited at the event to perform

Anatabloc studies.  A4460.  According to Secretary Hazel, the people affiliated

with Williams at the event did not "contribute in any way to the policies, public

policy and healthcare in Virginia" or "even to the economics of healthcare in

Virginia."  A3760.  Nevertheless, in response to a request from Williams,

defendant publicly recognized Dr. Paul Ladenson, a Maryland doctor who he knew

was affiliated with Star and who had attended the Anatabloc launch in August

2011.  A2336-38.  That night, defendant, Williams, Ladenson, and another doctor

whom Williams wanted to perform Anatabloc studies went out for a $1,400 dinner

for which Williams paid; the group discussed Anatabloc at dinner; and the doctors

stayed the night at the mansion at defendant's invitation.  A2338-39, 3719-20.

Dr. Hazel could not recall anyone other than Williams who had received

such a level of support from the McDonnells:  "I can't recall that there was ever a

situation quite like this one."  A3766.  He continued, "[L]ooking from sitting here

now four years into this, there was never anything quite like this that I saw.  I don't think I was ever looking at a product like this.  I don't think that there was the involvement that we had in terms of just the repeated contacts.  The Mansion event was unique.  That was the only time that happened."  A3767.

**J.    March 2012: Williams provided the $50,000 loan, and defendant took action on Williams's desired inclusion of Anatabloc in the state employee health plan.**

On March 6, 2012, Williams's assistant issued the $50,000 loan check, which was deposited into the MoBo account on March 12.  SA159; A6792-93.  When Williams had the check issued, he "expected what had already happened, that [defendant] would continue to help me move this product forward in Virginia" would continue to happen "[w]hether it was assisting the universities, with the testing, or help with government employees, or publicly supporting the product."  A2355.

A couple of weeks later, on March 21, 2012, defendant attended a meeting with another cabinet official, his secretary of administration Lisa Hicks-Thomas, who oversaw state employee health plans.  Defendant's chief of staff was also scheduled to attend the meeting because it was a "pretty big deal."  A6333.  In the meeting, defendant pulled Anatabloc out of his pocket and told the cabinet secretary that he had been taking the pills, that "they were working well for him,

31

and that he thought it would be good for [] state employees." A4227.[5]  Defendant

then asked the cabinet secretary and her subordinate to meet with the Anatabloc

people.  A4226-27.  After the meeting, the cabinet official and her subordinate

immediately walked down the hall and looked up Anatabloc on a computer.

A4228.  Notably, defendant, Hicks-Thomas, and staffers jointly decided what

drugs would be covered by the state medical plan.  A4225-26.

> ### K. May through September 2012: Williams provided another $20,000 loan and another expensive vacation, while Williams continued to seek defendant's action on state studies and other government assistance.

Defendant admitted that Williams "had told me on several occasions that if

we needed to borrow more after that $50,000, that he would do that." A6251.  *See*

*also* A2355-57; SA162, 164.  In a text message on May 18, 2012, defendant took

him up on it and wrote, "Johnnie [sic].  Per voicemail would like to see if you

could extend another 20k loan for this year.  Call if possible and I'll ask mike to

send instructions.  Thx bob."  SA166.  Twelve minutes later, Williams responded,

"Done.  Tell me who to make it out to and address.  Will FedEx.  Jonnie."  A2358;

SA168.  Williams's motivation for doing so was the same as it had been all along:

---

[5] Defendant's statements coincided with a plan Williams had explained to Huffstetler at the August 1 meeting ordered by the defendant.  In that meeting, Williams told Huffstetler that in addition to the UVA and VCU studies, he wanted state employees to take Anatabloc as part of the health plan and to study the results.  A2271, 3054.

"I was loaning him money so that he would help our company."  A2360.

Defendant's wife played no role in this $20,000 loan.  A6455.

Eight days after lending defendant $20,000, Williams contacted one of the

VCU researchers he wanted to study Anatabloc.  A4464.  And as late as August 9,

2012, Clore was still considering a potential Anatabloc study.  A3119-20.  All the

while, Williams and defendant both understood their agreement.  Between April

and July 2012, defendant, who had told Williams he was a Star stockholder, sent

Williams four emails or texts about Star's stock that coincided with its rising stock

price.  SA191-93; A2360-64.  On July 3, 2012, after defendant texted "[s]tock

looks good," Williams wrote, "Johns Hopkins human clinical trials report on

August 8th.  If you need cash let me know.  Let's go golfing and sailing Chatham

Bars inn Chatham mass labor day weekend if you can.  Business about to break out

strong.  Jonnie."  SA170.  Defendant accepted Williams's offer to vacation at

Chatham Bars, where Williams spent more than $7,300 on the McDonnells,

including their share of a $5,823.79 clambake.  SA173.  Dr. Ladenson, the same

doctor who had attended the launch and healthcare leaders events at the mansion,

also came to Chatham Bars at Williams's expense; Williams testified, "I was

working.  I was there with Dr. Ladenson to try to help get the Governor more

involved."  A2371.

**L.      Throughout the scheme, defendant concealed the bribes from the state officials he sought to influence on Williams's behalf.**

None of the UVA or VCU researchers who attended the mansion events knew about the things of value that Williams had provided to defendant.  A3120, 3356, 4322, 4462.  Similarly, with limited exceptions for low-dollar items or vacations that could not have been concealed from the staff, none of defendant's staff or political advisors knew about the things of value.  A2877 (Cox); 2998 (Block); 3159-60 (Eige); 3473 (Sutherland); 3641 (Scarbrough); 3793, 3807 (Martin); 4130, 4140 (Kent).

Nor did the voters.  None of the items that defendant received from Williams and hid from his staff was disclosed on his Statement of Economic Interests ("SOEI").  For example, defendant never disclosed the $15,000 wedding check, even though he was personally liable for the catering contract, and he and Williams were not friends.  A3793, 6341-42.  He also lied to his press secretary that "the family was paying" for the wedding.  A3790; SA197.  Nor did defendant disclose any of the golf outings or equipment that Williams bought for him.  A6138, 6342, 6344, 6673, 6675.

Moreover, defendant and his wife intentionally structured the sale and repurchase of the Star Scientific stock they held in Mrs. McDonnell's name to avoid SOEI reporting requirements—twice.  A3188-89.  In December 2011, Mrs. McDonnell sold all of her shares of Star stock at a loss of $17,812.56, and she then

34

repurchased them on January 20, 2012, allowing defendant to file an SOEI in January that truthfully did not report the stock ownership, since the SOEI is concerned only with stock that is held at the time of filing.  A3188-89, 6166.  In December 2012, defendant's wife transferred Star stock to defendant's children as a gift, right before the end of the year, again allowing him to file an SOEI that did not disclose any Star stock ownership.  A6275.

### M.     Trial and Sentencing

Defendant and his wife were indicted on 14 counts on January 21, 2014. A1045-51.  The jury found defendant guilty of all 11 corruption counts: conspiracy to commit honest-services wire fraud (Count 1), 18 U.S.C. § 1349; honest-services wire fraud (Counts 2-4), 18 U.S.C. § 1343; and conspiracy to obtain and obtaining property under color of official right (Counts 5-11), 18 U.S.C. § 1951.[6]  The district court sentenced defendant to two years of imprisonment, to be followed by two years of supervised release.

### Summary of Argument

1.     The United States adduced ample evidence from which a rational jury could find that defendant accepted Williams's largesse in exchange for official action.  Indeed, the trial evidence overwhelmingly showed that defendant accepted

---

[6] The substantive counts charged wires or extorted property related to the $120,000 in loans (Counts 3-4, 6, 10-11), $15,000 catering check (Counts 2 and 7), $2,380 golf outing in May 2011 (Count 8), and $1,368.91 golf outing in January 2012 (Count 9).

Williams's personal payoffs as part of a corrupt agreement to retain defendant's services on an as-needed basis, so that whenever the opportunity presented itself, defendant would use his gubernatorial power to take specific action on Williams's behalf.

Promoting businesses was a settled practice of Virginia governors, and defendant routinely exercised his gubernatorial power to do so by hosting events on state property, arranging meetings with subordinate state officials, and otherwise wielding his influence. Moreover, the evidence easily established that defendant knew Williams wanted action on matters that were pending before defendant, including studies at state medical schools and inclusion of Anatabloc in the state health plan. Defendant delivered, acting unilaterally on multiple occasions to advance Williams's goals by directing subordinates to aid Williams and by approving Williams's use of state property to convince researchers to study his product.

Although defendant and his *amici* characterize this case as unusual, they do so only by confusing the applicable law and artificially sanitizing the facts. But as this Court held in *Jefferson*, bribery's official-action requirement is met when (1) an official agrees to take various "actions"—such as conducting meetings, sending letters, and the like; (2) those actions are "on" various "matters" or "causes" relating to promoting business ventures; and (3) those matters or causes are

36

pending before that official as a matter of settled practice.  The evidence here easily satisfied that standard; indeed, defendant directed his actions toward subordinate state employees, not other branches or foreign governments like Jefferson did.  Thus, defendant's conviction does not break new ground or threaten democracy; the jury convicted him of a textbook *quid pro quo*.

2.     The district court properly charged the jury with instructions that were materially indistinguishable and follow inescapably from those this Court approved in *Jefferson*. The court required the jury to find that the alleged official action in this case met the statutory definition set forth in 18 U.S.C. § 201(a)(3), and it otherwise instructed the jury using settled principles of bribery law.  Moreover, the court adequately described the particular *quid pro quo* alleged, and it properly required the jury to find corrupt intent, bad faith, and intent to defraud. Defendant's allegations of error in those instructions are wrong, and his proffered alternative instructions were either legally inaccurate or otherwise adequately addressed by the charge given.  The district court did not abuse its considerable discretion in instructing the jury.

