No. 15-4019

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
*Appellee,*

v.

ROBERT F. McDONNELL,
*Defendant-Appellant.*

_____

On Appeal from the United States District Court for the Eastern District of Virginia, Richmond Division, James R. Spencer, District Judge

_____

**REPLY BRIEF OF DEFENDANT-APPELLANT ROBERT F. MCDONNELL**

_____

John L. Brownlee
Daniel I. Small
Christopher M. Iaquinto
Elizabeth N. Jochum
HOLLAND & KNIGHT LLP
800 17th Street N.W.
Suite 1100
Washington, DC 20006
Telephone: (202) 828-1854

Noel J. Francisco
*Counsel of Record*
Henry W. Asbill
Charlotte H. Taylor
James M. Burnham
Ian Samuel
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
Telephone: (202) 879-3939
Facsimile: (202) 626-1700
njfrancisco@jonesday.com

*Counsel for Defendant-Appellant Robert F. McDonnell*

**ORAL ARGUMENT SCHEDULED FOR MAY 12, 2015**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................ iii

INTRODUCTION.......................................................................... 1

ARGUMENT ................................................................................ 1

I.   The Government Attempts To Obscure Its Faulty Legal Theory
     With A Distorted Account Of The Evidence ............................ 1

     A.   The Government Exaggerates The Facts And
          Circumstances Of Each Supposedly "Official" Act...................... 2

          1.   The Huffstetler Meeting........................................... 2

          2.   The Mansion Event.................................................. 3

          3.   The Email To Jasen Eige.......................................... 6

          4.   The Healthcare Leaders Event .................................. 7

          5.   Suggested Meeting With Star .................................... 7

     B.   Governor McDonnell Did Not Hide Things From His
          Staff........................................................................ 8

     C.   The Government's Brief Distorts The Record In Other
          Respects.................................................................. 10

          1.   Governor McDonnell Never Tried To Persuade
               Anyone To Research Anatabloc Or Fund Anatabloc
               Research............................................................ 10

          2.   Williams Never Personally Requested Anything
               From Governor McDonnell And Governor
               McDonnell Never Promised Anything To Williams ........ 11

          3.   Governor McDonnell Did Not "Repeatedly
               Approach[] Dr. Hazel." ......................................... 13

II.  This Court Should Reject The Government's Unprecedented
     Legal Theory And Dismiss The Charges.................................... 14

     A.   The Government Ignores The Statutory Text It Invokes........... 15

     B.   The Government Cannot Distinguish *Sun-Diamond*..................... 18

     C.   Multiple Out-Of-Circuit Decisions Require Reversal ................. 19

**TABLE OF CONTENTS**
(continued)

Page

D.    The Government Relies On *Jefferson* And *Birdsall* To Rebut Arguments Governor McDonnell Has Never Made .................. 21

E.    The Other Decisions The Government Invokes Confirm That Its Position Is Unprecedented ............................................... 23

F.    The Government Ignores The Implications Of Its Theory........ 24

III.    The Government's Tepid Defense Of The District Court's Jury Instructions Confirms That A New Trial Is Necessary.......................... 26

A.    The District Court's "Official Act" Definition Was Unlimited And Error-Laden............................................. 26

B.    The Quid Pro Quo Instruction Was Prejudicially Incorrect ....... 31

1.    The Government's Defense Of The Refusal To Instruct On Goodwill Gifts Fails ....................................... 31

2.    The Government's Defense Of The Quid Pro Quo Instruction Fails.................................................. 33

IV.    The District Court's Voir Dire On Pretrial Publicity Requires Reversal............................................................................ 34

V.    The District Court Erred By Refusing To Sever The McDonnells' Trials........................................................................ 38

VI.    Multiple Prejudicial Evidentiary Errors Each Require Reversal............. 41

CONCLUSION ........................................................................... 43

CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) OR 32(a)

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page**

## CASES

*Citizens United v. Fed. Election Comm'n,*
558 U.S. 310 (2010) ................................................................ 1

*Commercial Union Assur. Cos. v. Sears, Roebuck & Co.,*
716 F.2d 606 (10th Cir. 1983) ................................................ 27

*Evans v. United States,*
504 U.S. 255 (1992) ..........................................................28, 29

*McCravy v. MetLife Ins.,*
690 F.3d 176 (4th Cir. 2012) ................................................ 19

*Morgan v. Illinois,*
504 U.S. 719 (1992) ..........................................................34, 37

*Mu'Min v. Virginia,*
500 U.S. 415 (1991) ................................................................ 37

*Murphy v. Florida,*
421 U.S. 794 (1975) ................................................................ 37

*Parklane Hosiery v. Shore,*
439 U.S. 322 (1979) ................................................................ 43

*Patton v. Yount,*
467 U.S. 1025 (1984) .............................................................. 37

*Rosales-Lopez v. United States,*
451 U.S. 182 (1981) ................................................................ 37

*Sec'y of Labor v. Ohio Valley Coal,*
359 F.3d 531 (D.C. Cir. 2004) .............................................. 16

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Skilling v. United States,*
    561 U.S. 358 (2010) .................................................................. 37

*United States v. Arthur,*
    544 F.2d 730 (4th Cir. 1976) .............................................. 32, 33

*United States v. Bailey,*
    112 F.3d 758 (4th Cir. 1997) ................................................... 37

*United States v. Bakker,*
    925 F.2d 728 (4th Cir. 1991) ................................................... 37

*United States v. Bencivengo,*
    749 F.3d 205 (3d Cir. 2014) .................................................... 29

*United States v. Biaggi,*
    853 F.2d 89 (2d Cir. 1988) ...................................................... 24

*United States v. Birdsall,*
    233 U.S. 223 (1914) .......................................................... 21, 23

*United States v. Carson,*
    464 F.2d 424 (2d Cir. 1972) .................................................... 18

*United States v. Catalan-Roman,*
    585 F.3d 453 (1st Cir. 2009) ................................................... 40

*United States v. Fareed,*
    296 F.3d 243 (4th Cir. 2002) .................................................. 19

*United States v. Hager,*
    721 F.3d 167 (4th Cir. 2013) .................................................. 15

*United States v. Hastings,*
    134 F.3d 235 (4th Cir. 1998) .................................................. 14

# TABLE OF AUTHORITIES
## (continued)

**Page**

*United States v. Hatfield,*
    591 F.3d 945 (7th Cir. 2010) ........................................................... 26

*United States v. Jefferson,*
    674 F.3d 332 (4th Cir. 2012) ................................................... *passim*

*United States v. Jennings,*
    160 F.3d 1006 (4th Cir. 1998) ................................................ 31, 33

*United States v. Lewis,*
    53 F.3d 29 (4th Cir. 1995) ................................................... 27, 32, 33

*United States v. Lipford,*
    203 F.3d 259 (4th Cir. 2000) ......................................................... 42

*United States v. Loftus,*
    992 F.2d 793 (8th Cir. 1993) ......................................................... 21

*United States v. Mazzei,*
    521 F.2d 639 (3d Cir. 1975) .......................................................... 29

*United States v. Medford,*
    661 F.3d 746 (4th Cir. 2011) ......................................................... 39

*United States v. Moore,*
    525 F.3d 1033 (11th Cir. 2008) ..................................................... 23

*United States v. Moye,*
    454 F.3d 390 (4th Cir. 2006) ......................................................... 14

*United States v. Queen,*
    132 F.3d 991 (4th Cir. 1997) ......................................................... 42

*United States v. Rabbitt,*
    583 F.2d 1014 (8th Cir. 1978) ....................................................... 21

# TABLE OF AUTHORITIES
## (continued)

Page

*United States v. Ring,*
706 F.3d 460 (D.C. Cir. 2013) ..................................................... 23, 27

*United States v. RMI Co.,*
599 F.2d 1183 (3d Cir. 1979) ........................................................ 43

*United States v. Rosen,*
716 F.3d 691 (2d Cir. 2013) ......................................................... 23

*United States v. Shuford,*
454 F.2d 772 (4th Cir. 1971) ........................................................ 38

*United States v. Sun-Diamond Growers of Cal.,*
526 U.S. 398 (1999) ............................................................*passim*

*United States v. Taylor,*
993 F.2d 382 (4th Cir. 1993) ........................................................ 32

*United States v. Thompson,*
562 F.3d 387 (D.C. Cir. 2009) ...................................................... 43

*United States v. Urciuoli,*
513 F.3d 290 (1st Cir. 2008) ...............................................6, 14, 20, 22

*Valdes v. United States,*
475 F.3d 1319 (D.C. Cir. 2007) .......................................17, 18, 19, 20, 22

**STATUTES & RULES**

18 U.S.C. § 201 ................................................................15, 16, 17, 18, 26

Fed. R. Crim. P. 16 ...........................................................42, 43

Fed. R. Evid. 404 ...........................................................42

# TABLE OF AUTHORITIES
**(continued)**

**Page**

**OTHER AUTHORITIES**

Brody Mullins, *Google Makes Most of Close Ties to White House*, Wall St. J. (Mar. 24, 2015, 9:24 PM) ............................................................................... 24

Indictment, *United States v. Menendez*, No. 15-CR-155, ¶259 (D.N.J. Apr. 1, 2015) ......................................................................................................... 25

Rosalind S. Helderman & Tom Hamburger, *Foreign Gifts Flowed to Clinton's Charity*, Wash. Post, Feb. 26, 2015, at A1 ....................................... 24

## INTRODUCTION

Governor McDonnell absolutely was "a chief executive who could take myriad official actions on his own accord and had ultimate authority over [] subordinate state officials." Ans.Br.45. Governor McDonnell thus *could have* "delivered" what Williams supposedly wanted. Ans.Br.36. He *could have* directed his subordinates to "aid Williams." *Id.* He *could have* appropriated money to Williams's causes or ensured he got studies. But he never *actually did*—or promised to do—anything that altered or influenced governmental policy, and Williams got nothing. At most Williams obtained access and tried to ingratiate himself. But "[i]ngratiation and access ... are not corruption." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 360 (2010). The Government's charges should be dismissed.

