No. 15-4019

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

———————

UNITED STATES OF AMERICA,

*Appellee,*

v.

ROBERT F. MCDONNELL,

*Defendant-Appellant.*

———————

**On Appeal from the United States District Court for the Eastern District of Virginia, Richmond Division, James R. Spencer, District Judge**

———————

## DEFENDANT-APPELLANT'S MOTION
## TO CLARIFY ORDER GRANTING RELEASE PENDING APPEAL OR, IN THE ALTERNATIVE, TO STAY THE MANDATE PENDING RESOLUTION OF A PETITION FOR CERTIORARI

———————

John L. Brownlee
Daniel I. Small
Christopher M. Iaquinto
Elizabeth N. Jochum
HOLLAND & KNIGHT LLP
800 17th Street N.W.
Suite 1100
Washington, DC 20006
Telephone: (202) 828-1854
Facsimile: (202) 955-5564

Noel J. Francisco
  *Counsel of Record*
Henry W. Asbill
James M. Burnham
JONES DAY
51 Louisiana Avenue N.W.
Washington, DC 20001
Telephone: (202) 879-3939
Facsimile: (202) 626-1700
njfrancisco@jonesday.com

*Counsel for Defendant-Appellant*
*Robert F. McDonnell*

# INTRODUCTION

On January 26, 2015, this Court granted Gov. McDonnell's motion under 18 U.S.C. § 1343(b) for release pending appeal, finding by clear and convincing evidence that (i) the Governor was not a flight risk nor a public danger nor attempting to delay, and (ii) that his case presented "substantial" questions that, if decided in his favor, would warrant reversal or a new trial. (*See* Dkt.39.) Ultimately, on July 10, 2015, the panel affirmed Gov. McDonnell's convictions, rejecting (among other things) his definition of "official act" for purpose of the federal corruption statutes and his objections to the efforts of the district court to address the threat of jurors tainted by heavy pretrial publicity. (Op. 3-4.) This week, the en banc Court—with nearly half of the Court's active judges recused—denied rehearing en banc after a poll. (Dkt.131.)

Gov. McDonnell has retained experienced Supreme Court counsel and intends to file a timely certiorari petition asking the Supreme Court to review these questions. Because the same standards under 18 U.S.C. § 1343(b) apply to release pending disposition of a certiorari petition as for release pending appeal, Gov. McDonnell asks this Court to clarify that its release order will remain in force pending the filing and disposition of a timely certiorari petition. After all, he remains neither a flight risk nor a threat to public safety, and the questions presented by his case remain "substantial," notwithstanding that a panel of this Court has rejected them. The Supreme Court should be given the same opportunity, and Gov. McDonnell should not be required to serve the bulk of his 24-month prison sentence before it has that chance.

In the alternative, the same result is called for under the Federal Rules, which expressly recognize that a stay of the appellate mandate is appropriate if a certiorari petition "would present a substantial question" and there exists "good cause" for a stay. Fed. R. App. Proc. 41(d)(2)(A). Again, this Court has already recognized that "substantial" questions are at stake here, and "good cause" exists to preserve the status quo, lest Gov. McDonnell suffer the irreparable harm of serving his relatively brief prison sentence to only later have the Supreme Court vacate his conviction.

In short, under both 18 U.S.C. § 1343(b) and Federal Rule 41(d), two facts are together dispositive. *First*, there is a reasonable probability that the Supreme Court will grant review: The questions presented raise important, high-profile issues of constitutional dimension; implicate political conduct that occurs routinely across the country; garner the attention of scores of *amici*, including bipartisan state and federal officials; divide the Courts of Appeals; and expose clear tensions in Supreme Court precedent. *Second*, the balance of equities is clear: If the Supreme Court *denies* review and Gov. McDonnell begins his 2-year sentence in 6 months, the Government is no worse off. Yet if Gov. McDonnell reports to prison immediately and the Court then *grants* review, Gov. McDonnell will never be able to recover that lost time. This is therefore a quintessential case for interim release and/or a stay of the mandate.[1]

---

[1] Gov. McDonnell informed the Government of his intent to file this motion, and the Government plans to file an opposition. Under Fed. R. App. Proc. 41(d)(1), the mandate is stayed pending briefing and disposition of this motion.