3.     The district court did not abuse its discretion in questioning prospective jurors on pretrial publicity.  After using a 99-item questionnaire that asked numerous questions about exposure to media coverage, the district court collectively questioned prospective jurors about pretrial publicity.  The court also

37

"brought to the bench each juror that McDonnell's counsel identified as cause for concern and questioned each about his or her opinion of the case and ability to remain impartial." A964. The court then "asked McDonnell's counsel if there is 'anybody else' he would like to question, and McDonnell's counsel responded 'not on publicity.'" *Id.* This process provided a fair opportunity to screen jurors for any potential bias, and defendant has not shown (or even alleged) that any biased juror was actually seated. Indeed, defendant's jury showed tangible impartiality by acquitting on some counts and convicting on others.

4.    The district court also did not abuse its discretion in declining to decide defendant's severance motion based on *ex parte* evidence and denying severance when defendant refused to subject his motion to the adversarial process. Defendant repeatedly refused to provide the district court with anything more than conclusory assertions regarding the need for his co-defendant's testimony unless the district court agreed to consider an *ex parte* affidavit. The district court properly declined to do so because such *ex parte* procedures are inadequate when a motion implicates a large volume of factual materials with many subtle interrelationships. Defendant's post-conviction decision to unveil the *ex parte* affidavit proves the point, as it outlines purported co-conspirator testimony that would have been highly impeachable and not truly exculpatory.

5.    Finally, none of defendant's handful of allegations of evidentiary error shows an abuse of discretion.  Under settled precedent, the court properly excluded expert testimony on witness credibility and legal conclusions, and properly admitted evidence that defendant concealed his relationship with Williams on state disclosure forms and sought similar things of value (namely, free golf) from others.

## Argument

### I.    Sufficient evidence easily showed that defendant agreed to perform official acts as needed in exchange for luxury goods and money.

#### A.    Standard of Review

The jury's finding that defendant agreed to perform official acts is reviewed as ultimately a question of fact.  *United States v. Ring*, 706 F.3d 460, 469 (D.C. Cir. 2013).  And in our legal system, the jury is entitled "to weigh contradictory evidence and inferences, pass on the credibility of witnesses, and draw the ultimate factual conclusions."  *United States v. Gomez-Jimenez*, 750 F.3d 370, 379 (4th Cir. 2014).

#### B.    Analysis

Defendant's convictions for honest-services fraud and Hobbs Act offenses require proof of a corrupt *quid pro quo*.  As the jury instructions stated, a public official must receive an "item of value corruptly in return for being influenced in the performance of any official act."  A7669.  This standard applies both to the

Hobbs Act, *Evans v. United States*, 504 U.S. 255, 268 (1992), and to honest-services fraud, *Skilling v. United States*, 561 U.S. 358, 408-09 (2010); *Jefferson*, 674 F.3d at 358, 362. And the "quid pro quo requirement is satisfied so long as the evidence shows a course of conduct of favors and gifts flowing to a public official *in exchange for* a pattern of official actions favorable to the" payor. *Id*. at 359 (quoting *United States v. Quinn*, 359 F.3d 666, 673 (4th Cir. 2004); *United States v. Jennings*, 160 F.3d 1006, 1014 (4th Cir. 1998)).

Defendant does not dispute that he and his family received numerous payments from Williams over two years. And given the deference owed to jury verdicts, defendant cannot contest the jury's findings that—as the jury instructions required—he received the payments with an intent to defraud, A7667, 7672, with corrupt intent, A7669-70, in bad faith, A7692, as part of an agreed-upon exchange, A7669, 7682-83, and through a conspiratorial agreement, A7661-63. *See, e.g., Evans*, 504 U.S. at 257 (under sufficiency-of-the-evidence standards, defendant's "acceptance of the bribe constituted an implicit promise to use his official position to serve the interests of the bribegiver"); *United States v. Hamilton*, 701 F.3d 404, 409 (4th Cir. 2012) (rejecting as "meritless" a sufficiency challenge to jury findings of intent and agreement in bribery case where evidence was "circumstantial").

Defendant's singular focus on what constitutes official action under 18 U.S.C. § 201(a)(3)—with his two-and-a-half-page review of the trial evidence—waives any sufficiency challenge to the jury's finding of corrupt intent, the *quid*, the *pro*, and the conspiratorial agreement. *Johnson v. United States*, 734 F.3d 352, 360 (4th Cir. 2013) (opening brief must contain "'authorities and parts of the record on which the appellant relies'" (quoting Fed. R. App. P. 28(a)(9)(A)).

### 1. Section 201(a)(3)'s definition of official action is broad but not unlimited.

The district court defined "official act" for the honest-services and Hobbs Act counts using the federal bribery statute's definition in 18 U.S.C. § 201(a)(3): "the term 'official act' means any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit." The plain language of this definition has interrelated parts that require (1) a "decision or action" that is (2) "on" a "question, matter, cause, suit, proceeding or controversy" that (3) "may at any time be pending" before the public official.

Section 201(a)(3)'s standard is phrased in broad terms. First, the statutory language covers "any" decision or action on "any" question or matter that may "at any time" be pending. The repeated use of "any" is not narrowing language.

41

Second, by embracing any "question," "matter," or "cause" as a potential

subject of official action—in addition to the more formal categories of "suit,

proceeding, or controversy"—the definition refutes that official action is limited to

formal executive, legislative, or judicial processes.

Third, "decision" and "action" are listed in § 201(a)(3) in the disjunctive,

and when interpreting disjunctive statutory terms, courts "must construe all parts to

have meaning" and avoid surplusage.  *United States v. Briley*, 770 F.3d 267, 273

(4th Cir. 2014) (quotation omitted).  Moreover, neither "decision" nor "action"

requires that the objective of a bribe be accomplished.  The agreed-upon exchange

is what is prohibited, and "fulfillment of the *quid pro quo* in not an element of the

offense."  *Evans*, 504 U.S. at 268.  *See also United States v. Brewster*, 408 U.S.

501, 526 (1972); *United States v. Hairston*, 46 F.3d 361, 365 (4th Cir. 1995).

The breadth of "official action" is unsurprising, because Congress has a

"long-standing commitment to a broadly-drafted federal bribery statute" and has

"expressed [a] desire to continue that tradition."  *Dixson v. United States*, 465 U.S.

482, 496 (1984) (discussing 1962 revisions to § 201(a)'s definition of "public

official").  That is sensible, as § 201(a)(3)'s general terms must cover widely

varied government officials and their duties, from the President to a prison guard,

and flexibility is necessary to prevent creative evasion of bribery prohibitions.  But

despite its breadth, § 201(a)(3) "does not encompass every action taken in one's

42

official capacity"; rather, "such an act must yet adhere to the definition confining an official act to a pending 'question, matter, cause, suit, proceeding, or controversy.'" *Jefferson*, 674 F.3d at 356 (quoting § 201(a)(3)).

### 2. Controlling precedent defining "official action" supports the verdict here.

Two controlling cases construing "official action" under § 201(a)(3) are especially illuminating on its scope—this Court's opinion in *Jefferson* and the Supreme Court's in *United States v. Birdsall*, 233 U.S. 223 (1914). Notably, defendant mischaracterizes *Jefferson* and mentions *Birdsall* only once, fleetingly, Defendant's Brief (DB) 37. But both cases make clear that although § 201(a)(3) does not engulf all actions that officials take, the statute's general terms squarely cover the alleged official actions at issue here.

### a. Jefferson

First, *Jefferson* illustrates how § 201(a)(3)'s requirements of action on pending matters apply to elected officials' promotion of constituents' businesses in exchange for personal payoffs. Jefferson, a former congressman, received payments to help advance bribe payors' interests primarily on trade with African countries, a matter he addressed through the settled practice of constituent services. *Jefferson*, 674 F.3d at 356-59. The trade itself—often between a private company and a foreign government—was not something that a congressman directly controlled or even that Congress as a whole determined. *Id.*

All three requirements of § 201(a)(3) were met: (1) Jefferson agreed to take, took, and directed various "actions"—meetings, letters, trips, and the like; (2) those actions were "on" matters or causes of African trade; and (3) such matters or causes were pending before Jefferson by virtue of his position. *Id.* at 357-58. It did not matter that the business ventures Jefferson promoted fell "outside the formal legislative process" or that he had no formal role in their resolution. *Id.* at 357. Nor did it matter that the actions Jefferson took and agreed to take were interim steps toward businesses' longer-term goals—"meeting[s], letter[s], trip[s], or other action[s]" taken over the course of years. *Id.* at 359 ("In that context, it would be impossible—and it is unnecessary—to link every dollar paid … to a specific meeting, letter, trip, or other action by Jefferson to fulfill his end of a corrupt bargain."). What did matter was that Jefferson took action "*with the specific understanding* that he would assist in [his bribe payors'] business ventures." *Id.* at 356.

Highlighting the relevant standard of review, this Court explained why § 201(a)(3)'s definition was easily met. "[T]he jury was free to find, first of all, that performing constituent services was a settled practice of Jefferson's congressional office and, second, that *African trade issues* were 'matters' or 'causes' that were pending before him. The jury was then entitled to conclude that Jefferson's actions in connection with both constituent requests and the promotion

of trade in Africa fall under the umbrella of his 'official acts.'"  *Id*. at 357-58 (emphasis added).

Defendant's case follows *a fortiori*: (1) he agreed to take, took, and directed various "actions"—meetings, events, and the like; (2) those actions were "on" matters or causes of Virginia business development, such as studies at state universities and use of Anatabloc in the state employee health plan; and (3) such matters or causes were pending before defendant by virtue of his position.  Indeed, unlike Jefferson, a legislator who had no formal authority over the African countries, private entities, and executive agencies that were parties to his bribe-payor's business deals, defendant was a chief executive who could take myriad official actions on his own accord and had ultimate authority over the subordinate state officials whom he directed and influenced on Williams's behalf.

### *b.*    **Birdsall**

*Birdsall* also illustrates § 201(a)(3)'s breadth and applicability here.  In *Birdsall*, two officers appointed by the Commissioner of Indian Affairs to prevent liquor trafficking were indicted for accepting bribes from an attorney in exchange for recommending leniency for his clients.  233 U.S. at 227-28.  The officers made sentencing recommendations to the Commissioner "either directly or through other subordinates" on sentencing leniency and clemency.  *Id*. at 228.  And through

settled practice, federal judges and the U.S. President consulted with the Commissioner on those topics. *Id*. at 228-29.