At the least, a new trial is necessary. The district court's error-laden jury instructions (which the Government demanded but barely defends), refusal to ask publicity-exposed jurors whether they had formed opinions (which the Government evades by distorting the transcript), refusal to sever the McDonnells' trials (despite Mrs. McDonnell's critical exculpatory role), and myriad other prejudicial errors require it.

## ARGUMENT

## I. The Government Attempts To Obscure Its Faulty Legal Theory With A Distorted Account Of The Evidence.

The Government's Answering Brief repeatedly distorts the record to paint a

misleading picture of the evidence.  Rather than rebutting every mischaracterization, this Reply focuses on those most relevant to whether Governor McDonnell engaged in "official action."  And on *that* question, the undisputed evidence is clear:  Governor McDonnell never promised anything and never did anything besides extend to Williams the sorts of routine courtesies elected officials throughout the country extend to donors and benefactors every day.[1]

### A.  The Government Exaggerates The Facts And Circumstances Of Each Supposedly "Official" Act.

The Government does not dispute that Governor McDonnell never promised to exercise governmental power in Williams's favor.  Instead, as it did below, it attempts to obscure this evidentiary void by serially exaggerating each supposedly official act:

### 1.  The Huffstetler Meeting.

The Government cannot dispute Ms. Huffstetler's testimony that Governor McDonnell never asked her to do anything for Williams.  The Government nonetheless mischaracterizes the record.  It claims, for example, that Williams mentioned "*possible* Tobacco Commission funding 'by request of Gov.'"  Ans.Br.17 (quoting V.JA.3048-53) (emphasis added).  In fact, Williams lied, telling Ms. Huffstetler "'Tobacco Fund in Virginia *is* paying for this—by request of Gov.'"

---

[1]  Governor McDonnell cites the Government's Supplemental Appendix as "USG.Supp.App.," followed by page number; and his Supplemental Appendix, as "Def.Supp.App.," preceded by volume number and followed by page number.

V.JA.3066 (emphasis added). That assertion was undisputedly false—Governor McDonnell never "requested" anything and nobody from the Tobacco Commission had ever heard of Star. VIII.JA.5342-44 (Executive Director of Commission). This innocuous meeting was not "official action."

### 2. The Mansion Event.

The Mansion Event was one of "possibl[y]" "1,150 or so" events at the mansion during Governor McDonnell's Administration. VI.JA.4148. Governor McDonnell arrived late, made neutral comments, and left. He never asked anyone to do anything for Williams.

The Governor's Counsel and Senior Advisor, Jasen Eige, dealt with this lunch on behalf of the Governor's Office. He testified the proposal came to them "from … the First Lady's Chief of Staff." V.JA.3160. It had been proposed as two events, a small luncheon and then a public launch of Anatabloc outside the mansion. *Id.* The Governor's staff was "concerned about this public launch event. Not the grant luncheon where, again, private sector is giving two universities grant money for research, but this public launch of a product at the Mansion." V.JA.3161. Because the "launch" idea was "coming from Star Scientific," Mr. Eige told Williams's lobbyist they "'don't have a problem with the luncheon necessarily with the grants going to the universities, but it is not appropriate to have this public launch at the Mansion as well.'" V.JA.3162.

3

Mr. Eige attended the lunch. Given "the two different events," including "the one that we shut down regarding the public launch of the product," he "had some concerns about how this lunch may proceed." V.JA.3169-70. As it happened, Mr. Eige thought the lunch was fine. The Governor arrived late, "kind of made his usual greetings," and told everyone about "the history behind the Mansion." V.JA.3171. Then, as the UVA researcher who attended (Dr. Lazo) explained:

Q: What do you recall him talking about?

A: So I think the one question he asked us was, did we think that there was some scientific validity to the conversation and some of the pre-clinical studies that were discussed…. He also, I think, asked us whether or not there was any reason to explore this further…. And also, he asked us about could this be something good for the Commonwealth, particularly as it relates to economy or job creation.

V.JA.3344.

Frustrated that Dr. Lazo would not say Governor McDonnell encouraged him to study Williams's product, the prosecutor pressed him. But he refused to go further:

Q: Based on what Mr. McDonnell said, did it seem like he knew Mr. Williams?

A: You know, I don't know that I can say that. I mean, I don't know whether he knew him or didn't know him based on my observations at the luncheon.

Q: Let me ask it this way: When Mr. McDonnell walked in, did he say, "What's going on? I don't understand what this is."

A: No, he walked in and was cheerful and greeted people. But I thought he was aware of what was going on.

Q: And based on the tenor of the conversation, was it generally a positive conversation about Anatabloc or was it all negative about Anatabloc?

4

> A: Well, I don't think the tenor was negative. I think it was, the conversation of Mr. Williams was, I would characterize as positive. I think the Governor's position was more of an interrogative type of a sort of questioning rather than "Isn't this great?" or "Isn't it this awful?" if that's what you are asking me.

V.JA.3345-46. Dr. Lazo thought the Governor's questions "were appropriate for a Governor, and were thoughtful." V.JA.3360.

That was it. The Governor played no role in initiating or organizing this lunch, which his PAC funded. IV.JA.2881-82. He attended what his briefing sheet described as a "[l]unch with researchers and doctors" concerning—as the form wrongly stated—"two studies that UVA and VCU Medical will conduct." USG.Supp.App.107. The Government asserts he "knew the purpose of the event was not ceremonial, but was rather to help Williams obtain the studies," Ans.Br.21, yet cites nothing to support that. In fact, the undisputed evidence showed: Governor McDonnell knew little beyond what his briefing form said, IX.JA.6290-92; his comments were "interrogative," V.JA.3345-46; he effectively told Williams he could *not* support a Tobacco Commission application, Op.Br.48; and his staff "only allow[ed] the lunch"—*not* the launch—"to go forward." V.JA.3229; V.JA.3245 ("It wasn't a launch.").

The Government therefore grasps at straws, invoking the incidental facts that: "invitations bore the Governor's seal," Ans.Br.52; at "other events" (such as for "Volkswagen"), there were not "any of those products out at the place settings," V.JA.3682; Governor McDonnell was not openly negative about the research Star was

donating money to conduct, V.JA.3346; and the professors from UVA and VCU did not take formal "leave" to attend, V.JA.3113,3338.  Since "(possibly improper) use of [official] letterhead" does not cross the legal line, *United States v. Urciuoli*, 513 F.3d 290, 296 (1st Cir. 2008), attending this event did not either.

### 3.     The Email To Jasen Eige.

The Government does not dispute that Governor McDonnell's eleven-word, "see me" email to Mr. Eige was an informational inquiry.  That email was not "official action" unless every other query is too.   The Government nevertheless distorts this issue by falsely implying that Mr. Eige testified "I've been asked by the Governor to call and … show support for this research." Ans.Br.54 (quoting VI.JA.4374); Ans.Br.28.  The testimony the Government quotes, however, was actually that of *Jerry Kilgore*—Williams's lobbyist—*not* Eige.  Mr. Eige made clear that, at the most, after receiving Governor McDonnell's email, he simply "popped in the next morning and kind of explained that it was taken care of, we didn't need to bother with this," and that Governor McDonnell "never followed back up with [me] or never pushed back or never directed [me] to actually go forward and try to make something happen with [Williams]."   V.JA.3218-3219.   The Government never disputed that account. V.JA.3247-48.  As for his call to Mr. Kilgore, Mr. Eige testified he made that call after receiving *Mrs.* McDonnell's email—before he received Governor McDonnell's so-called "official act" email—to "shut down" any request from Williams to Mrs.

McDonnell for assistance.  V.JA.3215-16,3219.  The Government's distortions cannot convert that "see me" email into an "official act."

### 4.    The Healthcare Leaders Event.

The Government essentially agrees this was a cocktail party—one of hundreds throughout the Governor's term—where Governor McDonnell mingled and welcomed guests.  But it still exaggerates.  For example, it claims Governor McDonnell "publicly laud[ed] one of Star's lead researchers," Ans.Br.55, when he merely welcomed the Chair of Endocrinology at Johns Hopkins, among other guests, without mentioning Star.  V.JA.3716; IX.JA.6328.  The Government also falsely implies that Governor McDonnell invited *only* "the very people who could help Williams, the '[h]ead officers at VCU/MCV, UVA.'" Ans.Br.54 (quoting V.JA.3624-28).  The underlying document reflects additions, however, of the top officials at major medical centers throughout Virginia—"Massey Cancer" (Massey Cancer Center at VCU), "VCU," "UVA," "EVMS" (Eastern Virginia Medical School), "Sentara" Healthcare, "Riverside" Health System, and "Bon Secours" Richmond Health System.  USG.Supp.App.220.  This was not an "official act."