# ARGUMENT

Under 18 U.S.C. § 1343(b), a defendant is entitled to release pending appeal or disposition of a certiorari petition if he is neither a flight risk nor a danger to public safety and the appeal "raises a substantial question of law or fact" that, if resolved in his favor, "is likely to result in" reversal or a new trial. The Federal Rules adopt a similar test for a motion to stay the mandate pending a certiorari petition: One must show both "a substantial question" and "good cause." Fed. R. App. P. 41(d)(2)(A).

These are not demanding standards. At the certiorari stage, the "substantial question" test does not ask whether the movant is likely to succeed on the merits. Rather, the test is whether there is a "reasonable probability" of Supreme Court review and reversal. *NextWave Personal Commc'ns v. FCC*, No. 00-1402, 2001 U.S. App. LEXIS 19617, at *4 (D.C. Cir. Aug. 23, 2001); *see also United States ex rel. Chandler v. Cook Cnty.*, 282 F.3d 448, 450 (7th Cir. 2002) (staying mandate where "possibility of the Supreme Court's granting certiorari … is not entirely insubstantial"). Hence this Court has repeatedly stayed its mandate in cases that the Supreme Court ultimately declined to review. *E.g.*, *United States v. Sterling*, No. 11-5028 (4th Cir. Nov. 6, 2013); *SEC v. Pirate Investor LLC*, No. 08-1037 (4th Cir. Mar. 12, 2010); *Mironescu v. Costner*, No. 06-6457 (4th Cir. Apr. 16, 2007). As for the "good cause" inquiry, it simply means balancing the equities on whether to preserve the status quo until the Supreme Court has opportunity to act. *See* Knibb, *Federal Court of Appeals Manual* § 34:13, at 924 (6th ed. 2013).

Here, these standards are easily satisfied. A panel of this Court already granted Gov. McDonnell release pending appeal (*see* Dkt.39), and he therefore asks only for clarification that its release order continues in effect pending the filing and disposition of Gov. McDonnell's timely certiorari petition. In the alternative, and for the same basic reasons, Gov. McDonnell is entitled to a stay of the mandate in the interim.

*First*, Gov. McDonnell's petition will raise "substantial" questions, including about the outer boundaries of "official action" under the federal corruption laws. Specifically, whether it could be criminal to engage in a *quid pro quo* exchange in which the official agrees merely to arrange a meeting, ask a question, or attend an event— even if the official does not agree to exercise, or urge others to exercise, any actual governmental power? The panel answered "yes," upholding convictions based on such acts. But three other Circuits have reached a contrary conclusion, adopting a narrower definition of "official act" that requires a direct, concrete, and specific effort to exercise sovereign authority. That conflict is reasonably likely to garner Supreme Court review, particularly given the discretion that the panel opinion accords federal prosecutors and its clear implications for constitutional values like federalism, due process, and First Amendment rights. Moreover, Gov. McDonnell's petition will also raise the question whether it suffices—in a highly publicized prosecution where jurors admit exposure to extensive, negative pretrial publicity—to neither ask potential jurors if they formed opinions about guilt, nor conduct individualized questioning. Again, the panel affirmed this process, but at least six Circuits have reached a contrary

conclusion. This, too, is an important constitutional issue, that divides lower courts, that the Supreme Court addressed not long ago, *Skilling v. United States*, 130 S. Ct. 2896 (2010), and that the Court is reasonably likely to revisit in this case.

*Second*, the equities are straightforward and cut in favor of preserving the status quo. On the one hand, if Gov. McDonnell reports to prison now, and the Supreme Court then grants certiorari and vacates or reverses, Gov. McDonnell will have suffered irreparable harm. On the other hand, if this Court grants a stay and the Supreme Court denies review, there is no harm done. Gov. McDonnell is hardly a flight risk and he poses no danger to the public. And a 24-month sentence is a 24-month sentence whether it commences in August 2015 or March 2016. Either way, Gov. McDonnell would serve his sentence. There is thus "good cause" for a stay.

## I. Gov. McDonnell's Certiorari Petition Will Present a "Substantial Question" Regarding the Scope of the Federal Corruption Laws.