The Supreme Court unanimously held that the officers' agreement to make recommendations to the Commissioner satisfied official-action standards even though the practice of making recommendations was not "prescribed by statute" or by "written rule or regulation." *Id*. at 231. "In numerous instances, duties not completely defined by written rules are clearly established by settled practice, and action taken in the course of their performance must be regarded as within the provisions of the above-mentioned statutes against bribery." *Id*. at 231.

In other words, in keeping with § 201(a)(3)'s language, the recommendations in *Birdsall* on sentencing or clemency were (1) decisions or actions (2) "on" a question or matter—namely, the Commissioner's position on sentencing or clemency—and were (3) pending before the officers as a matter of settled practice, even though not part of a legally prescribed procedure. Because the recommendations were settled parts of the officers' jobs on matters pending before them, they could not accept bribes to make those recommendations, even though their role was informal, and even if they never actually made the recommendations.

Again, defendant's case is directly supported by *Birdsall*. Indeed, unlike the subordinate officers who made nonbinding recommendations in *Birdsall*,

defendant was the chief executive, took and directed action on his own, and had ultimate authority over all state employees.

### 3.    Courts routinely find acts similar to defendant's to be official actions without encompassing all actions an official takes.

Consistent with *Jefferson* and *Birdsall*, courts have routinely found action similar to—and often far less substantial than—defendant's to qualify as official action. *See, e.g.*, *Ring*, 706 F.3d at 468-70 (email and phone call to further visa application); *United States v. Rosen*, 716 F.3d 691, 695 (2d Cir. 2013) (state legislator's actions included writing "letter on State Assembly letterhead stationery" to state senate majority leader asking to restore hospital funding and "set up a meeting between Rosen and the Governor's chief of staff" to discuss hospital debt relief); *United States v. Moore*, 525 F.3d 1033, 1041 (11th Cir. 2008) (rejecting that "the 'low level actions alleged in this case'" were not official acts; actions such as prison officers switching unit assignments, allowing telephone calls, making telephone calls, permitting meetings, and giving a key to help facilitate meetings were all sufficient to "fall within the broad definition of 'official act' set forth in *Birdsall*"); *United States v. Biaggi*, 853 F.2d 89, 98 (2d Cir. 1988) (congressman made phone calls to other officials, sent letters on official stationery, and attended meetings to assist payor with state nonprofit chartered by city).

These cases illustrate that what matters is not the category or form of the "action"—a meeting, an email, a phone call, or an event on state property—but

rather whether a rational jury could find that an action or course of action is "on" a pending question, matter, cause, suit, proceeding, or controversy.

Accordingly, the three-part test in § 201(a)(3) is not satisfied by a politician simply attending a Rotary egg breakfast (no matter pending); hosting a championship sports team at the White House (same); inviting donors to a campaign event (same); kissing a baby (same); giving commencement speeches (same); or posing for photographs (same). Moreover, the critical requirements of corrupt intent, a *quid-pro-quo* exchange, bad faith, and an intent to defraud are important limiting principles for these and many other obviously noncriminal hypotheticals. In citing such examples to contend that the government's theory of official action is too sweeping, defendant and his *amici* ignore the basic limits of the statutory language, the heightened mental state required for a bribery conviction, and the facts of this case.

### 4. *The evidence here easily supported the jury's finding on official action.*

The central policy initiative of defendant's administration was promoting Virginia businesses—a settled practice of his and other governors' administrations. A2858, 3588, 3785-86, 4092-93, 4487-89, 5902-03. In particular, defendant provided assistance to Williams and Star on things the state could provide— research at state medical schools and use of Anatabloc in the state health plan. Moreover, the matter of promoting Williams's business by helping him obtain state

studies and government assistance on Anatabloc was pending before defendant;

that is, after all, why Williams paid for it.

In predicting the collapse of politics as we know it if his conviction is

affirmed, defendant ignores how firmly grounded the specific types of official

actions *he agreed to* are in § 201(a)(3)'s requirements.  Using identical language,

both the indictment and the jury instructions described the specific type of official

acts that were part of the agreement in this case:

> First: Arranging meetings for Jonnie Williams, Sr. with Virginia
> government officials who were subordinates of the Governor *to*
> *discuss and promote Anatabloc*;

> Second: Hosting and the defendants attending events at the
> Governor's Mansion *designed to encourage Virginia university*
> *researchers to initiate studies of anatabine and to promote Star*
> *Scientific products to doctors for referral to their patients*;

> Third: Contacting other government officials in the Office of the
> Governor as part of an effort *to encourage Virginia state research*
> *universities to initiate studies of anatabine*;

> Fourth: *Promoting Star Scientific's products and facilitating its*
> *relationships with Virginia government officials* by allowing Jonnie
> Williams, Sr. to invite individuals important to Star Scientific's
> business to exclusive events at the Governor's Mansion;

> Fifth: Recommending that senior government officials in the Office of
> the Governor of Virginia *meet with Star Scientific executives to*
> *discuss ways that the company's products could lower healthcare*
> *costs*.

A7659-60 (jury instructions), 114-15 (indictment) (emphasis added).

On the trial record in this case, a rational jury could easily find the government proved the agreement between defendant and Williams encompassed the above, satisfying the official-action standard. Indeed, the government was not required to show that defendant actually performed any official actions or that defendant and Williams knew what actions defendant would be called upon to do as part of the corrupt *quid pro quo* at the time of any given bribe. "[A]ll that must be shown is that payments were made with the intent of securing a specific *type* of official action or favor in return. For example, payments may be made with the intent to retain the official's services on an 'as needed' basis, so that whenever the opportunity presents itself the official will take specific action on the payor's behalf." *Jennings*, 160 F.3d at 1014.

Defendant agreed to take a course of "actions" that were "on" the "matter" of promoting Williams's Virginia business through state research, and he then did so using settled practices of arranging meetings with cabinet-level staff and holding events at the mansion to promote Williams's company. This was not eggs at a Rotary club breakfast or a free cocktail at the Jefferson Hotel—this was "plain as a pikestaff" bribery. *Skilling*, 561 U.S. at 412.

In contending otherwise, defendant and his *amici* systematically sanitize every action he took on Williams's behalf by omitting the pending "matters" they were "on," as the indictment, closing arguments, and jury instructions described

50

with precision.  But as set forth in the five examples below, defendant himself—at least at the time of his conduct—understood full-well what matters he agreed to take (and then took) action "on." [7]

### a.      August 1 meeting.

After defendant received Williams's June 16 letter proposing state studies of Anatabloc, and some 90 minutes after driving Williams's Ferrari home from a *gratis* family weekend in Williams's opulent lakehouse, defendant directed his Secretary of Health, Bill Hazel, to send a deputy to a meeting "at the mansion about 10 am with first lady ***on*** *the Star Scientific anatablock [sic] trials* planned in va at vcu and uva."  SA80 (emphases added).  At 6:28 am the next morning, despite his personal views that Williams's product was garbage, Hazel dutifully obliged, "Will do."  *Id.*  As defendant's own email stated, he took action, by directing Hazel, "on the Star Scientific anatablock trials planned in va at vcu and uva," the pending matter of promoting Williams's state studies.

The deputy, who like Hazel referred to Williams as the "Tic-Tac Man," would not have attended if the governor had not made the request, but did so in order to "do what we can to carry out the desires of the Governor and First Lady."

---

[7] In addition to sanitizing their context, defendant also scrambles the chronological order of the five examples below, addressing the last three before the first two.  DB44-48.

A3042-43, 3059, 3746; SA81.  Plainly, a rational jury could conclude that this was

action on the pending matter of promoting Williams's state studies.

### b.     August 30 mansion event.

Defendant's approval of and attendance at the launch was likewise "action"

on a pending "matter."  Its purpose "was to launch Anatabloc" and "encourag[e]

universities to do research on the product"—via the same studies the August 1

meeting was "on."  A3608.  State employees arranged the event on official, state-

paid time; the invitations bore the Governor's seal; two senior officials attended;

and the university researchers who attended did so as part of their state jobs.

A3113, 3337-38, 3591-92, 6298; SA104.  As the government argued to the jury,

"this wasn't some ceremonial event without context or some event with no

purpose.  Hosting this event at the Mansion and all that went with it is what

mattered most to Jonnie Williams and Paul Perito and Star."  A7412.

The event also had an effect.  UVA's Dr. John Lazo explained that he was

"wide-eyed" about it and reported defendant's support to his university colleagues.

A3346-55.  Perhaps most tellingly, one of Lazo's colleagues, Sharon Krueger,

wrote a pro/con list about the studies that illustrated the impact of the governor's

influence and support, listing as the first pro "[p]erception to Governor" and the

first con "[p]olitical pressure from Governor and impact on future UVA requests

52

from the Governor." SA109; A4321. Ample evidence allowed the jury to

conclude that hosting the launch was an official act.

### c.    Eige email exchange.

The events surrounding the early February email exchange involving Jasen

Eige, defendant's cabinet-level policy advisor, also make clear that defendant

agreed to provide action on pending matters. Leading up to that point, Williams

was frustrated with the lack of progress with studies at the state medical schools.

When he communicated that to the first lady, she told him that defendant "was

furious" and "wants the contact information of the people that your company is

dealing with at University of Virginia." A2308-09. Then, after Williams and

defendant spoke on the phone about a loan, A6221, the first lady wrote to Eige,

"Here's the info from Jonnie, He has calls in to VCU & UVA & no one will return

his calls," SA147; A6734-35. Following up, and while sitting next to defendant in

an SUV, she wrote, "Gov wants to know why nothing has developed w studies

after Jonnie gave $200,000" and "Gov wants to get this going w VCU MCV."

SA154; A6744-45. Eige interpreted the request to "get this going" as an

instruction to "[s]omehow reach out and see if there—if we couldn't elicit some

type of response from these two universities." A3214. Then, six minutes after

defendant wrote to Williams to borrow more money, defendant wrote to Eige, "Pls

see me about anatabloc issues at VCU and UVA. Thx." SA156, 158.