### 5.    Suggested Meeting With Star.

Finally, as to the possibly suggested meeting between Lisa Hicks-Thomas, Sara Wilson, and Star, the Government does not dispute that, at most, Governor McDonnell took out his personal Anatabloc, noted it "would be good for … state employees, and then … asked us if we would meet with them."  VI.JA.4227 (Hicks-

Thomas).  Governor McDonnell did not pressure them to do anything:  "I mean, for me, it could say—I would say, 'I like Advil gel caps over Aleve.'  I had no idea why he pulled it out because there was no ask.  There was nothing there.… It was personal."  VI.JA.4218 (Wilson).  No "official act" here either.[2]

### B.    Governor McDonnell Did Not Hide Things From His Staff.

The Government's distortions continue.  It makes the following categorical statement:  "[W]ith limited exceptions for low-dollar items or vacations that could not have been concealed from the staff, none of defendant's staff or political advisors knew about the things of value."  Ans.Br.34.  That is false.  The undisputed evidence establishes that Governor McDonnell's staff knew about *many* of Williams's gifts:

**$15,000 wedding gift.**  At least three senior staff members knew about the $15,000 wedding gift.  Mrs. McDonnell's Chief of Staff (Mary-Shea Sutherland) testified that Mrs. McDonnell handed her the check and "said that Mr. Williams had given [the $15,000 check] to her to pay for the wedding."  V.JA.3416.  Ms. Sutherland told Governor McDonnell's longest-serving aide; and each of them told Governor McDonnell's Chief of Staff.  V.JA.3418; VIII.JA.5322-23.

**Shopping trip.**  Mrs. McDonnell's Chief of Staff actually accompanied Mrs. McDonnell on the shopping trip, V.JA.3381-82, and told at least one other mansion

---

[2] The Government attempts to connect this to something Williams told Ms. Huffstetler eight months earlier about studying state employees, Ans.Br.32 n.5, but no evidence links Williams's much-earlier statement to Governor McDonnell's possible suggestion at this meeting.

staffer about it.  V.JA.3596-97.  No staffers suggested that the dresses should be publicly reported, though, because they knew Virginia law required reporting only gifts to the officeholder—not family.  Ms. Sutherland only "kept track of things that would be considered gifts for the Governor."  V.JA.3397.

**Vacations.**  In both years of the "conspiracy," Governor McDonnell reported his vacations at Williams's expense.  I.Def.Supp.App.72 ($2,268 for "[l]odging and entertainment" from "Jonnie R. Williams"); I.Def.Supp.App.82 ($7,383.14 in flights and lodging from "Star Scientific").

**Golf.**  Multiple golf outings at Williams' club were on Governor McDonnell's official calendar, *e.g.*, I.Def.Supp.App.64, which his staff all had.  VI.JA.4162.  And his scheduler testified she "probably should have" asked who paid, since her "job was to look for anything on the calendar that might have involved a gift…."  V.JA.3030-31.

**Flights.**  The Government omits the undisputed evidence that Governor McDonnell disclosed at least "four flights"—totaling "over $79,000"—Williams donated for political purposes.  IV.JA.2920.

**Loans.**  Finally, Governor McDonnell reported Williams's loan to Mrs. McDonnell on his SOEI in accordance with state law.  VI.JA.3872-73; IX.JA.6254-55,6337-38.

*     *     *

The Government does not explain why Governor McDonnell would conceal some things, while publicly associating with Williams, publicly reporting vacations and

9

flights, scheduling golf on his calendar, and taking no steps to conceal Williams's $15,000 wedding gift. This theory makes no sense. The staff, which was aware of these gifts and contributed flights, was also well aware of the supposedly "official" acts. Yet nobody thought those innocuous acts could give rise to federal crimes. *See also* VA.AGs.Am.Br., Dkt.60, at 5 ("As Attorneys General, none of us would have concluded that any of these actions—all involving access or speech—constitute 'official actions.'").

## C.     The Government's Brief Distorts The Record In Other Respects.

Three other mischaracterizations require clarification:

### 1.     Governor McDonnell Never Tried To Persuade Anyone To Research Anatabloc Or Fund Anatabloc Research.

Governor McDonnell never told anyone he supported Anatabloc research. *First,* the Government cites Dr. Clore stating that "'the Governor would like to sponsor these trials.'" Ans.Br.16. But Dr. Clore's views were based *solely* on his interactions with Star; he *never* spoke with Governor McDonnell. As Dr. Clore testified, he became interested in Williams's product following a "cold call" from Star consultant "Dr. Ladenson." V.JA.3121. When he sent an email suggesting "'the Governor would like to sponsor these trials,'" Ans.Br.16, he "wrote that because that's what *Dr. Ladenson* told [him]." V.JA.3123 (emphasis added). Dr. Clore "never talked with Bob McDonnell about that." *Id.* The same was true for Dr. Clore's later email—which the Government also quotes, Ans.Br.16—in which he simply recounted

"to [his] colleagues" what Star personnel "at Gibson Island told [him]." V.JA.3127. He never "talked to Bob McDonnell about this." *Id.*

*Second*, the Government twice invokes "a pro/con list about the studies" that a UVA official named Sharon Krueger drafted—calling it some of the "most telling[]" evidence. Ans.Br.52. All that is "telling" is the weakness this evidence highlights in the Government's case. Ms. Krueger's list was based on speculation and hearsay; she "never spoke with Bob McDonnell about Star or Rock Creek," and agreed that "whatever" she was "referring to" in her list, "it didn't come from" Governor McDonnell. VI.JA.4323. Her impressions were based on internet research unearthing a photograph on Facebook of Governor McDonnell at a Star event—a photograph Governor McDonnell appeared in long before the supposed conspiracy, V.JA.3156-59[3]—"that influenced one of [her] later statements that [she] thought [Governor McDonnell] supported this product." VI.JA.4328.

### 2. Williams Never Personally Requested Anything From Governor McDonnell And Governor McDonnell Never Promised Anything To Williams.

The Government falsely implies Williams requested, and Governor McDonnell promised, to take official acts. But the evidence was undisputed that, other than requesting a meeting with Dr. Hazel months before the "conspiracy," Williams never personally requested anything. The Government attempts to mask this by conflating (1) Williams's (disputed) testimony that he spoke with Governor McDonnell about

---

[3] The Government alleged the conspiracy began in April 2011. I.JA.113.

loaning Mrs. McDonnell money, with (2) Williams's in-court assertions about *why* he made that loan, to (3) falsely imply Williams testified he *told Governor McDonnell* he "needed his help with the testing." Ans.Br.11-12. Williams never claimed to have done anything like that.

Nor did Governor McDonnell promise assistance. The Government claims "the first lady said, 'The Governor says it's okay for me to help you....'" Ans.Br.10 (quoting III.JA.2231). But that omits this immediately-following exchange:

> Q: Well, to be clear, she's saying that she's going to help you, but she's not promising you that the Governor is going to help you, right?
>
> A: No.
>
> Q: And she never tells you at this meeting, "I'll get Bob to do X, Y or Z if you give us the money"?
>
> A: No.

III.JA.2231-32; IV.JA.2260-61.

The Government finds "incredibl[e]" Governor McDonnell's testimony that when he sent the "see me" email, he did not know Williams (supposedly) wanted his assistance. Ans.Br.28. But that is not incredible at all.[4] Again, Williams never personally requested *anything* during the "conspiracy." The most Williams did was send a lengthy letter via Mrs. McDonnell's Chief of Staff; a letter that Governor McDonnell only glanced at, IX.JA.6121, that nobody else read, and to which Williams did not "recall any response" (another fact the Government omits), IV.JA.2256.

---

[4] As the district court obviously agreed in declining to find that Governor McDonnell lied. XI.JA.7744-45.

What is *actually* incredible is the Government's theory that Williams was paying bribes for two years without personally requesting or getting anything in return.

### 3.    Governor McDonnell Did Not "Repeatedly Approach[] Dr. Hazel."

Finally, the Government claims Governor McDonnell "repeatedly approached Dr. Hazel" about Williams.   Ans.Br.11.   But Dr. Hazel actually testified: "The Governor and I, as far as I know, only spoke about Star one time directly that I can think of."  V.JA.3743.  Dr. Hazel did not know when that happened and he never met with Williams thereafter, partly because "[he] really [didn't] know what [Williams] wanted from [him]," V.JA.3743-45.  The only time Williams met Dr. Hazel—pre-supposed-conspiracy, IX.JA.6041-42—Williams requested nothing.  As Dr. Hazel put it, "I missed the punch line of the meeting because I never got the ask."  V.JA.3739-40.  And Williams got *that* meeting *before* paying any supposed bribes.  IX.JA.6041-42.

*      *      *

The Government says this case involves "stronger evidence of official action than in *United States v. Jefferson*," because Governor McDonnell "directed his action toward subordinate state employees within the branch of government that he controlled as governor."  Ans.Br.2.  But that just proves Governor McDonnell's point.  Staffer after staffer agreed Governor McDonnell knew "how to make it plain that he wanted something done."  VI.JA.4153 (Chief of Staff); VIII.JA.5248,5379.