Gov. McDonnell's petition will ask whether a public official takes "official action" by asking an aide a question, encouraging a staffer to attend a meeting, or appearing at a private event—even without taking the additional step of asking anyone to exercise *any* actual government power. This case is the first to find that these sorts of ubiquitous actions are "official" and can serve as the *quo* in a corruption prosecution. Three Circuits have a different view, and multiple lines of Supreme Court authority support Gov. McDonnell's argument that these acts are not criminal. Those conflicts, and the issue's importance, make certiorari a reasonable probability.

**A.** **The Panel's Construction of "Official Action" Conflicts with the Narrower Construction Adopted by Three Other Circuits.**

As the panel recognized, to convict Gov. McDonnell required proof that he took, or promised to take, "official action" on behalf of Star Scientific or its CEO, Jonnie Williams. (Op. 51-52.) That is because the Supreme Court narrowed both of the relevant statutes, honest-services fraud and Hobbs Act extortion, to proscribe traditional bribery—and the federal bribery statute, at least, defines bribery as an agreement to exchange something of value for an "official act." 18 U.S.C. § 201(b)(2); *Skilling*, 130 S. Ct. at 2907; *Evans v. United States*, 504 U.S. 255, 260 (1991).

The critical question is: What constitutes an "official act" for these purposes? Prior to this case, lower courts understood it as exercising or urging others to exercise actual governmental power—like voting on legislation, awarding state contracts or grants, implementing policies, quashing investigations, or pressuring others to do the same. Three Circuits thus rejected the Government's efforts to expand the phrase to encompass other actions that may be "customary" for officials—like introducing someone to a contracting officer, or engaging in an "informational" inquiry for a gift-giver—but that lack a direct nexus to a specific exercise of governmental authority. Here, in contrast, the panel ruled that Gov. McDonnell engaged in "official action" by "asking a staffer to attend a briefing, questioning a university researcher at a product launch, and directing a policy advisor to 'see' him about an issue." (Op. 83.) That Circuit conflict provides a reasonable basis for Supreme Court review. S. Ct. R. 10(a).

1.      The Eighth Circuit squarely rejected an expansive definition of "official act" in *United States v. Rabbitt*, 583 F.2d 1014 (8th Cir. 1978), which has been cited by other federal courts more than 100 times.  *Rabbitt* reversed the conviction of a state official who "offered, for a fee … , to introduce [an architectural] firm" to high-ranking officials who could "secure architectural contracts for it."  *Id.* at 1020 & n.5.  The court explained that, "while Rabbitt's influence obviously helped these architects obtain state jobs, no testimony established that any state contracting officer awarded any contract … because of Rabbitt's influence."  *Id.* at 1028.  As the court later elaborated, it reversed the conviction because Rabbitt "promised only to introduce the firm to influential persons" but he "did not promise to use his official position to influence those persons."  *United States v. Loftus*, 992 F.2d 793, 796 (8th Cir. 1993).  The Eighth Circuit thus recognizes the distinction between taking action to *influence* a government decision versus merely affording *access* without directly trying to control that decision.  Helping the bribe payors to "gain … a friendly ear" fell on the non-criminal side of that line, even though their goal was "obtain[ing] state jobs," the ultimate awarding of which is obviously an official act.  *Rabbitt*, 583 F.2d at 1028.

The First Circuit has drawn the same line.  In *United States v. Urciuoli*, 513 F.3d 290 (1st Cir. 2008), the court found that a senator could be convicted for accepting payments from a hospital in exchange for "tr[ying] to 'kill' certain bills," taking other action "with respect to pending legislative matters," and "deliver[ing] a barely veiled warning of potential legislative trouble" for insurers if they did not settle a dispute

with the hospital, thus "deliberately" "exploit[ing]" his "leverage" of official powers. *Id.* at 292, 296-97.  But at the same time, the court held that the senator could not be convicted for taking money from the hospital to lobby mayors "to comply with Rhode Island law" in a way that benefited the hospital.  *Id.* at 294.  That conduct, unlike the other acts, did not abuse his "*official power* over legislation."  *Id.* at 297 (emphasis added).  In short, *Urciuoli* too rested on the critical difference between acts that directly use (or threaten) "official power[s]," *id.* at 295, 296, 297, versus those that merely "trade" on the "reputation," "network," or prestige that "comes with political office," *id.* at 296.  The latter assures "access," but does not directly control any government decision.  *Id.*  Because the district court did not instruct that the statute was limited to "exercises of official power," the First Circuit reversed.  *Id.* at 295.