On these facts, a jury could easily conclude that defendant agreed to take action on the matter of obtaining studies for Williams. If there were any question about the power of such action, Eige's later statements to Jerry Kilgore, Star's lawyer, exterminate it: "Well, I've been asked by the Governor to call and put— you know, show support for this research, and I'm just—I just don't think we should be doing it," and "I don't think we should be pressuring UVA and VCU on this research." A4374.

### d.    *Healthcare leaders event.*

Defendant's use of taxpayer funds to pay for Williams's guests at the healthcare leaders event over Hazel's well-known objections to Williams likewise showed defendant's agreement to take action on a pending matter. In the midst of defendant's secret negotiations over a $50,000 loan from Williams, the first lady told Williams to "invite all the doctors that you want to invite" and prompted him to "expand on your list." A2312-13. And as the mansion director explained, defendant and his wife handwrote on the same piece of paper the very people who could help Williams, the "[h]ead officers at VCU/MCV, UVA," and then passed the directive on to the mansion director, who promptly complied. A3624-28; SA146. Immediately before the event, defendant met with Williams about the loan, A6767, and after that meeting, defendant publicly recognized one of

54

Williams's doctors at the event and went to dinner with Williams's group on Williams's dime, A2336-40, 3719-20.

Again, the record is replete with evidence from which a rational jury could conclude that hosting the event, inviting Williams to stack the attendees with people of his choice, and publicly lauding one of Star's lead researchers showed an agreement to provide official acts in exchange for Williams's largesse.

### e.    Meeting with Secretary Hicks-Thomas.

After Williams issued a $50,000 check to defendant on March 6, 2012, defendant attended a meeting on March 21, 2012, with his secretary of administration about state employee health plans.  Defendant, the secretary, and staffers jointly decided what drugs would be covered by the plan.  A4225-26. Defendant described the meeting as a "pretty big deal."  A6333.  Defendant pulled Anatabloc out of his pocket, told the cabinet secretary that "they were working well for him, and that he thought it would be good for [] state employees."  A4227. And defendant "asked" the cabinet secretary to "meet with" the Anatabloc people, causing her to research the company.  A4227.  Again, a rational jury could conclude that defendant took official action by encouraging his cabinet secretary, who had oversight of state employee health plans, to consider Williams's product as "good for state employees."

### 5. *Defendant's arguments are meritless.*

Defendant raises a series of legal arguments that apply both to his sufficiency challenge and jury-instruction challenges. All are meritless.

### a. *Defendant and his **amici***'s efforts to restrict the official-action standard are misguided.*

First, defendant claims that his conviction must be set aside because Williams "received no grants, no bills, no appointments, no budget items, no permits, and not a dime of state money." DB1. His *amici* do the same, claiming various heightened official-action standards limited to, for example, "mak[ing] a board appointment, or offer[ing] a government job, or promulgat[ing] an executive order, or award[ing] a state contract, or expend[ing] public funds, or approv[ing] the adoption of a regulation, or sign[ing] or veto[ing] legislation." Dkt. 60, at 4.

But even setting aside that Williams *did* receive the benefit of state funds (through, at a minimum, the taxpayer dollars that funded the healthcare leaders reception), *Birdsall* and *Jefferson* foreclose such restrictive views of official action. *Jefferson*, 674 F.3d at 357 (official acts "need not be prescribed by statute" and may "fall[] outside the formal legislative process"); *Birdsall*, 233 U.S. at 231 (official acts need not be "prescribed by a written rule or regulation" and may be

"found in an established usage"). Indeed, neither defendant nor his *amici* have

supplied any workable standard that would exclude defendant's conduct.[8]

### b. *Defendant's reliance on* **Sun-Diamond** *is misplaced.*

Defendant invokes *dicta* in *United States v. Sun-Diamond Growers of Cal.*,

526 U.S. 398 (1999), a gratuities case. *Sun-Diamond* did not overrule *Birdsall*,

and *Jefferson* rejected that *Sun-Diamond* restricted the definition of "official

action" where, as here, the instructions limit that term to § 201(a)(3)'s definition

and otherwise include the *quid pro quo* requirements of bribery. 674 F.3d at 355-

56.

*Sun-Diamond* did state in *dicta* that reading the gratuity statute to reach gifts

given merely "by reason of the donee's office" would potentially criminalize *de*

*minimis* gifts—such as the President's receiving a replica jersey from a

championship sports team visiting the White House, a high school principal giving

a school baseball cap to the Secretary of Education, or farmers giving "a

complimentary lunch for the Secretary of Agriculture in conjunction with his

---

[8] For example, defendant's argument that "[t]he statutory definition in § 201(a)(3) requires that a government official promise to exercise, or induce others to exercise, actual governmental power," DB27, begs the question of what "governmental power" is and what makes it "actual." A reasonable jury could have found that defendant agreed to and did exercise his "actual governmental power" by, for example, ordering a subordinate state employee to take a meeting he described as "on" a particular issue, approving and attending an event on state property and arranged using state employees, and by taking a series of actions designed to convince other subordinate state officials to study Williams's product.

57

speech to the farmers concerning various matters of [Department] policy." 526

U.S. at 406-08. The Court said such "absurdities" could be avoided if "those

actions" are not deemed "official acts." *Id*. at 407-408.

Although *Sun-Diamond*'s brief, unelaborated *dicta* did not explain why the

examples listed could be deemed not official acts, *Sun-Diamond* is best understood

as saying that, without more, such ceremonial events like honoring a sports team

do not involve a pending question, matter, cause, suit, proceeding, or controversy.

But when a governor secretly receives payments totaling more than $177,000 over

two years in exchange for helping the bribe payor obtain state studies of his

product, that scenario readily falls outside of *Sun-Diamond*'s *dicta*. A great deal of

what governors do involves meetings, events, and recommendations; *Sun-Diamond*

did not say that they are all "set up for sale," as Lord Mansfield said many years

ago. *Rex v. Vaughan*, 98 Eng. Rep. 308, 310 (1769).

> ### c.    *Defendant's citations to various outlier, out-of-circuit cases do not help him.*

Defendant gains nothing from *Valdes v. United States*, 475 F.3d 1319 (D.C.

Cir. 2007), a gratuities case. Unlike in the present case, the district court in *Valdes*

"refused to include" in its instructions § 201(a)(3)'s language "or anything

comparable," *id.* at 1325. *Valdes* poses no restriction to official action

encompassing a public official promoting "specific business ventures." *Jefferson*,

674 F.3d at 356 (distinguishing *Valdes*).

Defendant's reliance on *United States v. Urciuoli*, 513 F.3d 290 (1st Cir. 2008), fares no better.  The First Circuit found fault there with instructions that were much broader and more nebulous than those given here and defined official action as encompassing all actions taken "in an official capacity" or "under the cloak of his office."  *Id*. at 295 n.2.  The instructions never tied back to § 201(a)(3)'s language and failed to account for the settled-practice standard from *Birdsall*.  And *Urciuoli*'s distinction between ambulance-run lobbying (an official act) and insurance-company meetings (not official acts) merely reflects the requirement that there be a "question, matter, [or] cause" pending before the public official that the official action be "on."  *Id.* at 295-96.  The court satisfied that requirement here in its instructions to the jury.

Nor does *United States v. Rabbitt*, 583 F.2d 1014 (8th Cir. 1978), support defendant's argument.  The Eighth Circuit read *Rabbitt* narrowly in *United States v. Loftus*, 992 F.2d 793 (8th Cir. 1993), a case much more analogous to defendant's.  In doing so, the court emphasized that "[a]ctual authority over the end result" sought "is not controlling if [defendant], through his official position, had influence and authority over a means to that end."  *Id.* at 796.  This quotation

from *Loftus* is nearly verbatim what the district court instructed (and the jury found) here.[9]

### d. Defendant's conviction poses no threat to democratic values.

Defendant claims that unlike ordinary government employees, politicians must have greater latitude to accept payments in exchange for official action because of First Amendment values. But the First Amendment does not protect *quid pro quo* bribery, and criminal liability was not premised here on campaign contributions. A1775 (opening argument), 7388 (closing). *Ring*, 706 F.3d at 466 ("[T]he First Amendment interest in giving hockey tickets to public officials is, at least compared to the interest in contributing to political campaigns, de minimis.").

Defendant's reliance on *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010), and related campaign-finance cases is thus misplaced. *Citizens United* held that "independent expenditures do not lead to, or create the appearance of, *quid pro quo* corruption. In fact, there is only scant evidence that independent expenditures even ingratiate." *Id.* at 360. And only *after* emphasizing its analysis

---

[9] *Rabbitt*'s reasoning is also suspect even on its own terms, as it emphasized harm to the government and control over the ultimate outcome—standards contradicted by settled bribery law. 583 F.2d at 1024-28; *see, e.g.*, *United States v. Dimora*, 750 F.3d 619, 626-27 (6th Cir. 2014); *United States v. Holzer*, 816 F.2d 304, 309 (7th Cir. 1987) ("very much doubt[ing] the soundness of this reasoning" in *Rabbitt*).

was about "independent" expenditures did the Court state what defendant now quotes repeatedly: "Ingratiation and access, in any event, are not corruption." *Id.*

But ingratiation and access do not by themselves involve a corrupt, bad-faith, fraudulent-intent, *quid-pro-quo* exchange, and there was nothing independent about Williams's largesse to the McDonnells. Moreover, *Citizens United* emphasized first that "[t]he hallmark of corruption is the financial *quid pro quo*: dollars for political favors." *Id*. at 359 (quotation omitted). Whatever else the evidence showed and the jury instructions required in this case, it was assuredly dollars for political favors. Williams did not merely "ingratiate" himself. Rather, as part of a corrupt agreement, defendant agreed to and took specific action, as opportunities arose, to use his powers of office to further Williams's business interests, in exchange for accepting payoffs.[10]

---

[10] Excluding any conduct that can be characterized as "access" from the definition of "official action" would also lead to absurd results. *See, e.g.*, *United States v. Carson*, 464 F.2d 424, 434 (2d Cir. 1972) ("Apparently [Carson], and those bribing him, thought he had access to the Justice Department through his position that would enable him to alleviate, if not altogether quash, pending Justice Department action or bring about lenient post-conviction treatment."). Indeed, a meeting with a prosecutor's supervisor about a pending matter is undoubtedly a form of "access," but such meetings are just as undoubtedly not "up for sale." *Vaughan*, 98 Eng. Rep. at 310. In any event, Williams received much more than "access"; he received specific exercises of gubernatorial power.