13

Had Governor McDonnell *wanted* to make something happen for Williams, he *would have* made something happen for Williams.  He never did.

## II.  This Court Should Reject The Government's Unprecedented Legal Theory And Dismiss The Charges.

The Government's basic argument is that officials take "official action" when they take any action that relates to anything pending before them as a matter of settled practice, including matters as all-encompassing as "Virginia business development." The Government thus told the jury that if Governor McDonnell posed for any of "400-and-some photos … making comments at different ribbon cuttings … in exchange for money, it's a crime," XI.JA.7439-40, and argues that Governor McDonnell took "official action" by, for example, "[r]ecommending that senior government officials … meet with Star Scientific executives to discuss ways that the company's products could lower healthcare costs," Ans.Br.49 (quoting Indictment). No court has endorsed that extreme position.  To prove corruption, the Government must show the official tried to induce governmental decisions on specific matters or leveraged his official powers to sway others.[5]

---

[5] The Government must carry that burden with respect to all five allegedly "official" acts.  *United States v. Moye*, 454 F.3d 390, 400 n.10 (4th Cir. 2006) (en banc) ("Where "legally inadequate theory of liability" is presented and "jury returns a general verdict," "reversal is required.").  If only some acts were official, it would be "impossible" to say whether the jury had convicted Governor McDonnell on the "legally inadequate" non-official acts, such that the error would not be "harmless beyond a reasonable doubt."  *United States v. Hastings*, 134 F.3d 235, 242 (4th Cir. 1998); *see also Urciuoli*, 513 F.3d at 297 (reversing because one of three types of official actions not illegal).

14

No amount of record-twisting can push Governor McDonnell's acts across that line. *No* witness testified that Governor McDonnell *ever* requested *anything* besides their independent judgment. And that is what they provided: Molly Huffstetler blew Williams off; Dr. Lazo prepared no research proposals; Jasen Eige told Williams's lobbyist the Governor would not help; Lisa Hicks-Thomas never met with Star; Dr. Hazel did nothing for Williams. And Governor McDonnell *never even asked why*, let alone second-guessed those decisions. The Government's case thus depends entirely on this Court adopting its dangerous, unprecedented theory. The Court should decline.[6]

## A. The Government Ignores The Statutory Text It Invokes.

The Government argues that the Hobbs Act and honest services statute silently incorporate 18 U.S.C. § 201(a)(3)'s definition of "official act," give that definition its broadest possible meaning, and, in doing so, criminalize courtesies that public officials routinely extend to donors and benefactors. That is wrong. Congress has never outlawed state officials arranging a meeting for, or sending an email about, someone partly because that person provided legal-under-state-law gifts or campaign contributions. And it *certainly* has not criminalized that conduct with the clarity criminal law requires. *See generally* Law.Prof.Am.Br., Dkt.62.

---

[6] Whether the evidence amounts to a crime is a legal question this Court reviews de novo. *E.g.*, *United States v. Hager*, 721 F.3d 167, 179 (4th Cir. 2013).

Even if § 201(a)(3)'s definition applies, its text forecloses the Government's theory. That statute defines "official action" as "the performance" of "any decision or action" "on" any "matter" that is (or could be) "pending." 18 U.S.C. § 201(a)(3), (b)(2)(A). The Government seeks to expand this text in two fundamental ways. *First*, it expands it to include every action *en route toward* taking action "on" a pending matter. On that reading, the text does not differentiate among discussing a matter, emailing about a matter, meeting about a matter, and actually resolving a matter. *Second*, the Government expands "matter" to encompass any topic of general governmental interest, *e.g.*, "Virginia business development."

The text forecloses both expansions. First, discussing a matter is not the "performance" of "action" "on" that "matter." The ordinary meaning of "perform" is "to carry out or bring about: accomplish, execute," *Sec'y of Labor v. Ohio Valley Coal*, 359 F.3d 531, 535 (D.C. Cir. 2004), which means the official must do more than merely receive information on the matter. He must "execute" "action" "on" the matter by resolving it or trying to induce its resolution. The statute requires more than something that *leads to* performing an action; it requires the *actual performance* of action. That is what the Supreme Court meant when it explained that this statute does not reach all actions that are "assuredly 'official acts' in some sense." *United States v. Sun-Diamond Growers of Cal.*, 526 U.S. 398, 407 (1999).

The Government's further expansion to include every conceivable "matter" compounds the problem. By abandoning Congress's limitation via the "six-term

series" of words to "a class of questions or matters whose answer or disposition is determined by the government," *Valdes v. United States*, 475 F.3d 1319, 1324 (D.C. Cir. 2007) (en banc), the Government inflates the text beyond recognition. It converts a statute criminalizing improper decisions on the sovereign's behalf into one that criminalizes every miscellaneous action related to any conceivable topic. Every speech, every photo-op, and virtually every conversation will relate to *some* matter, whether business development, agricultural policy, or the UVA basketball team.

The Government's half-hearted attempt to cabin its theory confirms both points: "the three-part test in § 201(a)(3) is not satisfied by a politician simply attending a Rotary egg breakfast (no matter pending); hosting a championship sports team at the White House (same); inviting donors to a campaign event (same); kissing a baby (same); giving commencement speeches (same); or posing for photographs (same)." Ans.Br.48. On that logic, the following *are* criminal whenever a jury concludes the official was motivated partly by the benefit: (1) breakfast at the Rotary Club during a presentation "on" the Club's legislative initiatives, (2) inviting Iowa donors to a campaign event and conversing "on" the matter of ethanol subsidies, (3) accepting free travel to an association's meeting and speaking "on" policy issues, (4) having a meeting "on" business development over dinner with a lobbyist who picks up the check, or (5) to use the Supreme Court's example, accepting a free meal from farmers and speaking "on" USDA policy. The examples are endless. The

17

Government proved as much below, where it argued "posing for photographs," Ans.Br.48, *is* "official act[ion]," XI.JA.7439-40.

By plucking the words from their textual context, the Government creates a Frankenstein statute Congress never enacted. Congress "insist[ed] upon an 'official act,' *carefully defined.*" *Sun-Diamond*, 526 U.S. at 406 (emphasis added). Enforcing the statutory requirement that the official "perform" "action" "on" a matter "whose answer or disposition is determined by the government," *Valdes*, 475 F.3d at 1324, avoids these absurd outcomes. It also comports with Congress's purpose of preventing "the corruption of official positions through misuse of influence in governmental decision-making." *United States v. Carson*, 464 F.2d 424, 434 (2d Cir. 1972). The bribery statutes are not gift bans. They punish officials who actually corrupt their offices, leaving other provisions (here, Virginia's) to regulate gifts. That is why "a statute in this field that can linguistically be interpreted to be either a meat axe or a scalpel should reasonably be taken to be the latter." *Sun-Diamond*, 526 U.S. at 412. The Government's "meat axe" construction fails. At the least, the statutes do not *unambiguously* embrace it—as multiple canons require. Op.Br.40-44.

## B.    The Government Cannot Distinguish *Sun-Diamond*.

The Government asks this Court to ignore the Supreme Court's construction of this text in *Sun-Diamond*, calling it "unelaborated *dicta.*" Ans.Br.58.[7]    But that

---

[7] 18 U.S.C. § 201 uses the same definition of "official act" for both bribery and gratuities.

reasoning was neither "unelaborated" nor "*dicta*." The Court discussed its interpretation for several pages in justifying its holding. And regardless, a "court of appeals is bound by Supreme Court dicta almost as firmly as by the Court's outright holdings, particularly when the dicta is recent and not enfeebled by later statements." *McCravy v. MetLife Ins.*, 690 F.3d 176, 181 n.2 (4th Cir. 2012); *United States v. Fareed*, 296 F.3d 243, 247 (4th Cir. 2002) (same).

*Sun-Diamond* forecloses the Government's position. The Government claims its examples of non-"official" acts turned on the absence of "a pending question, matter, cause, suit, proceeding, or controversy." Ans.Br.58. Not so. As the Court explained: "the Secretary of Agriculture always has before him or in prospect *matters* that affect farmers, just as the President always has before him or in prospect *matters* that affect college and professional sports, and the Secretary of Education *matters* that affect high schools." *Sun-Diamond*, 526 U.S. at 407 (emphases added). When the Secretary of Agriculture is "speaking to the farmers about USDA policy," he is acting *directly* "on" the "pending matters" he speaks about. Yet that was *still* not an "official act" because that official—like the others—neither exercised nor leveraged governmental power.

### C.   Multiple Out-Of-Circuit Decisions Require Reversal.

The Government ignores the en banc D.C. Circuit's reasoning in *Valdes*, focusing on the jury instructions. Ans.Br.58. But the D.C. Circuit did not reverse based on improper instructions; it *dismissed the charges* because the Government there—

like here—failed to prove that the defendant exerted "inappropriate influence on decisions that the government actually makes." *Valdes*, 475 F.3d at 1325, 1330.