Finally, the D.C. Circuit's en banc decision in *Valdes v. United States*, 475 F.3d 1319, 1324-25 (D.C. Cir. 2007) (en banc), similarly agreed that "official acts" under the federal corruption laws are limited to those that influence an actual governmental decision about actual governmental policies.  In *Valdes*, the en banc court held that a policeman who took payments in exchange for using an official police database to perform searches for license plates and outstanding warrants had not taken any "official act"; although searching the databases fell within his official duties, he had not exercised any "inappropriate influence on decisions that the government actually makes."  *Id.* at 1321-25.  As the court later explained, Valdes's "purely informational inquiry" (*i.e.*, seeking information for a gift-giver) was distinct from seeking "to

influence" a government decision (*i.e.*, by urging a specific outcome). *United States v. Ring*, 706 F.3d 460, 470 (D.C. Cir. 2013); *see also* Trial Tr. Day 12, *United States v. Ring*, No. CR 08-274 (D.D.C. Nov. 3, 2010), Dkt. 270, at 36:8-39:21 (instructing that the "fact that gifts or hospitality might make a public official willing to take a lobbyist's phone call or might provide the lobbyist greater access to the official's appointment schedule is not enough by itself"). It is only "corruption of official decisions through the misuse of influence in governmental decision-making which the bribery statute makes criminal." *United States v. Muntain*, 610 F.2d 964, 968 (D.C. Cir. 1979).

**2.** While the First, Eighth, and D.C. Circuits have limited the meaning of "official act" to the exercise of actual governmental power, the panel here upheld Gov. McDonnell's conviction even though he did not exercise, promise to exercise, or pressure anyone else to exercise governmental power on Mr. Williams' behalf. Nor was the jury instructed that this distinction was relevant to finding "official action."

The acts the panel's opinion cited to affirm Gov. McDonnell's conviction were (i) directing Secretary Hazel to send a deputy to a "briefing" about Mr. Williams' product; (ii) asking university researchers whether studying that product would be "good"; (iii) asking his counsel to "see me" about the matter; and (iv) asking two state officials "if they would be willing to meet" with Star Scientific. (Op. 81-82, 84.) Those acts, however, would not suffice for criminal liability in the other Circuits.

*Rabbitt*, for example, specifically held that arranging meetings, even those at which state business would be discussed, was not "official" absent efforts "to

influence" actual policy outcomes. *Loftus*, 992 F.2d at 796. Yet the staffers who attended meetings for Gov. McDonnell understood he wanted "nothing more" than their attendance and independent judgment, Tr. Vol. VII, at 1492:14-1493:8, 1517:10-25; Tr. Vol. XI, at 2680. *Urciuoli* similarly required that the official exercise and "misuse" his "official power." 513 F.3d at 296-97. Yet the acts here cannot be described as involving such misuse of official power, and the jury was never instructed on this issue. Rather, attending briefings, asking questions, and talking to aides are all "purely informational," *Ring*, 706 F.3d at 470, involving no "inappropriate influence" on "decisions that the government actually makes," *Valdes*, 475 F.3d at 1325.

The panel did not attempt to distinguish *Rabbitt* or *Loftus*, *Valdes* or *Ring,* thus implicitly acknowledging its disagreement with those courts' construction of "official action."[2] The panel did cite *Urciuoli* in a footnote, purporting to distinguish the jury instructions given in that case from those here. (Op. 59 n.18.) The instructions were indeed different, but the panel overlooked *Urciuoli*'s broader significance—its insistence that an "official act" is one that exercises or threatens to exercise "official power," thus "misus[ing]" sovereign power. 513 F.3d at 296-97. That close nexus to official power is absent here—and, as in *Urciuoli*, it was never imparted to the jury.

_____

[2] The fact that the Fourth Circuit's rule conflicts with the D.C. Circuit's creates a special type of jurisdictional confusion that demands especially prompt resolution. This Circuit encompasses Virginia and Maryland suburbs that surround D.C., raising the untenable prospect that a Member of Congress who has lunch with a donor in D.C. would have no fear—but that the same lunch in Bethesda could be a crime.