61

### e.   Bribery law is not unconstitutionally vague as applied to defendant.

*Skilling* rejected a vagueness challenge to honest-services law when it covers bribery.  561 U.S. at 412.  And courts continue to reject such challenges, as "[t]he need for flexibility is especially important in the context of criminal laws aimed at public corruption."  *Rosen*, 716 F.3d at 699 (rejecting as-applied vagueness challenge to honest-services statute).  Moreover, defendant's extensive concealment and the proof of corrupt intent, bad faith, and intent to defraud demonstrate that he knew the wrongfulness of his conduct, place that conduct squarely within settled bribery law, and foreclose his vagueness challenge.  *Holder v. Humanitarian Law Project*, 561 U.S. 1, 19 (2010) (party whose "conduct … is clearly proscribed cannot complain of vagueness of the law as applied to the conduct of others" (quotation omitted)); *Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 342 (1952) (element of "culpable intent" does "much to destroy any force" of vagueness challenge grounded on lack of notice).

### f.   Defendant's other arguments should be rejected.

The rule of lenity applies only where there is "grievous ambiguity," *Abramski v. United States*, 134 S. Ct. 2259, 2272 n.10 (2014), which is not present here.  Defendant's conviction rests on a straightforward application of § 201(a)(3) under settled law.

Defendant's federalism argument is equally meritless. There is no conflict between gift laws and *quid pro quo* bribery; the two prohibitions are distinct. And regardless, under the Supremacy Clause, a state could not draft gift laws that displace federal bribery laws. The Supreme Court has also rejected a federalism argument for narrowing established principles of federal bribery law. *Salinas v. United States*, 522 U.S. 52, 59-61 (1997).

***

In the end, defendant's claim is that a governor may secretly accept, with corrupt intent and without good faith, unlimited cash payments, and may do so in exchange for ordering cabinet-level officials to attend meetings and hosting events to further a particular business's efforts to obtain state assistance. The claim is manifestly wrong.

## II.  The district court's jury instructions quoted verbatim the statutory language defining an official act and applied settled law.

### A.  Standard of Review

"A trial court has considerable discretion in choosing the specific wording of [its] instructions." *United States v. Whitfield*, 695 F.3d 288, 305 (4th Cir. 2012) (quotation omitted). A district court abuses its discretion in failing to give a proposed instruction only if the instruction (1) was correct, (2) was not "substantially covered by the charge" the court gave, and (3) "involved some point

so important that the failure to give the instruction seriously impaired the

defendant's defense." *United States v. Hager*, 721 F.3d 167, 184 (4th Cir. 2013).

In that review, this Court does not "view a single instruction in isolation"; rather,

the question is "whether taken as a whole and in the context of the entire charge,

the instructions accurately and fairly state the controlling law." *United States v.*

*Rahman*, 83 F.3d 89, 92 (4th Cir. 1996).

### B.    Analysis

As noted above, the jury instructions quoted from the indictment in

describing the official acts charged and how the actions were on matters pending

before defendant.  A7659-7660.  Then, in defining official action, the instructions

quoted verbatim the language of § 201(a)(3), setting forth the requirement of action

on a pending matter.  A7671.  The instructions also explained that official action

> includes those actions that have been clearly established by settled
> practice as part of a public official's position, even if the action was
> not taken pursuant to responsibilities explicitly assigned by law.  In
> other words, official actions may include acts that a public official
> customarily performs, even if those actions are not described in any
> law, rule, or job description.  And a public official need not have
> actual or final authority over the end result sought by a bribe payor so
> long as the alleged bribe payor reasonably believes that the public
> official had influence, power or authority over a means to the end
> sought by the bribe payor.  In addition, official action can include
> actions taken in furtherance of longer term goals, and an official
> action is no less official because it is one in a series of steps to
> exercise influence or achieve an end.

64

A7671-7672.  Later, the instructions explained that "a given thing of value need not be correlated with a specific official action, and a thing or things of value may be given with the intent to retain a public official's services on an as-needed basis, so that as opportunities arise the public official would take specific official action on the payor's behalf."  A7682-83.

The district court did not abuse its discretion in giving these instructions. The relevant law has already been covered above.  The first two sentences follow directly from the settled-practice standard in *Birdsall* and *Jefferson*.[11]  The third sentence is equally well-established because "fulfillment of the *quid pro quo* is not an element of the offense."  *Evans*, 504 U.S. at 268.  And *Birdsall* and *Jefferson* concretely illustrate that the public official need not have final authority over the matter—as illustrated by defendant's examples of the Army contract, the loan, and the visa from *Jefferson*.[12]  Likewise, the fourth and fifth sentences are well-supported by *Jefferson*.  "'[T]he government need not show that the defendant

---

[11] *Skilling* cited a bribery opinion by then-Circuit-Judge Sotomayor as an example of what honest-services fraud covers.  561 U.S. at 413 (citing *United States v. Ganim*, 510 F.3d 134 (2d Cir. 2007)).  *Ganim* defined official act "to mean an act taken under color of official authority, not necessarily as" defined in § 201(a)(3).  510 F.3d at 142 n.4.  *Jefferson* established official action under honest-services fraud is at least as broad as § 201(a)(3).

[12] *See also Carson*, 464 F.2d at 433 ("There is no doubt that federal bribery statutes have been construed to cover any situation in which the advice or recommendation of a Government employee would be influential, irrespective of the employee's specific authority (or lack of same) to make a binding decision.")

intended for his payments to be tied to specific official acts (or omissions)'"

because "'bribery can be accomplished through an ongoing course of conduct.'"

*Jefferson*, 674 F.3d at 359 (quoting *Ganim*, 510 F.3d at 148-49).  "[I]t would be

impossible—and it is unnecessary—to link every dollar paid to one of the

Jefferson family companies to a specific meeting, letter, trip, or other action by

Jefferson to fulfill his end of a corrupt bargain." *Id*.[13]

     The course-of-conduct theory explains why the instructions did not require a

one-to-one matching of bribe to specific official act.  And that is why the district

court did not abuse its discretion in declining to give defendant's proposed

definition of "corruptly," A751-52, 756-57.  The proposed instruction said, "You

may convict the defendant only if you find that he received something of value in

exchange for performing or promising to perform some specific official act." *Id*.

But that is not the law. *Jennings*, 160 F.3d at 1014; *Ganim*, 510 F.3d at 144-45.

---

[13] In *Jefferson*, the district court defined "official act" using § 201(a)(3) and then continued, "An act may be official even if it was not taken pursuant to responsibilities explicitly assigned by law.  Rather, official acts include those activities that have been clearly established by settled practice as part of a public official's position.  Moreover, an act on a particular question or matter may still be official even if the public official did not have authority to make a final decision or take binding action on the issue." *United States v. Jefferson*, No. 1:07cr209, Dkt. 684, at 58 (E.D. Va. June 22, 2010).  Later, the court instructed that "[t]he quid pro quo requirement is satisfied if … the defendant agreed to accept things of value in exchange for performing official acts on an as-needed basis, so that [when]ever the opportunity presented itself, he would take specific action on the payor's behalf." *Id*. at 60.  Those instructions are materially indistinguishable from the instructions at issue here.

66

Similarly, defendant's official-action instruction, A753-54, included numerous legal errors that conflict with the case law set forth above, including an attempt to exclude meetings, events, and phone calls categorically from the definition of official action.[14]

Defendant quarrels with the district court's word choice, but because his objections fail to establish error, he fails to show an abuse of discretion. *See United States v. Patterson*, 150 F.3d 382, 388 (4th Cir. 1998) ("[A]lthough a more specific instruction might have been desirable to [defendant], it cannot be said that the district judge abused his discretion.").[15]

The parties' arguments in closing demonstrated the real point of disagreement—a question of fact that the jury decided against defendant. Defense

---

[14] By requiring a corrupt, bad-faith, fraudulent *quid pro quo*, the district court's instructions also amply captured the principle that "a good will gift to an official to foster a favorable business climate, given simply with the generalized hope or expectation of ultimate benefit …, does not constitute a bribe." *Jennings*, 160 F.3d at 1013 (quotation omitted).

[15] Indeed, defendant's complaints about the third and fourth sentences of the instructions quoted above are inconsistent with his other arguments. On the one hand, defendant argues that these sentences, which required proof "that the public official had [apparent] *influence, power, or authority* over a means to the end sought" and that official actions must be at least "one in a series of *steps to exercise influence* or achieve an end," A7672 (emphasis added), were "conflated and confused," DB57. But on the other hand, defendant complains repeatedly that the district court's official-action standard and the government's proof failed to show he exerted "power" or exercised "influence." Defendant cannot have it both ways. The very purpose of the sentences defendant asserts now are erroneous was to reemphasize that the alleged official actions involved the exertion of power or influence—*i.e.*, action on a pending matter.

counsel argued in closing that defendant never agreed to do anything that constituted official action. Defense counsel stated, "The judge will instruct you that the term 'official action' means any decision or action on any question, matter, cause, suit, proceeding, or controversy which may at any time be pending or which may, by law, be brought before any public official in that official's official capacity." A7543.