The Government's distinction of *Urciuoli* makes even less sense. The Government confuses the acts that *Urciuoli* held are *not* official with those it held *are* official: "*Urciuoli*'s distinction between ambulance-run lobbying (an official act) and insurance-company meetings (not official acts) merely reflects the requirement that there be a 'question, matter, [or] cause' pending before the public official that the official action be 'on.'" Ans.Br.59. *Urciuoli* held just the opposite, explaining "that the ambulance run advocacy with the mayors *cannot* qualify as a deprivation of the 'honest services' owed to the public," 513 F.3d at 295 (emphasis added), *even though* that advocacy was on the specific matter of "comply[ing] with Rhode Island law governing patient entitlement to be taken by ambulance to the hospital of the patient's choice," *id.* at 294. Such lobbying was not "official" because the official was not "biased" in "his judgment in making an official decision," and did not "invoke[] any purported oversight authority," "threaten[] to use official powers in support of his advocacy," or seek "deliberately to exploit []his leverage" as a legislator. *Id.* at 295-96. The ambulance-run lobbying was thus "not a crime even if the facts are taken most favorably to the government." *Id.* at 296. The insurance scheme, though, *was* official action because there the legislator exploited his "considerable power over health care legislation" as pressure. *Id.*

Finally, the Government concedes it cannot distinguish *United States v. Rabbitt*, 583 F.2d 1014 (8th Cir. 1978), claiming only that the Eighth Circuit has read it "narrowly." Ans.Br.59. But even that "narrow" reading forecloses its theory: "The official in *Rabbitt* promised only to introduce the firm to influential persons; he did not promise to use his official position to influence those persons." *United States v. Loftus*, 992 F.2d 793, 796 (8th Cir. 1993). At worst, all Governor McDonnell did was introduce Williams to one person, Ms. Huffstetler, who blew Williams off. He never "use[d] his official position to influence" anyone. *Id.*

**D.    The Government Relies On *Jefferson* And *Birdsall* To Rebut Arguments Governor McDonnell Has Never Made.**

Rather than discuss the statutory text or cite decisions with similar facts, the Government relies almost exclusively on *United States v. Jefferson*, 674 F.3d 332 (4th Cir. 2012). But that decision was about Jefferson's "broad assertion that *Sun-Diamond* supersedes *Birdsall*['s]" conclusion that "settled practices" can fall within the bribery statute. *Id.* at 356. Rejecting that extreme argument, this Court explained settled practices *can be* official acts, if they *also* "adhere to the definition confining an official act to a pending 'question, matter, cause, suit, proceeding or controversy.'" *Id.*

That decision has nothing to do with this case. Jefferson argued that trial courts cannot give a settled practice instruction. Governor McDonnell, by contrast, is arguing the statutory definition of "official act" requires that the official make a decision on the government's behalf, try to induce a decision on the government's

behalf, or invoke his official powers to pressure others.  Those arguments are ships passing in the night.  Governor McDonnell has *never* claimed that "the bribery statute" cannot be "read to encompass a public official's settled practices." *Jefferson*, 674 F.3d at 355.

Jefferson *had to* argue "settled practices" were categorically excluded because he was *clearly* trying to induce particular decisions on specific matters, in addition to leveraging his official powers against others.  Jefferson personally met "with Army officials and representatives" to "promote[] iGate" and personally met "with representatives of the Ex-Im Bank to endorse, assist, and promote the iGate scheme." *Id.* at 356. In those meetings, Jefferson lobbied for a particular resolution of the specific "matters" of awarding Army contracts or funding Bank projects.  In dealing with foreign nations, Jefferson deployed his official powers by, among other things, "obtaining visas," *id.* at 347, and introducing himself to African officials "as a U.S. congressman in charge of overseeing affairs of Nigeria or Africa" while pressing them for specific assistance, *id.* at 344.  Jefferson thus advocated for particular resolutions of specific decisions, in addition to "deliberately" exploiting his congressional "leverage." *Urciuoli*, 513 F.3d at 296.  Governor McDonnell never did anything like that.  And while the Government essentially concedes its theory is irreconcilable with *Sun-Diamond* and *Valdes*, *Jefferson* "agree[d] with *Sun-Diamond* and *Valdes* that the bribery statute does not encompass every action taken in one's official capacity." *Jefferson*, 674 F.3d at 356.

*United States v. Birdsall*, 233 U.S. 223 (1914), is even less relevant. There, officials "performed" clear-cut "actions" "on" a specific governmental "matter" by attempting to bias the governmental decision about executive clemency. *Id.* at 234. Here, Governor McDonnell never tried to bias any governmental decision-making process. The Government's invocation of *Birdsall* to show that bribery extends to actions "not 'prescribed by statute,'" Ans.Br.46, again rebuts an argument nobody has made.

**E.     The Other Decisions The Government Invokes Confirm That Its Position Is Unprecedented.**

Whereas the Government cannot distinguish the decisions Governor McDonnell has cited, the Government's cases, Ans.Br.47, support Governor McDonnell. *United States v. Ring*, 706 F.3d 460 (D.C. Cir. 2013), carefully distinguishes between "making a purely informational inquiry," and acting in one's "official capacity to *influence* the visa application process." *Id.* at 470. The former is Governor McDonnell's request to "see" him, while the latter is trying to induce a specific official decision, which he never did.

The other three cases involve classic official action. In *United States v. Rosen*, 716 F.3d 691, 695 (2d Cir. 2013), the official sought "to restore millions of dollars in funding to the hospital indigent care pool" and "co-sponsored legislation." In *United States v. Moore*, 525 F.3d 1033, 1041 (11th Cir. 2008), the acts included switching a prisoner's unit and permitting inmates to leave units—altering prison policies. And in

23

*United States v. Biaggi*, 853 F.2d 89, 98 (2d Cir. 1988), a congressman invoked "congressional interest" to induce officials to award Navy contracts. These decisions all reinforce the line separating "official action" from every action an official takes.

### F.    The Government Ignores The Implications Of Its Theory.

In its zeal to prosecute Governor McDonnell, the Government has blinded itself to its theory's destructive potential. Close relationships between business leaders, lobbyists, and public officials are commonplace. Each week, the news is filled with articles documenting the extraordinary access officials afford their supporters.

For example, *The Wall Street Journal* recently reported Google representatives "have visited the White House for meetings with senior officials about 230 times, or an average of roughly once a week." Brody Mullins, *Google Makes Most of Close Ties to White House*, Wall St. J. (Mar. 24, 2015, 9:24 PM). "During Mr. Obama's 2012 re-election campaign, Google employees were the second-largest source of campaign donations to his campaign by any single U.S. company." *Id.* Other cozy relationships abound. *E.g.*, Rosalind S. Helderman & Tom Hamburger, *Foreign Gifts Flowed to Clinton's Charity*, Wash. Post, Feb. 26, 2015, at A1 ("contribution" by Algeria to Clinton Global Initiative "coincided with a spike in the North African country's lobbying visits to the State Department").

If meetings *alone* are official acts—and each of these meetings plainly pertained to some pending matter—administration officials and Google employees could be investigated for, and charged with, exchanging a pattern of preferential access for a

pattern of campaign contributions. That would mean countless officials in the Executive Branch, along with Google executives and lobbyists, have potentially committed felonies. The fact that those people will likely go uninvestigated and unprosecuted is no defense; it simply confirms that theory's inherent lawlessness.

This is not hypothetical. On April 1, 2015, the Government indicted United States Senator Robert Menendez for taking "official act[ions]" in exchange for, among other things, "approximately $103,500 for various New Jersey county Democratic Party entities, and approximately $300,000 for Majority PAC that was earmarked for the New Jersey Senate race." Indictment, *United States v. Menendez*, No. 15-CR-155, ¶259 (D.N.J. Apr. 1, 2015). If (1) "official action" includes meetings where no official commitments are made (or even requested), neutral queries to aides, and brief public appearances, (2) campaign contributions to "various … Democratic Party entities" are bribes, and (3) the corrupt agreement can be shown through timing, then virtually every elected official in America is a felon. Whether or not Senator Menendez took real official actions, these campaign-contribution-based charges illustrate the staggeringly broad criminality the Government's construction creates. That is, no doubt, why no court has ever suggested this was the reach—much less the *unambiguous* reach—of these vaguely worded statutes. This Court should not be the first.

25

## III.   The Government's Tepid Defense Of The District Court's Jury Instructions Confirms That A New Trial Is Necessary.

### A.   The District Court's "Official Act" Definition Was Unlimited And Error-Laden.

The Government's proof fails and this Court should dismiss the charges. At the least, though, it was critical to carefully instruct the jury about the scope *and* limits of "official action."  But instead, the district court's instructions quoted at-best-opaque statutory language and *expanded* it in multiple erroneous ways. That was error, which, if upheld, would make every public official a potential felon and would "leave[] far too much discretion in the hands of prosecutors, who are thereby vested with the ability to criminalize ordinary interactions between public officials and private citizens, and who may be faced with the temptation to yield to political pressure or make a name for themselves by bringing charges against particular public officials in high-profile matters." Fmr.Fed.Officials.Am.Br., Dkt.75-1, at 3.[8]

The Government's rebuttals fail.  *First*, the Government notes the instructions "quoted verbatim the statutory language defining an official act." Ans.Br.63.  That is not enough.  The Supreme Court has held—concerning § 201 itself—that trial courts err by adding an "expansive gloss" on the statutory language that misstates the law. *Sun-Diamond*, 526 U.S. at 403, 412-13; *United States v. Hatfield*, 591 F.3d 945, 949 (7th Cir. 2010) (ordering new trial; "[e]laborating on a term often makes it less rather than

---

[8] The instructions quoted the indictment, Ans.Br.49, but only in describing it, XI.JA.7659-60, *not* in instructing on what the jury must find in order to convict.

more clear"). That is what the district court did, enabling the prosecutors to quote the statutory definition only once, to tell the jury to *ignore it*. XI.JA.7608; Op.Br.58-59.