**3.**     In affirming Gov. McDonnell's conviction, the panel appeared at times to accept the legal rule that he urged yet concluded that it was satisfied, asserting (for example) that "Appellant did, in fact, use the power of his office *to influence governmental decisions*." (Op. 81 (emphasis added); *see* also Op. 83-84.)

But the panel's subsequent application of that standard reveals the conflict between it and Gov. McDonnell and the other Circuits.   In explaining how Gov. McDonnell supposedly "use[d] the power of his office to influence governmental decisions," the panel's first illustration is that he "asked his Secretary of Health … to send a deputy to a 'short briefing' with Mrs. McDonnell at the Governor's mansion," the subject of which would be the prospect of Anatabloc trials at Virginia universities. (Op. 81.)   There was no evidence (and the panel cites none) to suggest that Gov. McDonnell told that deputy to institute trials, or to pressure the universities to hold them, or to do anything else aside from attend the briefing.   Likewise, the panel's next examples are that Gov. McDonnell asked university researchers whether studying Anatabloc "could 'be something good'" for Virginia and requested that one of his aides "see me" about the matter.   (Op. 82-83.)   But again, the panel cites no evidence that he did anything other than ask questions; he thus never crossed the line by directing the researchers or his aide to make any governmental decisions one way or the other.   And the panel did not address how Gov. McDonnell's attendance at the Healthcare Leaders reception was "official action," even though it is possible that, under the instructions given, the jury could have convicted on this basis alone.

In other words, in the panel's view, asking a question about a policy issue, gathering information about it, directing others to do so, or even attending a ceremonial reception with the relevant decision makers, *itself* "exploit[s]" official power "to influence" the ultimate policy decision on the issue. That logic conflates procedural access with substantive influence, thereby eliminating the line recognized by *Rabbitt*, *Valdes*, and *Urciuoli*. Under the panel's rationale—that a meeting is a means to an end, and so to arrange a meeting is to act "on" the policy end that seeks "to influence" it—Mr. Rabbitt *did* influence the official acts of awarding state contracts to the bribe-payors. *But see Loftus*, 992 F.2d 793, 796. Likewise, a "purely informational" inquiry about a policy is an action "on" the decision whether to implement it. *But see Ring*, 706 F.3d at 470; *Urciuoli*, 513 F.3d at 296 (trading on "access" not criminal).

Moreover, even if the panel's broader view of "influence" were correct, the panel did not—unlike the courts in *Urciuoli* and *Ring*—require that the jury be *told* that Gov. McDonnell had to try "to influence" governmental decisions. Rather, the panel found it sufficient that the district court quoted to the jury a complex statutory definition along with a series of expansive glosses on what "official action" *includes*— never hinting at what it *excludes*. (Op. 54.) *But see Urciuoli*, 513 F.3d at 295 (vacating where instructions did not convey this); Trial Tr. Day 12, *Ring*, No. CR 08-274, Dkt. 270, at 36:8-39:21, Ex. E (instructing on this). Jurors were never told, despite defense requests and the panel's agreement, that an "official act" must be "intended to … influence a specific official decision the government actually makes." (*Cf.* X.J.A.7341.)

In short, the panel acknowledged the need for official "influence," but its understanding of what counts as such "influence" is very different from the understanding reflected in the other Circuits' opinions; and it further divided from those other courts by affirming a conviction when the jury was never told that "influencing actual governmental decisions" is a critical element of the crime. The disagreement between the panel and the other Circuits is thus genuine and deep.

### B. The Panel's View of "Official Action" Is Also in Tension with Multiple Lines of Supreme Court Authority.

The Supreme Court also grants certiorari to resolve conflicts with its own decisions. S. Ct. R. 10(c). That consideration, too, supports review here.