Defense counsel then marched through each alleged official action. The August 1 meeting after the Smith Mountain Lake vacation? "It didn't have anything to do with helping Jonnie Williams." A7544. Defendant "sent someone to a meeting at the First Lady's office to ensure that no improper decisions or commitments were made." A7545. The mansion event on August 30? "[I]t wasn't a launch" and "was closed to any more than 29 total people." A7545. "Bob rarely knows the details about his next event until he reads the briefing sheet right before." A7546. The healthcare leaders event? "They have not shown that Bob had anything to do with inviting anyone from Star." A7548. Similar arguments were offered about defendant's communications with his cabinet-level officials, Eige and Hicks-Thomas, on Williams's behalf. Summing up, defense counsel argued, "[T]he prosecution's evidence does not prove that Bob made any

decisions or took any action on any issues that were pending before him in his official capacity.  To the contrary, Bob didn't make any decisions at all."  A7549.[16]

Defendant himself told jurors that he never did anything for Williams. Defense counsel asked defendant, "Did you ever do anything for Williams or Star in exchange for any gifts, any loans, any money?"  A6421.  Defendant replied, "No.  Absolutely not."  A6421.  Defendant was not deprived of any legal defense. Rather, he offered a theory that was utterly unpersuasive on the facts.

## III.    The district court did not abuse its discretion in conducting voir dire.

### A.    Standard of Review

The trial court's role in voir dire "is not unlike that of the jurors later on in the trial."  *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981).  "Appellate courts thus accord great deference to the district court's decisions about the conduct of voir dire," and "it is a rare case in which a reviewing court will find error."  *United States v. Jeffery*, 631 F.3d 669, 673 (4th Cir. 2011) (quotation omitted).  Indeed, "[t]he Supreme Court has not required specific voir dire questions except in very limited circumstances—capital cases, and cases where racial or ethnic issues" predominate.  *Id.* (citations omitted).

---

[16] Defendant also mischaracterizes the government's arguments to the jury, which clearly and consistently argued that defendant's official actions were on the pending matters described in the Indictment.  *See, e.g.*, A7412-13, 7418-19, 7428, 7437-42, 7609-10, 7613 ("What did Mr. Williams always want?  He wanted the studies at UVA and VCU.").

Otherwise, "[n]o hard-and-fast formula dictates the necessary depth or breadth of *voir dire*." *Skilling*, 561 U.S. at 386. That is so "[p]articularly with respect to pretrial publicity," where the Supreme Court has "stressed the wide discretion granted to the trial court" and rejected any constitutional requirement of asking "questions specifically dealing with the content of what each juror has read." *Mu'Min v. Virginia*, 500 U.S. 415, 427, 431 (1991). Rather, "primary reliance on the [trial court's] judgment … makes good sense"; "that court sits in the locale where the publicity is said to have had its effect and brings to his evaluation … his own perception of the depth and extent of news stories that might influence a juror." *Id.* at 427.

Thus, in noncapital, non-racial-animus cases, "court[s] need not pursue a specific line of questioning … , provided the voir dire as a whole is reasonably sufficient to uncover bias or partiality in the venire." *United States v. Lancaster*, 96 F.3d 734, 739-40 (4th Cir. 1996). That includes written questionnaires, and abuse-of-discretion review applies. *Skilling*, 561 U.S. at 388; *United States v. Bailey*, 112 F.3d 758, 770 (4th Cir. 1997). Moreover, "findings of juror impartiality may be overturned only for manifest error." *Mu'Min*, 500 U.S. at 428 (quotation omitted).

70

**B.    Analysis**

First, defendant's appeal does not raise and hence waives any challenge to specific jurors, arguments that prejudicial publicity warranted a venue change, or complaints of any midtrial (indeed, post-May 2014) negative publicity.  Rather, defendant challenges the voir-dire process on constitutional grounds.  There are several problems with his claim.

To begin with, defendant attempts to set the stage by claiming "overwhelming negative pretrial publicity," DB11, but the record scarcely supports him.  Defendant did not proffer any full, particular reports before voir dire, instead selectively quoting articles in his pleadings.  A261-70.  Thus, he never showed that the pretrial coverage here was anything other than "unemotional, factual reports of legal proceedings," *United States v. Bakker*, 925 F.2d 728, 732 (4th Cir. 1991)—particularly before his defense strategy made it otherwise.  Defendant routinely spoke to press during the investigation, gave a press conference the day he was indicted, and commented to press frequently during trial.[17]  This Court should reject defendant's invocation of publicity he helped create.  *Id.* at 733.[18]  Not to mention, even were defendant's claims about pretrial publicity true,

---

[17] *E.g.*, A381.

[18] Defendant conclusorily asserts that "many … leaks were attributed to 'law enforcement sources,'" but cites to a solitary report attributing the investigation's existence to law enforcement.  DB6.  Despite repeatedly making this claim, he has never supported it—because it is specious.

"'[p]rominence does not necessarily produce prejudice, and juror *impartiality* …

does not require *ignorance*.'"  A962 (district court quoting *Skilling*, 561 U.S. at

381).

More importantly, defendant's voir dire was, as a whole, more than

sufficient.  It began with a jointly-submitted, 139-item questionnaire, which the

court reduced to 99 items and sent to 650 prospective jurors.  A497-535, 571-601,

963.  The survey included numerous questions designed to uncover potential

pretrial-publicity bias—including nine media-consumption questions, 12 political-

involvement questions, and 11 defense-connection questions, including whether

"there have been any actions by" defendant that "affected you in a personal

way"—and if so, to explain.  A584-92.  It also included 14 pretrial-publicity and

case-knowledge questions, including whether prospective jurors had heard about

the case, how closely they followed it, from what sources, and whether they had

"expressed an opinion about" the case or "those involved to anyone"—and if so, to

explain.  A592-95.

After the court and parties reviewed responses and made for-cause strikes, a

142-member venire appeared in court.  A1553-65.  And the panel was not shy;

individuals responded 286 times over seven hours to the court's questions.  A1572-

1714.  The court identified three whose questionnaire opinions raised concern; all

were removed.  A1639-41.  Later, the court asked whether anyone "harbor[ed] any

72

bias or prejudice which would prevent you from sitting as a fair and impartial juror" or knew "any reason why you could not … render a fair verdict based on the evidence presented"; none did.  A1683.

The court also addressed publicity more directly per defense requests.  As the court summarized:

> [T]he Court acknowledged the publicity generated by the case and posed two questions to the panel: (1) "[I]f you have read, heard or seen something in the media, I want you to stand up for me"; and (2) "Based on what you have heard or read or seen relating to this case, if you are in your mind, able to put aside whatever it is that you've heard, listen to the evidence in this case and be fair to both sides, then I want you to sit down."  After the entire panel answered in the affirmative to both questions, the Court summoned counsel to the bench.  The Court stated it was satisfied with the panel's answers.  However, [defendant] noted his concerns about the credibility of the jurors and requested further inquiry.  The Court subsequently brought to the bench each juror that [defendant] identified as cause for concern and questioned each about his or her opinion of the case and ability to remain impartial. At the end of this questioning the Court asked [defendant]'s counsel if there is "anybody else" he would like to question, and [he] responded "not on publicity."

A963-64 (quoting A1691-1706).  Defendant is thus wrong to claim the court "limited its oral voir dire … to two questions" and "asked no individual questions" on pretrial publicity.  DB12, 68.  Rather, the court gave defendant free rein to bring forward whomever he sought to question individually about publicity.  A964.  Defendant identified eight; two were excused; and defendant requested no more.  A1692-1706.  Defendant could have identified mere media exposure as cause for concern.  A964.  He chose not to.

The jury's actions spoke volumes, too. They acquitted on seven counts, showing tangible impartiality the Supreme Court has found of "prime significance" in rejecting challenges like defendant's. *Skilling*, 561 U.S. at 383. ("It would be odd for an appellate court to presume prejudice … [when] jurors' actions run counter to that presumption."). Indeed, defendant has not even alleged that any of the jurors who convicted him showed any bias at all. *Id.* at 425 ("[I]f no biased jury is actually seated, there is no violation of the defendant's right to an impartial jury.") (Alito, J., concurring).

Defendant points to 31 questions that he provided in court and requested be asked individually of anyone who heard about the case. DB12. These came in the context of repeated requests on irrelevant areas "concerned less with ensuring an impartial jury and more with ensuring a jury inclined to acquit." *Bakker*, 925 F.2d at 733-34. For example, even after the jointly-proposed, 139-item questionnaire, defendant sought 50 additions, including inquiries into religion, frequency of religious worship, and income; defendant even included requests to "describe yourself and your view of life in ten words or less" and check boxes next to 42 words if they "describe you," such as "[r]eligious," "[j]udgmental," or "[s]keptical." A536-39. Defendant also sought to discover everyone's "personal opinion" of him and his job performance. A541-42. Many of the 31 questions defendant submitted during voir dire were similar. A916-17.

The court was thus rightly dubious of the questions defendant sought, which it did not ask precisely. A1690. But as described above, and most importantly in the context of this appeal, defendant ultimately received the opportunity for individual voir dire of *any* juror on pretrial-publicity grounds. A964.

Moreover, the court did not even have to go that far. In this Circuit, "[i]t is well established that a trial judge may question prospective jurors collectively rather than individually" about pretrial publicity. *Bakker*, 925 F.2d at 734. "This is especially true where, as here, the trial court provides for individual questioning of a juror whose individual responses prove less than satisfactory and offers potential jurors the opportunity to speak with the court privately." *Id.*

Defendant claims that *United States v. Hankish*, 502 F.2d 71 (4th Cir. 1974), and *Goins v. Angelone*, 226 F.3d 312 (4th Cir. 2000), support him. But *Hankish* addressed jurors' *midtrial* exposure to a specific, prejudicial story and a court's refusal to inquire—nothing about pretrial publicity or broad assertions like defendant's. 502 F.2d at 76-77. And *Goins* rejected a defendant's voir-dire claim, reaffirming that courts may constitutionally question on publicity collectively. 226 F.3d at 325.[19]

---

[19] *Goins* suggested some individualized questioning in certain cases would be "a matter of prudent procedure" but rejected it as a constitutional requirement, and only referred to circumstances (not present here) of specific, "prejudicial" publicity found by a district court. 226 F.3d at 325.