*Second*, the court compounded that error by refusing to include *any* limitations. Courts must tell juries about critical limits on criminal liability; they cannot simply give a "general instruction" that "implie[s]" them. *United States v. Lewis*, 53 F.3d 29, 33-34 (4th Cir. 1995); *see also Commercial Union Assur. Cos. v. Sears, Roebuck & Co.*, 716 F.2d 606, 609 (10th Cir. 1983) ("[A] trial judge has a duty to go beyond mere abstract statements or legal definitions where necessary in guiding the jury toward an intelligent understanding…."). The district court rejected every proposed limitation—including limitations it endorsed in its post-trial opinions, limitations adopted in *Jefferson*, and limitations Judge Huvelle articulated in *Ring*. Op.Br.53-54. That was reversible error.

The Government's counter-argument is that Governor McDonnell's proposed limitations contained unspecified "legal errors." Ans.Br.67. That just highlights the breathtaking scope of the Government's position. Under that view, it would be "legal error" to instruct that "the fact that an activity is a routine activity, or a 'settled practice,' of an office-holder does not alone make it an official act." I.JA.753. That instruction is "error" only if *every* settled practice is official action—a contention that ignores the statutory text, that *Jefferson* forecloses, and that would reach *everything* officials customarily do. It also means it is "legal error" to instruct that "[a] government official's decisions on who to invite to lunch, whether to attend an event,

or whether to attend a meeting or respond to a phone call are not decisions on matters pending before the government." *Id.* But that is only "error" if every lunch invitation or phone call is *per se* official action. If officials take "official action" whenever they dine with someone, then *nothing* falls outside the statute. Those arguments—which the Government does not explain and cannot support—are wrong.

*Third*, the Government claims these instructions were "materially indistinguishable from those in *Jefferson*." Ans.Br.3. Not true, as side-by-side comparison shows. Op.Br.54. The instruction below combined miscellaneous legal principles defining other elements of the charged offenses, yielding an instruction which said (1) every customary practice is official action, (2) everything a bribe-payor subjectively believes furthers his cause is official action, and (3) every prefatory step *toward* official action constitutes official action. That instruction compelled the jury to conclude—contrary to *Jefferson*—that official action includes "every action taken in one's official capacity," *Jefferson*, 674 F.3d at 356, since practically everything Governors customarily do might someday lead to official action.

*Fourth*, the Government claims the instruction defining official action according to whether "the alleged bribe payor reasonably believes that the public official had influence, power or authority over a means to the end sought by the bribe payor," XI.JA.7672, comes from *Evans v. United States*'s statement that "'fulfillment of the *quid pro quo* is not an element of the offense.'" Ans.Br.65 (quoting 504 U.S. 255, 268

(1992)). But that passage does not define "official action"; it relates solely to whether officials must *complete* a promised official act. It clarifies that a congressman breaks the law by selling his vote, even if he never casts it.

Nor is this instruction *even from Evans*. It is, rather, misappropriated from Hobbs Act instructions defining extortion "under color of official right." *United States v. Bencivengo*, 749 F.3d 205, 212-13 (3d Cir. 2014). That, too, has nothing to do with defining "official action"; it goes, rather, to defining extortion. *United States v. Mazzei*, 521 F.2d 639, 643 (3d Cir. 1975). It makes clear that, for example, a policeman who demands $100 to make criminal charges disappear—textbook official action—is guilty of extortion even if he does not actually have the power to take that promised official action. Neither *Evans* (aborted official action) nor the Hobbs Act decisions (impossible official action) relate to *defining* official action.

*Fifth*, the Government repeats this mistake in defending the unprecedented "series of steps" instruction, XI.JA.7671-72, citing principles governing the *separate* "'quid pro quo' element." Op.Br.57 (citing *Jefferson*, 674 F.3d at 358); Ans.Br.65-66 (quoting 674 F.3d at 359). The jury had to find *both* a quid pro quo *and* a promised or performed official act. Simply finding the quid pro quo *twice*—which the instructions permitted—eliminates an element of the crime. That is obviously error.[9]

---

[9] The Government suggests the last two sentences in the definition required the jury to find attempts to influence governmental policy. Ans.Br.67 n.15. But those sentences described things the jury did *not* have to find. Neither required finding that Governor McDonnell leveraged official powers or tried to induce governmental

*Finally*, if the Government is now arguing that Governor McDonnell broke the law by taking action on some "matter" more concrete than "Virginia business development," that just confirms the incorrectness of the instructions. The instructions did not require finding any "matter" beyond "Virginia business development." And that is the "matter" the Government focused on in the critical portion of its closing argument, where it summarized the evidence and the law. The Government claims Governor McDonnell "mischaracterize[d]" its closings, Ans.Br.69 n.16, so, without alteration:

> Now, all of these things, the launch at the Mansion, directing Dr. Hazel to send somebody to the meeting in August of 2011, the effort to pressure VCU and UVA on Star's behalf that Jasen Eige shut down, the Virginia Healthcare Leaders event at the Mansion, Mr. McDonnell meeting with Lisa Hicks-Thomas and Sara Wilson, asking them to reach out to the Star people, or strongly suggesting as much, *all of these are official acts on the issue of Virginia business development*, which everyone who testified about it said was a capital priority of Bob McDonnell's administration.

> Mr. McDonnell's involvement with every single one of these things was in his official capacity as Governor, whether it was approving the Mansion event, which Dr. Scarbrough and Mr. Kent both said were ultimately approved by him, or directing conduct by a subordinate. Whatever it was, it's all official action. So the fact that Mr. McDonnell didn't order a dispensation from the Governor's Opportunity Fund or to Star, and he didn't put a line item in the budget for the studies that Mr. Williams wanted, that's like saying a guy who steals a TV isn't guilty because he didn't steal two. Not a defense.

---

(continued…)

decisions.

XI.JA.7438-39 (emphasis added). Right after that, the prosecutor claimed that "[w]hat separates the official action in this case from all the other … similar things" Governor McDonnell did—such as saying "kind word[s] about Virginia business" or posing for "400-and-some photos"—was that Williams paid "Bob McDonnell to get" the five acts here. XI.JA.7439-40. The Government's central theory was thus that "[w]hatever" Governor McDonnell did in his official capacity, "it's all official action." XI.JA.7439. The instructions blessed that legally incorrect argument and thus require a new trial.

### B.     The Quid Pro Quo Instruction Was Prejudicially Incorrect.

### 1.     The Government's Defense Of The Refusal To Instruct On Goodwill Gifts Fails.

The district court further erred by refusing to instruct that a gift "given simply with the generalized hope or expectation of ultimate benefit on the part of the donor, does not constitute a bribe." *United States v. Jennings*, 160 F.3d 1006, 1013 (4th Cir. 1998). This instruction was essential to Governor McDonnell's defense, since Williams never testified to any agreement, claiming only vague hopes for unspecified "help." Op.Br.62. Excluding this instruction was reversible error.

The Government's only response is that generic instructions requiring corrupt intent, a scheme to defraud, and bad faith somehow implied that goodwill gifts are not illegal. Ans.Br.67 n.14. Incorrect. The instructions needed to "focus" the jury's "attention on the essential trial issues in the case and inform it of the permissible ways

in which these issues may be resolved." *Lewis*, 53 F.3d at 34 (quotation omitted). That is why *Lewis* rejected the Government's argument. There, the court failed to instruct that the defendant "could not be convicted for conspiring with a government agent," though it *did* instruct that "a person can only be a conspirator if he joined another to commit an unlawful act or accomplish an unlawful purpose." 53 F.3d at 34. The Government argued that general instruction communicated the crucial limit by "implication." *Id.* This Court reversed because "no basis exists to assume the jury *knew*, without being instructed" about that limit. *Id.*

This Court has consistently vacated corruption-related convictions for failure to instruct on goodwill gifts. In *United States v. Taylor*, 993 F.2d 382 (4th Cir. 1993), this Court reversed despite an instruction that the defendant should be acquitted if he "accepted money … reasonably believing that the money was a legitimate campaign contribution." *Id.* at 384. That instruction is more specific than the intent instructions here, but was not enough because it allowed conviction "upon a finding that the payments were made … simply because [the defendant] held office," *id.* at 385—which is *precisely* what Governor McDonnell's jury thought, Op.Br.51. And in *United States v. Arthur*, this Court reversed because "the district court's instruction on bribery … failed to adequately distinguish conduct which amounts to bribery from conduct which is legally innocent." 544 F.2d 730, 734 (4th Cir. 1976). "Not every gift, favor or contribution to a government or political official constitutes bribery," *id.*,

and those instructions did not explain the "crucial distinction between 'goodwill' expenditures and bribery," *id.* at 735.