**1.** The Court specifically addressed federal corruption laws in *United States v. Sun-Diamond Growers of Cal.*, and emphasized the importance of narrowly construing the term "official act" lest it criminalize routine political conduct. 526 U.S. 398, 408 (1999). Acts like "receiving [a] sports teams at the White House, visiting [a] high school, and speaking to ... farmers about USDA policy," the Court observed, while "assuredly 'official acts' in some sense" are "not 'official acts' within the meaning of the statute." *Id.* at 407. Simply put, like the acts that the panel held to be criminal— asking questions, requesting staffers to attend meetings, and making introductions— the acts referenced in *Sun-Diamond* do not exercise sovereign power.

The panel sought to distinguish this "dicta" on the basis that the acts *Sun-Diamond* listed are not "official" because they are "strictly ceremonial or educational,"

and therefore have no potential impact on any actual governmental decisions. (Op. 57, 60-61.) By arranging meetings and asking questions on subjects of potential state action, by contrast, Gov. McDonnell's actions *were* "official" in the panel's view. (*See* Op. 81-84.) But on that reasoning, if, instead of giving a speech to farmers, the Agriculture Secretary held a "roundtable" to listen and engage about their policy views, then his receipt of free lunch at that event would be criminal. Or, if a local official visited a high school and took town-hall style questions about educational funding decisions, his acceptance of a school jersey would be a crime. Respectfully, the Supreme Court may find those consequences of the panel's holding contrary to its reasoning in *Sun-Diamond.* 526 U.S. at 408.

**2.** The panel opinion also creates tension, if not outright conflict, with the Supreme Court's campaign finance decisions. While the government can forbid true *quid pro quo* corruption—*i.e.*, "direct exchange of an *official act* for money"—it "may not target … the *political access* such [financial] support may afford." *McCutcheon v. FEC*, 134 S. Ct. 1434, 1441 (2014) (emphases added). That is because "[i]ngratiation and access … are not corruption." *Citizens United v. FEC*, 558 U.S. 310, 360 (2010). In other words, paying for "access"—the ability to a get a phone call answered or a meeting scheduled—is, according to the Court, constitutionally protected. Yet Gov. McDonnell was convicted for allegedly trading such preferential access for gifts.

The panel responded that *Citizens United* is "a campaign-finance case" and it "involved neither the honest-services statute nor the Hobbs Act." (Op. 72.) True

enough. But if buying "access" cannot be *constitutionally proscribed*—as the Court held—then the corruption statutes should not be construed to *proscribe it*. And if Gov. McDonnell can be imprisoned for giving special access to a gift-giver, any official could equally be imprisoned for agreeing to answer a campaign donor's phone call about a policy issue or meeting with him (or arranging a meeting for him) about that issue, which is a daily occurrence. That, too, is at odds with the Supreme Court's decisions. There is a reasonable probability it will attract the Court's attention.

    **3.**    Finally, the panel opinion is in tension with at least four principles the Supreme Court has laid out concerning *how* to construe vague federal corruption laws. *See Staples v. United States*, 511 U.S. 600, 619 n.17 (1994)("an ambiguous criminal statute is to be construed in favor of the accused"); *Sun-Diamond*, 526 U.S. at 409 (federal corruption laws should be given "a narrow, rather than a sweeping," interpretation); *McNally v. United States*, 483 U.S. 350, 360 (1987) (courts should not be quick to construe statute as "involv[ing] the Federal Government in setting standards of disclosure and good government for local and state officials"); *Edward J. DeBartolo Corp. v. Fl. Gulf Coast Bldg. and Constr. Trades Council*, 485 U.S. 568, 575 (1988) (courts should construe statutes "to avoid [constitutional] problems"). In contrast to these decisions, the panel construed the federal corruption laws broadly, to encompass routine political conduct not clearly covered, in tension with Virginia ethics rules, and in a manner that is, according to bi-partisan former Virginia Attorneys General, "alien to any legal advice that [they] would have given to any Governor," Dkt.60, at 2.

## C. The Question Presented Is Exceedingly Important Because of Its Implications for Routine Political Conduct.

There is a reasonable probability Gov. McDonnell's petition will be granted given the extraordinarily important real-world implications of the panel opinion. Under its rule—and certainly under the jury instructions it upheld—nearly any elected official could be investigated, and likely prosecuted, on federal felony charges. Arising at the intersection of politics, federalism, and criminal justice, the scope of the federal corruption laws is undeniably a matter of great public significance. *See* S. Ct. R. 10(c).