In sum, "the selection process successfully secured jurors who were largely untouched" by publicity before hearing the evidence and "paid scant attention to [case]-related news." *Skilling*, 561 U.S. at 389-90. Defendant's claims should be rejected.[20]

## IV.    The district court properly tried the defendants together.

### A.     Standard of Review

"The decision of the district court denying severance will not be disturbed unless the denial of severance deprives the defendants of a fair trial and results in a miscarriage of justice, or was so manifestly prejudicial that it outweighed the dominant judicial concern with judicial economy and compelled the exercise of the trial court's decision to sever." *United States v. Parodi*, 703 F.2d 768, 780 (4th Cir. 1983) (citations and quotations omitted). That is because "[j]oint trials play a vital role in the criminal justice system." *Zafiro v. United States*, 506 U.S. 534, 537 (1993). And severance is "rarely granted," particularly in conspiracy cases. *United States v. Dinkins*, 691 F.3d 358, 368 (4th Cir. 2012).

### B.     Analysis

Defendant claimed before trial that severance was necessary because his wife would refuse to testify at a joint trial and her testimony was critical to his

---

[20] Moreover, additional peremptory challenges and daily, emphatic instructions regarding outside contacts—and dismissal of one violating juror—undermine defendant's claim. *Skilling*, 561 U.S. at 388 n.21; A496, 1973, 4391, 4645-46.

defense.[21]  A294-304.  But as even defendant later conceded, his pleadings

supporting severance merely provided an "unadorned summary of the evidence [he

would] present if severance [were] granted."  A346.  The total of the "unadorned

summary" were four conclusory sentences claiming that Mrs. McDonnell would

testify at separate trials that: (1) she and defendant did not conspire; (2) defendant

did not agree to use his office to obtain research studies for Star; (3) she did not

solicit "*certain* gifts and loans"; and (4) they did not conceal the alleged scheme.

A296 (emphasis added).  Defendant failed to provide any detail regarding the

exculpatory nature of the evidence.

    Apparently recognizing this insufficiency, defendant requested leave to file

two declarations from his and his wife's counsel for *ex parte* review by the district

court.  A313-17.  Defendant claimed that the government should be denied access

to the declarations primarily because disclosure would reveal defense trial strategy

by setting forth their expected testimony.  *Id.*  The government opposed permitting

secret declarations, noting that it would be impossible to respond meaningfully

---

[21] He also claimed that severance was necessary because his wife would purportedly invoke the marital communications privilege at a joint trial and prevent him from offering exculpatory evidence during his testimony.  A304-10.  Even though counsel for both defendants represented to the district court that such invocation would likely occur without severance, counsel for both defendants waived any marital communications privilege (and thus any severance arguments based on that privilege) during their opening statements.  A1794-96, 1819-22.  And in doing so, they undermined their claims before trial that Mrs. McDonnell would not have asserted her Fifth Amendment right, too, had defendant's trial proceeded first.

without knowing the factual basis that defendant claimed necessitated severance. A320-32.  Recognizing that severance motions "require[] a fact-intensive, multi-factored analysis for which there is a heightened need for well-informed advocacy," the district court refused to consider the declarations *ex parte*.  A351-52.  But the court gave defendant an opportunity to file the declarations under seal, with service upon the government, "if he so chooses."  A352.  Defendant refused to do so.  A354.

Then, despite having strenuously argued in his brief that deferring ruling on the severance motion "would be less efficient and would make management of the trial more difficult in a variety of ways," A292, defendant changed course and asked the district court, *if it were inclined to deny severance*, to take the motion under advisement until some unspecified date "closer to the time of trial" when defendant might choose to provide additional information.  A354.  Two weeks before the hearing on the severance motion, defendant again asked the court, *if it were inclined to deny severance*, to defer ruling until fourteen days before trial when defendant could submit declarations.  A465, 484.  A few days later—and well before the motions hearing—the court refused to delay ruling but gave defendant another opportunity to submit a declaration.  A487.  Despite arguing that severance was necessary for a fair trial, defendant left the court with his "unadorned summary."

78

After hearing argument on the severance motion, the district court noted that both defendants had limited their showing "to vague and conclusory statements that 'merely contradict part of the Government's proof'" and denied the motion. A494 (quoting *Parodi*, 703 F.2d at 780).

On appeal, defendant does not even attempt to argue that the district court erred in denying severance based on his "unadorned summary." Nor could he, given *Parodi*'s prohibition against "vague and conclusory" statements of counsel to establish the exculpatory nature and effect of proffered testimony. 703 F.2d at 780. Thus, the only issue on appeal is whether the district court abused its considerable discretion in refusing to consider *ex parte* evidence, a claim that readily fails.

First, "[i]t is settled beyond peradventure that, in our system of justice, ex parte judicial proceedings" are "greatly disfavored." *RZS Holdings AVV v. PDVSA Petroleo S.A.,* 506 F.3d 350, 356 (4th Cir. 2007). Moreover, "[a]n *ex parte* proceeding places a substantial burden upon the trial judge to perform what is naturally and properly the function of an advocate." *United States v. Napue*, 834 F.2d 1311, 1319 (7th Cir. 1987) (quotation omitted).

In its ruling, the district court invoked *Alderman v. United States*, 394 U.S. 165, 183-84 (1969), which explained that *ex parte* procedures become "inadequa[te]," particularly in cases with a "large volume of factual materials" and

"many and subtle interrelationships" that matter "among the facts." A350-51. The district court correctly determined that it would be unable to accurately apply the *Parodi* factors for severance based on *ex parte* evidence. A493-94.

And an assessment of the no-longer-secret declaration proves the point.[22] As to *Parodi*'s four threshold elements, while defendant claimed in his then-secret declaration a bona fide need for Mrs. McDonnell to testify about difficulties in marital communications, the stresses she was under because of her parents' deaths, and the strain of her job, A7927, the government could have pointed to numerous witnesses that could—and in fact did at trial—provide similar testimony. *See, e.g.*, A3400, 5605-06. Likewise, to support the exculpatory nature and effect element, defendant asserted that Mrs. McDonnell would testify about various things of value from Williams that she purportedly hid from defendant. A7927-33. To rebut that this was truly exculpatory or address what effect the testimony would likely have, the government could have shown that defendant knew about or personally received from Williams the $15,000 wedding payment, SA20; the luxury golf outings, SA21-22, 85-88, 124-25; the vacations, SA133, 171-72; the golf equipment for him and his sons, A2156-57; and $70,000 of undocumented loans defendant personally negotiated with Williams, SA166.

---

[22] Defendant provided this declaration to the United States for the first time at the beginning of his sentencing hearing, when it asked the district court to consider its contents for those purposes.

Had defendant made the requisite threshold showing, the district court was even less equipped to weigh—based on *ex parte* evidence—the five remaining *Parodi* factors. For example, while defendant claimed that his wife's testimony was not likely subject to impeachment, the government had evidence contradicting her purported testimony. Mrs. McDonnell claimed that she would testify that

(1)   she never intended to avoid state reporting requirements when she sold Star stock—a claim contradicted by her stockbroker, who testified that she personally instructed him to sell Star stock to avoid reporting requirements, A4019-20, 4063;

(2)   the purpose of the August 2011 lunch was not to "launch" Anatabloc—a claim undercut by the mansion director, who testified that the first lady said the purpose of the event was to "launch" Anatabloc, A3608; and

(3)   defendant had no role in organizing or planning the February 29, 2012 mansion event—a claim rebutted again by the mansion director, who testified that she personally discussed adding invitees with defendant, and documentary evidence showing defendant added handwritten names to the invitation list, A3619-28, SA220.

Given Mrs. McDonnell's obvious incentive to exculpate defendant—thereby exculpating herself—this impeachment through testimony and documentary evidence, notably independent of Williams, would have been devastating at trial. But the district court would have no way of knowing that if it considered only *ex parte* evidence when making its severance decision. The district court properly refused to do so.

81

But even if the court abused its discretion, any error was harmless because defendant failed to establish that Mrs. McDonnell's testimony was necessary to avoid a "miscarriage of justice" resulting from a joint trial. While defendant attempts to portray this trial as a credibility contest between himself and Williams, and claims that his wife's testimony was essential to corroborate his own, the truth is that her purported testimony "merely contradict[ed] *part* of the Government's proof." *Parodi*, 703 F.2d at 780 (emphasis added) (quotation omitted). Left unaddressed by Mrs. McDonnell was the most damaging evidence against defendant in the case, including: Williams's and defendant's discussions about testing of Anatabloc on Williams' jet in October 2010; the letter from Williams to defendant outlining his plans for the studies at Virginia research universities; defendant instructing Secretary Hazel to send a deputy to meet with Williams about Anatabloc studies hours after driving home in Williams's Ferrari from Williams's estate; defendant's handwritten notes of his conversations with Williams about reportability of additional loans; defendant emailing his policy director asking to meet about the status of the Anatabloc studies *six minutes* after emailing Williams to inquire about additional loans; defendant suggesting to the cabinet official who oversaw Virginia's employee health plan that she meet with Star soon after defendant received another $50,000 undocumented loan from

Williams; and defendant's concealment of the significant graft he received from

Williams from his SOEIs.

Simply put, the best evidence that Mrs. McDonnell's testimony was not truly

exculpatory or necessary for defendant to receive a fair trial was his steadfast

refusal to allow the district court to consider any details of her proffered testimony

in its severance analysis in an adversarial proceeding.  This refusal was

understandable because this case was not a simple credibility dispute between

defendant and Williams but, rather, was built from wide-ranging independent

testimony and documentary evidence establishing the corrupt agreement and the

McDonnells' efforts to conceal it.

**V.     The district court's evidentiary rulings were proper under the law.**

**A.     Standard of Review**

If preserved, evidentiary rulings are reviewed for abuse of discretion.

*United States v. Iskander*, 407 F.3d 232, 236 (4th Cir. 2005).  This Court "will not

find an abuse unless the district court's decision was 'arbitrary and irrational.'"  *Id*.

(quotation omitted).  If defendant failed to object, this Court reviews for plain

error.  *United States v. Olano*, 507 U.S. 725, 731-32 (1993).