Same here. Generic instructions requiring "corrupt intent" or "bad faith" do not communicate the specific rule that a "gift or payment given with the generalized hope of some unspecified future benefit is not a bribe." I.JA.751,756; X.JA.7340,7352. Jurors could *easily* conclude that gifts given with a "generalized" "expectation" of future benefits were accepted in bad faith. The trial court needed to foreclose that by "instruct[ing] the jury clearly," *Lewis*, 53 F.3d at 34, particularly since the gifts here were all otherwise-legal.

### 2. The Government's Defense Of The Quid Pro Quo Instruction Fails.

Finally, the district court erred by refusing to instruct that "you must still find beyond a reasonable doubt that the official accepted the payments in exchange for agreeing to perform a specific type of official acts." X.JA.7354,7363. That comes from *Jennings*: "[A]ll that must be shown is that payments were made with the intent of securing a specific *type* of official action or favor in return." 160 F.3d at 1014. That refusal requires reversal.

The Government tries to obscure this error by irrelevantly noting it did not have to "link every dollar paid … to a specific meeting, letter, trip, or other action." Ans.Br.66. But what it *did* need to prove was, as the *Jefferson* district court instructed, "the defendant sought, received or agreed to receive payments with the intention of

providing a *specific type of official action* in return." II.JA.1144 (emphasis added). Absent that instruction, the jury could have convicted Governor McDonnell for taking otherwise-lawful gifts without agreeing to do anything more specific than provide unspecified "help." That, too, requires reversal.

## IV. The District Court's Voir Dire On Pretrial Publicity Requires Reversal.

"[P]art of the guarantee of a defendant's right to an impartial jury is an adequate voir dire to identify unqualified jurors." *Morgan v. Illinois*, 504 U.S. 719, 729 (1992). Here, despite relentless, negative pretrial publicity, the district court refused to (1) ask potential jurors if they had formed an opinion about guilt, and (2) conduct individualized voir dire of jurors who admitted exposure to pretrial publicity.

The Government first denies that the record establishes substantial negative pretrial publicity. Ans.Br.71. But as Governor McDonnell demonstrated below, *thousands* of stories appeared locally, I.JA.262; and in the dominant regional newspapers, *at least two-thirds* of the coverage was negative, I.JA.265-66. The record also includes 63 pages of negative stories. I.Def.Supp.App.1-63. The Government never contested this below, *conceding* voir dire should address publicity. I.JA.381.

The Government next claims "defendant [was given] free rein to bring forward whomever he sought to question individually about publicity," but "chose not to." Ans.Br.73. That is demonstrably false:

> —The parties *jointly* proposed a written questionnaire asking "what opinions, if any [jurors had] formed about the guilt or innocence of Robert F. McDonnell." I.JA.527.

34

—The district court rejected that request. It instead asked only whether potential jurors had "*expressed* an opinion" to others. I.JA.593.

—The court's questionnaire asked no other questions aimed at uncovering whether jurors had formed an opinion about guilt. I.JA.592-93.

—During voir dire, the Government suggested, and the defense strenuously requested, individualized voir dire of jurors who had been exposed to pretrial publicity. The court refused:

> [GOVERNMENT]: … Mr. Asbill has raised the issue of pretrial publicity in this case and he's at least expressed to me his opinion that if the Court does not ask each and every person that ever heard about this.
>
> The government doesn't believe that that is the case. However … at least for those individuals that have said that they have very closely or somewhat closely followed the case, it might be advisable for us to do some limited inquiry or bring them up or something….
>
> THE COURT: Well, I mean, I appreciate his position, but *that's not the Court's position.* … I mean, I will ask the question so that we can see if there are—anybody responds to, you know, having discussions or anything that happened.
>
> [GOVERNMENT]: Let me be clear. That's satisfactory to the government. Mr. Asbill—
>
> THE COURT: Mr. Asbill can speak for himself. But if that's his position, that's fine. *But in terms of what I'm going to do here, I'm not going to do what you suggest. I'm just not going to do it.*
>
> [DEFENSE]: Well, Judge, the reason I'm asking for much more inquiry with respect to pretrial publicity is this. For example, one of the jurors said that she hadn't followed the case at all, and so—she said barely at all, and then we checked after that, all the resources that she said had said things about the case. So there's some confusion. It's very subjective, number one.
>
> Number two, if anybody sees a news article or watches one program that really makes an impact, the fact that they haven't watched it multiple times or seen a lot of publicity about it, that can't make [any difference] if they have an indelible impression from one source. That is a problem. … So—and *my position is that if somebody is exposed to pretrial publicity, they*

35

*have to be individually voir dired*, and I have a list of questions I'd like to give to the Court that I think they should be asked.

THE COURT: Okay. Well, you can provide the questions. … [T]his is what you're going to have to do. You're going to have to identify *specifically* the people that you think should be struck for cause, and the Court will make an assessment of that *based on information that we have. I'm not asking these questions. I'm not going to do it.*

III.JA.1688-90 (emphases added).

—The district court thus limited follow-up questioning to jurors who gave *specific* cause—*i.e.*, cause *beyond* exposure to publicity.

—The court then conducted its *en masse* stand-up, sit-down inquiry. III.JA.1691-92.  It said, "I'm satisfied with these … responses, but if you got specific folks who we need to look at *specific responses*, let me know." III.JA.1692 (emphasis added).

—The defense—for the *third* time—reiterated the need for specific questions about the opinions of jurors who had been exposed to pretrial publicity:

> [DEFENSE]: Can I just make a record on this question, this particular question?
>
> THE COURT: Sure.
>
> [DEFENSE]: I understood that everybody said they could be put aside. I can't trust the credibility of that without a further inquiry and I can't make any judgments or arguments to you without any further inquiry.

*Id.*

—Then—after the district court had thrice refused to ask about opinions—the defense identified "specific folks" whose responses to the questionnaire's question about *expressing* an opinion raised concerns.  *Id.  Only* those jurors were questioned.  III.JA.1692-1706.

—Only *then* did the defense say it had no more questions "on publicity." III.JA.1706.

—This process led to the court seating 14 jurors (out of 16 seated) who had been exposed to pretrial publicity at the time of the questionnaires,

36

II.Def.Supp.App.104,131,158,185,212,239,266,293,320,347,374,401,428,509
—with more admitting exposure in-court, III.JA.1692—without ever asking
whether those jurors had *formed* opinions pretrial, *see generally*
II.Def.Supp.App.

This cursory voir dire was inadequate. No decision of the Supreme Court or
this Court has *ever* approved a trial court *neither* asking exposed jurors about their
opinions *nor* allowing individual follow-up questioning in the face of extensive pretrial
publicity. *Skilling v. United States*, 561 U.S. 358, 371 & n.4, 374 (2010) (questionnaire
asked about opinions; court conducted individual follow-up voir dire); *Mu'Min v.
Virginia*, 500 U.S. 415, 420 (1991) (individual voir dire on opinions); *Patton v. Yount*,
467 U.S. 1025, 1033-35 & n.10 (1984) (same); *Murphy v. Florida*, 421 U.S. 794, 800-02
& n.5 (1975) (same); *United States v. Bakker*, 925 F.2d 728, 733 (4th Cir. 1991) (same).[10]
Governor McDonnell's acquittal of making false statements on two loan
applications—charges that got virtually no publicity—only underscores the damage
publicity caused on the corruption allegations.

Finally, the Government's assertion that Governor McDonnell does not claim
any seated juror was biased misses the point. Ans.Br.71,74. Error occurred when the
trial court three-times denied the *opportunity to discover* bias. *Morgan*, 504 U.S. at 729-30;
*Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981) ("Without an adequate *voir dire*

---

[10] The only case that comes close is *United States v. Bailey*, 112 F.3d 758, 769-70
(4th Cir. 1997). But even in that pre-*Skilling* decision, the court asked every question
the defendant provided and asked jurors *both* whether they had formed opinions
(inquiring whether the media coverage "would predispose them to favor one side or
the other") *and* whether they could based their verdict solely on in-court evidence.

the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled."). That requires reversal.

## V. The District Court Erred By Refusing To Sever The McDonnells' Trials.

"[W]here one defendant's case rests heavily on the exculpatory testimony of his co-defendant, willing to give such testimony but for the fear that by taking the stand in the joint trial he would jeopardize his own defense," a court must grant severance. *United States v. Shuford*, 454 F.2d 772, 776 (4th Cir. 1971). Severance was required here. Mrs. McDonnell was willing to provide highly exculpatory testimony in a separate trial, but would not testify in a joint trial because admitting to habitually concealing things from her husband would have inculpated her on her obstruction charge. Yet the district court refused to even read the declaration detailing her anticipated testimony, instead requiring Governor McDonnell to choose between forfeiting severance and exposing his entire strategy three months before trial.

The Government claims "the only issue on appeal is whether the district court abused its ... discretion in refusing to consider *ex parte* evidence." Ans.Br.79. Not so. Governor McDonnell repeatedly asked the court to *either* consider his evidence *ex parte*, *or* defer ruling until two weeks before trial. I.JA.465,484. The district court abused its discretion by refusing *both* requests.