On the panel's view, an "official act" need not be a direct exercise of government power—or even a direct effort to substantively influence any specific exercise of such power—but rather encompasses any action by an official that may bear on any hypothetical future exercise of governmental power: Taking a phone call to discuss a policy is an "official act" to "influence" whether to adopt the policy. Connecting a donor to an agency with jurisdiction over his concern is an "official act" to "influence" the agency's response to that concern. Participating in a roundtable with an advocacy group is an "official act" to "influence" policy on any issue aired therein. If that is correct, prosecutors would have every reason to investigate whether such a call, referral, or event was done with, or on behalf of, someone who had given any gift or campaign donation—and they could then ask a jury to find an implicit *quid pro quo* and convict the official. What this means, in practice, is that any official who holds a fundraiser would be a potential target for ambitious prosecutors.

This is no hypothetical. To the contrary, it is routine. For example, the Supreme Court's decision in *McConnell v. FEC* cited—without suggesting that any of this constituted a crime—"White House coffees that rewarded major donors with access to President Clinton," "courtesies extended to an international businessman" whose donations were "motivated by his interest in gaining the Federal Government's support for an oil-line project in the Caucasus," and donor programs that "promised 'special access to high-ranking … elected officials.'" 540 U.S. at 130. Indeed, "national party committees actually furnish[ed] their own menus of opportunities for access," ranging from "bimonthly conference calls" to "private dinners" or "retreats" with legislators. *Id.* at 150-51. All of these practices involved the open "peddling [of] access," the Court said, which it distinguished from the sale of "actual influence." *Id.* Under the panel's opinion, all those officials, from President Clinton on down, could have readily been convicted of bribery and extortion.

And, notwithstanding campaign-finance reform, public officials continue to routinely accept free travel and vacations—the same sorts of benefits that form the predicates of some of the counts here—in at least partial exchange for discussing state matters or providing enhanced access for such discussion. This includes Members of Congress, who routinely accept free vacations in exchange for participating in policy seminars and meetings about pending legislative matters. *E.g.*, Fredreka Schouten, *Lawmakers Accept Millions In Free Travel*, USA Today, Feb. 27, 2014; Shane Goldmacher, *Congress Quietly Deletes A Key Disclosure Of Free Trips Lawmakers Take*, Nat'l

Journal, June 30, 2014.  No doubt those officials ask questions and listen to pitches at these events—just as Gov. McDonnell did (and asked others to do) in this case.

In short, the panel opinion gives prosecutors the opportunity and basis to investigate and charge essentially any official they choose—which is why so many state and federal officials submitted *amici* briefs supporting Gov. McDonnell (and will do so again before the Supreme Court).  That makes this an issue of great public importance, heightening the probability of Supreme Court review.

## II.    Governor McDonnell's Petition Will Also Present a "Substantial Question" on the Constitutional Right to *Voir Dire* Regarding Pretrial Publicity.

Gov. McDonnell's petition will raise a second, independently certworthy issue—must a district court, in a highly politicized case with extensive pretrial publicity, ask jurors if they have formed opinions about guilt, or else permit individualized *voir dire*.  The district court did neither; it rejected the former questions, notwithstanding the Government's consent, *see* II.J.A.916-17, III.J.A.1690, and asked the nearly 150 potential jurors who had been exposed to pretrial publicity, as a group, if they could nonetheless "be fair."   III.J.A.1691-92.   The panel upheld that as sufficient to ensure a fair jury under the Sixth Amendment.  (*See* Op. 33-35.)

The panel's determination conflicts with two separate lines of authority from the Supreme Court and other Circuits.  *First*, this was one of the highest-profile, most politicized criminal cases in Virginia history—so much so that nearly *half* the judges on this Court were recused from even participating in Gov. McDonnell's appeal.  *See*

Dkt.131 (reflecting that seven of fifteen active judges recused from en banc process). The Court nonetheless held that Gov. McDonnell was not entitled to ask whether potential jurors had formed opinions based on their admitted exposure to pre-trial publicity. That holding conflicts with every prior case to have addressed the issue. For example, in *Mu'min v. Virginia*, the Supreme Court made clear that "[w]henever a potential juror indicated that he had read or heard something about the case, the juror was then asked whether he had formed an opinion…." 500 U.S. 415, 420 (1991).[3]