**B.     Analysis**

The district court properly ruled on each of the evidentiary issues defendant

raises, and the handful of alleged errors he identifies in this five-week trial would

be harmless regardless.  To the extent defendant implicitly invokes cumulative-error doctrine, his argument fails.  *See, e.g., United States v. Runyon*, 707 F.3d 475, 520 (4th Cir. 2013) (cumulative errors "must so fatally infect the trial that they violated the trial's fundamental fairness" (quotation omitted)).

### 1. *No cumulative evidence was necessary to cross-examine Williams.*

First, the district court did not arbitrarily and irrationally exclude cumulative evidence of Williams's immunity agreements.  Counsel for defendant, first lady, and the government asked Williams approximately 48 pages of questions about the agreements and purported collateral benefits he received.  A2395-2402, 2489-2495, 2509-2512, 2772-2800.  The agreements were admitted into evidence.  A2395-96, 2399-2400.  Ample cross-examination fodder for Williams existed.  *See* A1978 (district court stating, "If you all can't effectively cross-examine Jonnie Williams, you should leave the profession.  I mean really.").  Defendant had plenty of opportunities to establish for the jury any bias on Williams's part.

Moreover, defendant's proffered "expert" testimony regarding the value of Williams's agreements was unnecessary and foreclosed by circuit precedent. *United States v. Allen*, 716 F.3d 98, 105 (4th Cir. 2013) (affirming exclusion of expert testimony purporting to explain "the legal significance of § 5K1.1 letters, § 3553(e) motions, and 21 U.S.C. § 851 notices").  Defendant argues his "expert" could have "explained the technical aspects" of Williams's agreements, DB79-80,

but his cited authority addresses expert testimony regarding the reliability of

eyewitness identifications.  *See United States v. Mathis*, 264 F.3d 321 (3d Cir.

2001); *United States v. Smithers*, 212 F.3d 306 (6th Cir. 2000).  The "technical

aspects" relevant here were enumerated in the written agreements and available for

the jury to review, unlike the science of eyewitness memory.  A jury is able to

assess the credibility of a witness without the aid of an expert.  *United States v.

Lespier*, 725 F.3d 437, 449 (4th Cir. 2013) (proper to exclude expert where

"testimony would intrude[] on the jury's role regarding the assessment of the

credibility of witnesses" (quotation omitted)); *United States v. Davis*, 457 F.3d

817, 824 (8th Cir. 2006) (same).

> ## 2.    *Defendant's concealment of transactions involving Williams by omitting them from his SOEIs was admissible and not an appropriate subject for expert testimony.*

Nor did the district court abuse its discretion in admitting evidence about

defendant's SOEIs and declining to permit defendant to present expert testimony.

First, at this stage in the litigation, defendant's statement that it was "unclear why

the court or the Government believed this evidence was even legally relevant,"

DB82, is, to say the least, unpersuasive.  As the district court held, the SOEI

evidence "goes to concealment and may be probative of intent to defraud—an

element of the charged crimes."  A760 (citing *United States v. Zayyad*, 741 F.3d

452, 463 (4th Cir. 2014)).  Defendant (1) concealed gifts from Williams, A6138,

6342, 6673; and (2) intentionally structured transactions involving Williams to

avoid reporting, A6341 (claiming $15,000 wedding check was a gift to Cailin);

A2353, 2720, 6513, 6859-61 (claiming that that Williams made loans to MoBo,

not defendant); A6166, 6275 (selling and repurchasing Star stock to avoid

reporting).

And no expert was necessary to explain the plain-English instructions on the

SOEI forms.  Defendant's proposed expert would have testified that SOEIs

"contain[] many vague instructions and that reasonable public officials could vary

in their interpretation of those instructions."  A646.  But this Court has rejected this

kind of expert testimony.  *United States v. Fowler*, 932 F.2d 306, 315 (4th Cir.

1991) (affirming exclusion of expert testimony in theft-of-government property

case that "regulations were confusing, vague, and uncertain" and that the

defendant's "interpretation of them was 'at least arguably correct'").  A jury

"need[s] no expert witnesses to speculate about a defendant's state of mind.  The

expert witnesses could not testify that [defendant] was confused, not culpable."  *Id*.

Defendant's jury received copies of the SOEI to review.  And defendant had ample

opportunity to explain to the jury his state of mind in completing the forms.  *See,

e.g.*, A6138, 6254-55.

### 3. *Defendant's direction to staff to find him free golf was admissible.*

Defendant complains on hearsay and character-evidence grounds about the admission of a January 2013 email in which his staff members discussed defendant's directives to find free golf vacations for the McDonnell family. A7921. At trial, he objected only to relevance, A6706, requiring plain-error review now. There was no error, plain or otherwise. The email was not hearsay. The portion of the email from Emily Rabbitt, defendant's scheduler and travel aide, was made within the scope of her employment relationship. Fed. R. Evid. 801(d)(2)(D). The portion from Adam Zubowsky, defendant's son-in-law and then-former travel aide, simply conveyed defendant's prior directive to find him free golf. Fed. R. Evid. 801(d)(2)(C)-(D). Nor was the email inadmissible character evidence under Rule 404. As the district court noted, it "was relevant to McDonnell's motive for entering a corrupt agreement with Williams; the prior act alleged is similar to the act the Government sought to prove—acceptance of free gifts from Williams; and there is nothing in the record to suggest that the evidence was unreliable or unfairly prejudicial to McDonnell." A973.

But even if the evidence were improperly admitted, no substantial rights could possibly have been affected by one email—an email neither party referenced in closing arguments—given the quantum of evidence introduced during the five-week trial. *See* A972. Contrary to what defendant claims, harmlessness for

nonconstitutional evidentiary claims need not be proven beyond a reasonable

doubt. *United States v. Johnson*, 587 F.3d 625, 637 (4th Cir. 2009).

### 4.    *Evidence of defendant's efforts to avoid reporting other free golf was intrinsic and admissible.*

Defendant also objected to evidence that he received things of value from

William Goodwin. Specifically, the Government introduced evidence that

defendant's draft 2012 SOEI listed a $23,312.55 Kiawah Island golf resort trip

from Goodwin, but defendant subsequently crossed out the trip and wrote

"personal," thus removing it before filing his final SOEI. A6864-65. And the

SOEI on which defendant decided not to report the Goodwin trip is the same form

on which defendant failed to disclose gifts and loans from Williams. Thus, the

Goodwin evidence was intrinsic to defendant's scheme to defraud. Evidence

"intrinsic to the alleged crime" does "not fall under Rule 404(b)'s limitations."

*United States v. Otuya*, 720 F.3d 183, 188 (4th Cir. 2013) (quotation omitted).

And even if the evidence were not intrinsic but, rather, 404(b) evidence, it

showed defendant's sophisticated knowledge of the SOEI rules and the existence

of the "personal friend" exception. It also demonstrated lack of mistake and

negated defendant's testimony that he simply forgot to disclose gifts and loans

from Williams. This Court has characterized Rule 404(b) "as an inclusive rule,

admitting all evidence of other crimes or acts except that which tends to prove *only*

criminal disposition." *United States v. Powers*, 59 F.3d 1460, 1464 (4th Cir. 1995)

(quotation omitted).  Finally, even if this evidence were somehow improperly admitted, the error was harmless in any event.

### 5.    *Defendant's requested fishing expedition into Williams's iPhone is not an independent basis for relief.*

Finally, defendant complains about his access to Williams's iPhone but does not identify this as an independent basis for reversal, waiving this claim.  *Russell v. Absolute Collection Servs.*, 763 F.3d 385, 396 n.* (4th Cir. 2014).  Nor is defendant entitled to relief.  He obtained two pre-trial Rule 17(c) subpoenas to Williams, including phone data, addressing topics that defendant identified.  SA 247-52.  As such, his sole complaint now is that *Brady* material *may* exist elsewhere in other categories *that he cannot identify* and that would be found in data that was subject to a protective order, returned to its owner, and never reviewed by the government.  This speculative evidence also deals with a witness that defendant and his wife were able to cross-examine for three days, with a weekend break, spanning 397 transcript pages.  Defendant's argument is meritless and does not warrant relief.

**Conclusion**

For the foregoing reasons, this Court should affirm defendant's convictions.


                  Respectfully submitted,

                  Dana J. Boente
                  United States Attorney

                  Raymond Hulser
                  Acting Chief, Public Integrity Section
                  Criminal Division
                  U.S. Department of Justice


By:_____/s/_____
           Richard D. Cooke
           Ryan S. Faulconer
           Michael S. Dry
           Jessica D. Aber
           David V. Harbach, II
           Counsel for the United States
           U.S. Attorney's Office
           600 E. Main Street, Suite 1800
           Richmond, VA 23219
           Phone: 804-819-5400
           Fax: 804-771-2316
Email:    richard.cooke@usdoj.gov
           ryan.faulconer2@usdoj.gov
           michael.s.dry@usdoj.gov
           jessica.d.aber@usdoj.gov

## Statement Regarding Oral Argument

Oral argument in this matter is currently scheduled for May 12, 2015.

**Certificate of Compliance**

I certify that I wrote this brief using 14-point Times New Roman typeface and Microsoft Word 2010.

I further certify that this brief does not exceed 21,000 words (and is specifically 20,994 words) as counted by Microsoft Word, excluding the table of contents, table of citations, statement regarding oral argument, this certificate, the certificate of service, and any addendum.

I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions.

By:    _____/s/_____
       Richard D. Cooke
       Assistant United States Attorney
       Eastern District of Virginia
       600 East Main Street, Suite 1800
       Richmond, Virginia 23219
       (804) 819-5400
       richard.cooke@usdoj.gov

## Certificate of Service

I certify that on March 26, 2015, I filed electronically the foregoing brief with the Clerk of the Court using the CM/ECF system, which will send notice of the filing to all counsel of record.

By:    _____/s/_____
        Richard D. Cooke
        Assistant United States Attorney
        Eastern District of Virginia
        600 East Main Street, Suite 1800
        Richmond, Virginia 23219
        (804) 819-5400
        richard.cooke@usdoj.gov