The Government trumpets the court's invitation to file the declarations under seal with service on the Government. *See* Ans.Br.78. But that option was meaningless.

The *only* entity Governor McDonnell was concerned about sharing strategy with *was* the Government.

Closely reading the declaration confirms that it warranted severance. Mrs. McDonnell would have testified that, *e.g.*:

—"Williams filled a void that she was feeling in her life, as he gave her both gifts and attention."

—She concealed from Governor McDonnell that Williams was the source of highly prejudicial gifts, including the New York shopping trip (which she concealed altogether) and the Rolex (which she gave as a gift from her).

—"[S]he invoked her husband's name and a directive in [the February 10, 2012] email [stating that 'Gov wants to get this going with VCU MCV'] without his approval."

—She "made other requests in [his] name without his knowledge or approval."

—Governor McDonnell was not involved in planning the Mansion lunch or adding Star's guests to the list for the Virginia healthcare leaders reception.

—She and her husband never discussed or agreed to any scheme and Williams told her the reason he was so generous was that "he respected and admired the Governor, [and] ... wanted to support him."

XII.JA.7927-34.

This declaration satisfies *Parodi*. Op.Br.70-74. One or two observers noting her occasional stress, Ans.Br.80 (citing V.JA.3400, VII.JA.5605-06), was obviously no substitute for her own account. And this testimony was highly exculpatory. *United States v. Medford*, 661 F.3d 746, 753 (4th Cir. 2011). The Government's recitation of facts casts Mrs. McDonnell as *the* central figure. They say she: requested that Williams buy her expensive clothing, Ans.Br.7-8; sent glowing emails about Star,

Ans.Br.9,10,18; spent substantial time with Williams, Ans.Br.9-10; solicited funds from Williams and said "'she would help [him],'" Ans.Br.10; offered to host the luncheon for Star, Ans.Br.12; asked to use a boat and Williams' Ferrari, Ans.Br.16; scheduled and attended the August 1, 2011 meeting with Williams and Huffstetler, Ans.Br.16-17; asked Williams to buy the Rolex watch, Ans.Br.18-19; scheduled and planned the August 30, 2011 luncheon, including arranging the Governor's attendance through his aide, Ans.Br.18-19; told Williams and others that the Governor was interested in Anatabloc studies, Ans.Br.24,26-27; and allowed Williams to invite doctors to the healthcare leaders reception, Ans.Br.25. Mrs. McDonnell's testimony that she acted independently, kept secrets from her husband, and invoked her husband's name without his knowledge would have powerfully confirmed Governor McDonnell's defense that there was no corrupt agreement with Williams or conspiracy with his wife, *e.g.*, I.Def.Supp.App.84 (private email between McDonnells detailing marital strife), and would have refuted the inflammatory assertion that Governor McDonnell "thr[ew] his wife under the bus." XI.JA.7631.

The Government argues that Mrs. McDonnell would have been impeached, Ans.Br.81, but never undercuts her essential testimony. *United States v. Catalan-Roman*, 585 F.3d 453, 462 (1st Cir. 2009). And besides, much of her testimony would have been pitted against *Williams*—who initially *denied* wanting anything from Governor McDonnell, IV.JA.2467-69, and who only claimed he expected the Governor's "help"

*after* the Government began immunizing him for an ever-expanding list of felonies. IV.JA.2491-95.

## VI.   Multiple Prejudicial Evidentiary Errors Each Require Reversal.

*First*, the Government neither denies that Williams's transactional immunity deal was unprecedented, nor cites any evidence that could elucidate (1) what crimes Williams was immunized for; (2) what transactional immunity is; (3) how unusual transactional immunity is; or (4) how extraordinary it is to receive transactional immunity for unrelated crimes.  The Government does not even *attempt* to justify excluding testimony from Agent Hulser and Williams himself about the deal's unusual nature.  And for expert testimony, the Government erroneously relies on a decision addressing the distinct issue of plea agreements.  Ans.Br.84.  This was clearly harmful error, since the erroneously-overbroad instructions made the *entire case* turn on whether the jury believed Williams's claim that he gave gifts "[b]ecause they are helping me."  IV.JA.2306.

*Second*, the Government's justification for admitting prejudicial and confusing SOEI evidence fails.  Apart from some golf Governor McDonnell admittedly forgot to report, IX.JA.6138,6342,6673, the Government points to no gifts that should have been reported but were not.  Instead, the Government pursues a convoluted "structur[ing]" theory that only reinforces the need for expert testimony on Virginia law.  Ans.Br.85-86.  Without it, this evidence only confused and inflamed the jury.  Op.Br.81-82.

41

*Third*, the Government cannot justify admitting the highly prejudicial Zubowsky email. The Government claims it "simply conveyed defendant's prior directive," Ans.Br.87, but that is implausible given Zubowsky's extensive personal commentary. XI.JA.7921, Ans.Br.83. (Besides, the district court has acknowledged the email was hearsay. II.JA.972.) The suggestion that Governor McDonnell failed to properly object, Ans.Br.87, is wrong. Defense counsel objected: "He's not on this e-mail. Never seen this e-mail." IX.JA.6706. That is a textbook hearsay objection. This issue is thus clearly presented.[11]

*Fourth*, the Government is wrong that a $23,000 vacation the McDonnells took as guests of William Goodwin was "intrinsic" to the charges. Evidence that Governor McDonnell (properly) did not report a gift from an unrelated person is not "inextricably intertwined" with Williams's alleged bribery. *United States v. Lipford*, 203 F.3d 259, 268 (4th Cir. 2000). Rule 404(b) therefore applies. The Government claims this evidence showed knowledge of the "personal friend" exception, yet does not dispute that Governor McDonnell *never* invoked that exception for Williams. Op.Br.84. This evidence was thus classic inflame-the-jury evidence that violated Rule 404(b).

*Finally*, the Government identifies nothing empowering the district court to confiscate properly-produced Rule 16 evidence via secret litigation conducted *ex parte*

---

[11] Evidence showing a defendant previously sought free things is also 404(b)-barred propensity evidence. *United States v. Queen*, 132 F.3d 991, 995 (4th Cir. 1997).

from the defendant.  The proceeding that led to confiscating the iPhone violated due process.  *See, e.g.*, *Parklane Hosiery v. Shore*, 439 U.S. 322, 327 n.7 (1979).  Nor has any court held that Rule 16 materials may be confiscated *without even reviewing them* to determine what was "material" and thus subject to mandatory disclosure.  *United States v. Thompson*, 562 F.3d 387, 397 (D.C. Cir. 2009); *United States v. RMI Co.*, 599 F.2d 1183, 1186 (3d Cir. 1979).  If Governor McDonnell receives a new trial, he is entitled to this evidence; if any is material, the court's confiscation of it *itself* requires a new trial.[12]

## CONCLUSION

This Court should decline the Government's request to "federalize the law of public corruption, empowering federal prosecutors to transform innocent political courtesies into fodder for federal criminal prosecutions," National.AGs.Am.Br., Dkt.61-1, at 3, while "wreak[ing] havoc on the public life of Virginia," VA.AGs.Am.Br., Dkt.60, at 5.  It should instead dismiss the charges.  At the least, it should order a new trial.

---

[12] The Opening Brief *does* "identify this as an independent basis for reversal," Ans.Br.89, *see* Op.Br.85 (requesting reversal if material evidence).

Dated:  April 8, 2015                    Respectfully submitted,


                                         /s/ Noel J. Francisco
                                         Noel J. Francisco
                                         Henry W. Asbill
                                         Charlotte H. Taylor
                                         James M. Burnham
                                         Ian Samuel
                                         JONES DAY
                                         51 Louisiana Avenue, N.W.
                                         Washington, DC 20001
                                         Telephone: (202) 879-3939
                                         Facsimile: (202) 626-1700
                                         njfrancisco@jonesday.com

                                         John L. Brownlee
                                         Daniel I. Small
                                         Christopher M. Iaquinto
                                         Elizabeth N. Jochum
                                         HOLLAND & KNIGHT LLP
                                         800 17th Street N.W.
                                         Suite 1100
                                         Washington, DC 20006
                                         Telephone: (202) 828-1854
                                         Facsimile: (202) 955-5564

                                         *Counsel for Defendant-Appellant*
                                         *Robert F. McDonnell*

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**No. 15-4019**          **Caption:** *United States v. Robert F. McDonnell*

## CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) OR 32(a)
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

I certify that this brief complies with the type-volume limitation of Fed. R.

App. P. 32(a) and the Court's Order dated February 2, 2015 granting leave to file a

reply brief of not more than 10,500 words.   This brief is written in Garamond, a

proportionally spaced font, has a typeface of 14 points, and contains 10,498 words (as

counted by Microsoft Word 2007), excluding the parts of the brief exempted by Fed.

R. App. P. 32(a)(7)(B)(iii).


/s/ Noel J. Francisco
Noel J. Francisco

*Counsel for Defendant-Appellant*
*Robert F. McDonnell*

## CERTIFICATE OF SERVICE

I certify that on April 8, 2015, the foregoing document was served on all parties or their counsel of record through the CM/ECF system.


/s/ Noel J. Francisco
Noel J. Francisco

*Counsel for Defendant-Appellant*
*Robert F. McDonnell*