*Second,* it also conflicts with decisions in at least six other Circuits, which hold that "asking potential jurors to raise their hands if they could not be impartial [is] not adequate voir dire in light of significant pretrial publicity." *United States v. Pratt*, 728 F.3d 463, 471 (5th Cir. 2013).[4] The panel did not distinguish *Pratt* or the other Circuit cases; instead, it adopted a contrary rule. Once again, this is an issue that has attracted the Supreme Court's attention in the past and that is likely, on these facts, to do so again. *See, e.g., Skilling*, 561 U.S. at 438 (Sotomayor, J., dissenting).

---

[3] *See also Skilling*, 561 U.S. at 371 & n.4, 374 (questionnaire asked about "opinions regarding the defendants and their possible guilt or innocence" and court asked individual questions about pretrial publicity). The panel cites *United States v. Bailey*, but even there the court twice asked whether prospective jurors had formed opinions based on pre-trial publicity. *See* 112 F.3d 758, 769-70 (4th Cir. 1997); Reply Br., No. 15-4116, Dkt.34, at 32 (quoting questions).

[4] *Jordan v. Lippman*, 763 F.2d 1265, 1275 (11th Cir. 1985) ("[R]elief is required where there is a significant possibility of prejudice plus inadequate voir dire to unearth such potential prejudice in the jury pool."); *United States v. Dellinger*, 472 F.2d 340, 374 (7th Cir. 1972) (similar); *Silverthorne v. United States*, 400 F.2d 627, 639-40 (9th Cir. 1968) (similar); *Patriarca v. United States*, 402 F.2d 314, 317-18 (1st Cir. 1968) (similar); *United States ex rel. Bloeth v. Denno*, 313 F.2d 364, 372 (2d Cir. 1963) (en banc) (similar).

## III.    Absent Relief, Gov. McDonnell May Be Forced To Serve His Sentence Before Supreme Court review.

Given the probability of further review, the panel's earlier release order should remain in force, and there is also "good cause" for a stay.  After all, Gov. McDonnell is neither a flight risk nor a public threat.  (*See* Dkt.39.)  There is thus no harm, to the Government or the public, if he begins his 2-year sentence in six months rather than now.  By contrast, if the Supreme Court grants review—likely by March 2016—then Gov. McDonnell may have already served more than 25% of his sentence, and may then be forced to complete his sentence before the Court decides the case.  That is unjust.  *See United States v. McManus*, 651 F. Supp. 382, 383-84 (D. Md. 1987) ("There seems little point to an appeal if the defendant will serve his time before a decision is rendered.").  Gov. McDonnell should not be imprisoned "before he has a fair opportunity to seek Supreme Court review."  *Mickens v. Taylor*, 243 F.3d 870, 871 (4th Cir. 2001) (Michael, J., joined by Motz & King, JJ., dissenting from denial of stay).

## CONCLUSION

Gov. McDonnell respectfully requests that the Court clarify that its order granting release pending appeal remains in effect pending the filing and disposition of a timely certiorari petition; or, in the alternative, stay its mandate, pursuant to Fed. R. App. P. 41(d), pending the filing of a timely petition for certiorari.[5]

---

[5] This Court could also remand to the district court with directions to delay any reporting date until after the Supreme Court makes a decision on certiorari, and to further delay the reporting date if the Court grants review.

August 13, 2015

Respectfully submitted,

John L. Brownlee
Daniel I. Small
Christopher M. Iaquinto
Elizabeth N. Jochum
HOLLAND & KNIGHT LLP
800 17th Street N.W.
Suite 1100
Washington, DC 20006
Telephone: (202) 828-1854
Facsimile: (202) 955-5564

/s/ Noel J. Francisco
Henry W. Asbill
Noel J. Francisco
James M. Burnham
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Telephone: (202) 879-3939
Facsimile: (202) 626-1700

# CERTIFICATE OF SERVICE

I certify that on August 13, 2015, the foregoing motion was served on counsel

of record for all parties through the CM/ECF system

Dated:      August 13, 2015

/s/ Noel J. Francisco
Noel J. Francisco

*Counsel for Defendant-Appellant*
*Robert F. McDonnell*