IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

No. 15-4019

———————————

UNITED STATES OF AMERICA,

*Appellee,*

v.

ROBERT F. MCDONNELL,

*Appellant.*

———————————

Appeal from the United States District Court for the Eastern District of Virginia
at Richmond*, The Hon. James R. Spencer, Senior United States District Judge*

———————————

UNITED STATES' RESPONSE IN OPPOSITION
TO APPELLANT'S MOTION TO STAY THE MANDATE
PENDING RESOLUTION OF A PETITION FOR CERTIORARI

———————————

Dana J. Boente
United States Attorney

Richard D. Cooke
Ryan S. Faulconer
Michael S. Dry
Jessica D. Aber
Assistant United States Attorneys
600 East Main Street, Suite 1800
Richmond Virginia 23219
804-819-5400

Raymond Hulser
Chief, Public Integrity Section

David V. Harbach, II
U.S. Department of Justice
Criminal Division
Public Integrity Section
1400 New York Ave., N.W.,
Ste. 12100
Washington, D.C. 20005
202-514-1412

*Attorneys for the United States of America*

**Introduction**

The United States respectfully opposes defendant's motion to stay the mandate and receive bail pending his filing a petition for a writ of certiorari. As explained below, defendant misapplies the bail standard that controls, mischaracterizes this Court's opinion rejecting his appeal in the first instance, and points to no substantial question that is likely to result in the Supreme Court granting certiorari and reversing this Court. His motion should thus be denied.

## I.     Defendant fails to satisfy the bail standards.

Defendant suggests that the bail determination now is effectively the same as the one this Court made before having an opportunity to review the full record and briefs, hear oral argument, issue a unanimous opinion, and deny rehearing en banc without dissent. Defendant ignores, however, that his convictions have now withstood searching and exhaustive review before both this Court and the district court and, equally important, that the standards for obtaining further review in the Supreme Court are stringent and seldom met. Under the 1984 Bail Reform Act, the law governing release on appeal "shifted from a presumption of release to a presumption of valid conviction." *United States v. Perholtz*, 836 F.2d 554, 556 (D.C. Cir. 1988) (per curiam) (citing S.Rep. No. 225, 98th Cong., 1st Sess. 27 (1983)).

Bail at this stage is controlled by 18 U.S.C. § 3143(b).  *See Morison v.*

*United States*, 486 U.S. 1306, 1306 (1988) (Rehnquist, C.J., in chambers) ("The

statutory standard for determining whether a convicted defendant is entitled to be

released pending a certiorari petition is clearly set out in 18 U.S.C. § 3143(b).").

Under that standard, defendant must raise "a substantial question of law or fact

likely to result in," as relevant here, a "reversal" or "new trial."  *Id*. (quoting

§ 3143(b)).  Because the only avenue for defendant to obtain relief now is the

much more demanding standard for obtaining discretionary review in the Supreme

Court—a different standard than this Court considered, with limited information,

when defendant first filed his appeal—he cannot satisfy the standards for bail now.

Under Sup. Ct. R. 10, "Review on a writ of certiorari is not a matter of right, but of

judicial discretion.  A petition for a writ of certiorari will be granted only for

compelling reasons."

Apart from the formal legal standards, there is the improbability of Supreme

Court review.  The Supreme Court receives some 9,000 petitions per Term

(http://www.uscourts.gov/uscourts/Statistics/JudicialBusiness/2012/appendices/A0

1Sep12.pdf) and grants review in about one percent of those cases (http://www.

supremecourt.gov/casehand/guideforIFPcases2014.pdf).  As a treatise on Supreme

Court practice observes, "Although bail applications continue to be filed every

term, there is not a single published in-chambers opinion under the Bail Reform

Act of 1984 granting bail.  Nor does there appear to be any significant practice of Circuit Justices granting bail under that Act without opinion."  Stephen M. Shapiro, et al., Supreme Court Practice 911 (10th ed. 2013).

Importantly, the length of defendant's sentence is immaterial to whether he has satisfied his burden of showing that his petition for writ of certiorari would pose a substantial question likely to result in Supreme Court review and reversal. So, too, are the quality of counsel defendant has retained.  *See* Def. Mot. at 1 (citing "experienced Supreme Court counsel" in support of his motion).  This Court should not treat defendant any differently than it treats other defendants who have to meet the stringent requirements of the Bail Reform Act.  And as set forth below, defendant simply has not met his burden.[1]

---

[1] Defendant attempts to cast his motion as a motion asking this Court "to clarify that its release order" previously entered with respect to his *appeal* "will remain in force pending the filing and imposition of a timely certiorari petition." Def. Mot. 1.  But as § 3143(b) makes clear, a defendant's "appeal" of right to a court of appeals and the discretionary review of a petition for writ of certiorari to the Supreme Court are different questions.  *See* § 3143(b) (setting forth standards for defendant seeking release after filing "an appeal *or* a petition for writ of certiorari" (emphasis added)).  This Court's prior order applied by its plain terms only to defendant's "appeal," Doc. No. 39, at 2, and said nothing regarding a prospective petition for writ of certiorari.  Similarly, although defendant has also described his motion as a motion to stay this Court's mandate, it is in reality a new substantive motion for bail pending his petition for writ of certiorari pursuant to § 3143(b).  And under *Morison*, defendant must meet the standard set forth in § 3143(b) regardless of how his motion is characterized.

**II.    None of defendant's official-action arguments present a substantial question likely to result in certiorari or reversal.**

First, defendant has not shown a substantial likelihood that the Supreme Court will grant certiorari and reverse this Court's opinion on his sufficiency and jury-instruction challenges to the official-act component of his corruption convictions.  Defendant does not clearly state which of his two official-act challenges (to sufficiency or the jury instructions) poses a substantial question likely to result in review and success in the Supreme Court and instead groups his challenges and rephrases them in terms different than the questions the Supreme Court would actually be deciding whether to review.  Defendant then mischaracterizes this Court's opinion and attempts to invent conflicts with precedents of other circuits or the Supreme Court.  But as explained in this Court's opinion affirming defendant's conviction and as set forth in greater detail below, no such conflicts exist.  Indeed, the Supreme Court previously declined to review similar challenges to this Court's opinion in *United States v. Jefferson*, 674 F.3d 332 (4th Cir.), *cert. denied* 133 S. Ct. 648 (2012).  Defendant thus cannot meet his burden here.

**A.    Defendant cannot show that his sufficiency challenge is likely to warrant certiorari or reversal by the Supreme Court.**

Defendant's sufficiency challenge amounts to a fact-bound assessment of the evidence that does not warrant Supreme Court review.  *See Branti v. Finkel*, 445

U.S. 507, 512 n. 6 (1980) (discussing the Supreme Court's "settled practice of accepting, absent the most exceptional circumstances, factual determinations in which the district court and the court of appeals have concurred") (citing *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 336 U.S. 271, 275 (1949)); *see also United States v. Johnston*, 268 U.S. 220, 227 (1925) ("We do not grant . . . certiorari to review evidence and discuss specific facts"); Sup. Ct. R. 10 ("A petition for a writ of certiorari is rarely granted when the asserted error consists of . . . the misapplication of a properly stated rule of law.").  And as explained below, all of the cases defendant cites are factually distinguishable or involved jury instruction errors that were not present here.

As this Court recognized, defendant's official-act sufficiency challenge turned on whether any reasonable jury could have found that the evidence at trial met the requirements of § 201(a)(3)'s statutory definition, which the district court's instructions adopted for purposes of the honest-services and Hobbs Act charges against defendant.  *See* Op. 50-53, 79.  Section 201(a)(3) and the district court's jury instructions, in turn, require proof that the agreed-upon official action in a bribery exchange be "any decision or action on any question, matter, cause, suit, proceeding, or controversy, which may at any time be pending, or which may by law be brought before any public official, in such public official's official capacity."  A7671; *see also* Op. 53, 79.  Importantly, "it was not necessary for the

Government to prove that [defendant] actually took any such official action." *Id.* at 81. Rather, "[w]hat the Government had to show was that the allegedly corrupt agreement between [defendant] and [Jonnie] Williams carried with it an expectation that some type of official action would be taken." *Id.*

This Court's opinion found that "the Government presented evidence of three questions or matters within [defendant's] sphere of influence." *Id.* at 79. The first "was whether researchers at any of Virginia's state universities would initiate a study of Anatabloc. The second was whether the state-created Tobacco . . . Commission . . . would allocate grant money for the study of anatabine." *Id.* And "[t]he third was whether the health insurance plan for state employees in Virginia would include Anatabloc as a covered drug." *Id.* As this Court observed, "[t]hese were all government matters, and [defendant], as head of the Commonwealth's government, was in a prime position to affect their disposition." *Id.* Moreover, this Court found that the United States "showed that [defendant] did, in fact, use the power of his office to influence governmental decisions on each of the three questions and matters discussed above." *Id.* at 81. The Court found that the United States did so by, among other things, proving that defendant took various actions to "exploit[] the power of his office in furtherance of an ongoing effort to influence the work of state university researchers." *Id.* at 83-84. In sum, as this Court found, "the Government exceeded its burden" on official action. *Id.* at 81.

This Court's rejection of defendant's sufficiency challenge was unsurprising, as it followed *a fortiori* from this Court's opinion in *Jefferson*. Jefferson, a former congressman, received payments to help advance bribe payors' interests primarily on trade with African countries, a matter he addressed through the settled practice of constituent services. *Jefferson*, 674 F.3d at 356-59. All three requirements of § 201(a)(3) were met: (1) Jefferson agreed to take, took, and directed various "actions"—meetings, letters, trips, and the like; (2) those actions were "on" matters or causes of African trade; and (3) such matters or causes were pending before Jefferson by virtue of his position. *Id.* at 357-58. It did not matter that the business ventures Jefferson promoted fell "outside the formal legislative process" or that he had no formal role in their resolution. *Id.* at 357. Nor did it matter that the actions Jefferson took and agreed to take were interim steps toward businesses' longer-term goals—"meeting[s], letter[s], trip[s], or other action[s]" taken over the course of years. *Id.* at 359 ("In that context, it would be impossible—and it is unnecessary—to link every dollar paid … to a specific meeting, letter, trip, or other action by Jefferson to fulfill his end of a corrupt bargain."). What did matter was that Jefferson took action "*with the specific understanding* that he would assist in [his bribe payors'] business ventures." *Id.* at 356.

The same was true here: (1) defendant agreed to take, took, and directed various "actions"—meetings, events, and the like; (2) those actions were "on"

matters or causes of Virginia business development, such as studies at state universities and use of Anatabloc in the state employee health plan; and (3) such matters or causes were pending before defendant by virtue of his position. Indeed, unlike Jefferson, a legislator who had no formal authority over the African countries, private entities, and executive agencies that were parties to his bribe-payor's business deals, defendant was a chief executive who could take myriad official actions on his own accord and had ultimate authority over the subordinate state officials whom he directed and influenced on Williams's behalf.

Moreover, consistent with *Jefferson*, other courts of appeals have routinely found action similar to—and often far less substantial than—defendant's sufficient to satisfy the official-action standard. *See, e.g.*, *United States v. Ring*, 706 F.3d 460, 468-70 (D.C. Cir. 2013) (email and phone call to further visa application); *United States v. Rosen*, 716 F.3d 691, 695 (2d Cir. 2013) (state legislator's actions included writing "letter on State Assembly letterhead stationery" to state senate majority leader asking to restore hospital funding and "set up a meeting between Rosen and the Governor's chief of staff" to discuss hospital debt relief); *United States v. Moore*, 525 F.3d 1033, 1041 (11th Cir. 2008) (rejecting that "the 'low level actions alleged in this case'" were not official acts; actions such as prison officers switching unit assignments, allowing telephone calls, making telephone calls, permitting meetings, and giving a key to help facilitate meetings were all

sufficient to "fall within the broad definition of 'official act'"); *United States v. Biaggi*, 853 F.2d 89, 98 (2d Cir. 1988).

Similarly, the cases that defendant has cited in support of his motion involved proof inadequacies or jury instruction errors not present here. For example, *Valdes v. United States*, 475 F.3d 1319 (D.C. Cir. 2007) (en banc), involved a police officer's search of a law enforcement database that the government did not allege was related to any pending investigation, but rather was "linked only by pure supposition to an imaginary future matter" that could not "in any meaningful sense, be 'pending' before an official, now or at 'any time' in the future." *Id.* at 1329. Likewise, in *United States v. Urciuoli*, 513 F.3d 290 (1st Cir. 2008), the First Circuit distinguished between two categories of alleged conduct based on the requirement that there be a question, matter, or cause pending before the public official that the official action be "on." *Id.* at 295-96. And *United States v. Rabbitt*, 583 F.2d 1014, 1026, 1028 (8th Cir. 1978), also involved a failure to adduce proof that would have satisfied § 201(a)(3)'s standard.[2] Most

---

[2] Indeed, *Rabbitt* reversed a conviction for evidentiary insufficiency with respect to one sub-scheme in a broader corruption case based on facts that showed "the official promised *only* to introduce the [paying] firm to influential persons; he did not promise to use his official position to influence those persons." *United States v. Loftus*, 992 F.2d 793, 796 (8th Cir. 1993) (citing *Rabbitt*, 583 F.2d at 1028) (emphasis added). In other words, the alleged action was not "on" the question or matter. Moreover, *Loftus* substantially narrowed *Rabbitt*, and *Rabbitt*'s reasoning emphasized government harm and ultimate control—irrelevant factors for settled bribery law. 583 F.2d at 1024-28; *see United States v. Dimora*, 750

importantly, none of these cases involved jury instructions, like those here, that required the jury to apply § 201(a)(3)'s definition.  There was overwhelming evidence here, unlike in those cases, that defendant agreed to take action on matters and questions that were pending before him as governor.  There is thus no arguable circuit split on sufficiency.[3]

### B. Defendant cannot show that the jury instructions affirmed here create any circuit split or conflict with Supreme Court precedent.

Next, defendant has not shown that the Supreme Court is likely to grant certiorari and reverse his convictions based on his challenge to the district court's official-action jury instructions.  As this Court found, the district court's official-action jury instructions here gave a "near-verbatim recitation" of the statutory language of § 201(a)(3).  Op. 51.  It is that statutory language, as this Court has found both in defendant's case and in *Jefferson*, that prevents the definition of official action from encompassing "every action taken in one's official capacity." *Jefferson*, 674 F.3d at 356-58; Op. 54-55.  In other words, as this Court held, "the

---

F.3d 619, 626-27 (6th Cir. 2014); *United States v. Holzer*, 816 F.2d 304, 309 (7th Cir. 1987) ("very much doubt[ing] the soundness of this reasoning" in *Rabbitt*).

[3] Any challenge to the sufficiency of the evidence of intent, or the *pro* in the *quid pro quo* exchange, is even weaker.  As this Court found, "the Government presented an array of evidence to show [defendant's] corrupt intent" at trial.  Op. 85.  That evidence "demonstrated a close relationship between [defendant's] official acts and the money, loans, gifts, and favors provided by Williams to [defendant] and Mrs. McDonnell." *Id.*  In other words, "[t]he temporal relationship between the 'quids' and the 'quos' . . . constitute compelling evidence of corrupt intent." *Id.* at 87.

reach of § 201(a)(3) is broad enough to encompass the customary and settled

practices of an office, but only insofar as a purpose or effect of those practices is to

influence a 'question, matter, cause, suit, proceeding or controversy' that may be

brought before the government."  Op. 61.  Thus, jury instructions that define

official action using § 201(a)(3)'s definition are correct because they confine

official action to "any decision or action *on*" any question, matter, cause, or the

like at issue.  § 201(a)(3) (emphasis added).

Notably, defendant does not point to a single decision—of the Supreme

Court, this Court, or any other court of appeals—that rejected *jury instructions*

comparable to those given here.  Indeed, the most comparable jury instructions to

those given in this case were those given in *Jefferson*.  Op. 62 ("To a large extent,

the instruction echoed the 'official act' instruction in" *Jefferson*.); A958 (finding

official-action instructions in *Jefferson* to be "nearly identical" to those here).  The

Supreme Court denied *Jefferson*'s petition for certiorari, and there is no reason to

think the Supreme Court's calculus would be any different for this defendant.

Instead, defendant points—as he has done throughout this case—to a series

of inapposite cases that do not stand for the propositions he seeks to extract from

them.[4]  For example, he points, as former Congressman Jefferson did

---

[4] By the United States' count, defendant has unsuccessfully litigated the
same official act arguments in approximately 19 separate briefs or similar
pleadings filed in the district court or this Court.  His arguments have changed little

unsuccessfully, to *dicta* in *United States v. Sun-Diamond Growers of Cal.*, 526

U.S. 398 (1999), a gratuities case. But as this Court held in in rejecting

defendant's appeal, defendant "simply misreads *Sun-Diamond*." Op. 59. That is

because *Sun-Diamond* "did not rule that receptions, public appearances, and

speeches can *never* constitute 'official acts' within the meaning of § 201(a)(3); the

Court's point was that job functions of a strictly ceremonial or educational nature

will *rarely*, if ever, fall within this definition." *Id.* at 60 (emphases added). But

where, as here, a district court's jury instructions define official action using the

§ 201(a)(3) statutory definition, those jury instructions capture any limitation

suggested by *Sun-Diamond*'s *dicta*. *See* Op. 61.[5]

Defendant gains no more from *Valdes*, another gratuities case. Unlike here,

the district court in *Valdes* "refused to include" in its instructions § 201(a)(3)'s

language "or anything comparable," 475 F.3d at 1325. Thus, *Valdes* poses no

restriction to official action encompassing a public official promoting "specific

---

since the first pleading he filed mere hours after the grand jury indicted him, and
there is little reason to think those arguments will meet unexpected success for the
first time in the Supreme Court.

[5] This is supported by the Supreme Court's description of the jury
instructions in *Sun-Diamond*, which included the statement that it was sufficient to
prove a gratuity if the thing of value was given "simply because [the public
official] held public office" and that "[t]he government need not prove that the
alleged gratuity was linked to a specific or identifiable official act or any act at
all." 526 U.S. at 403. The jury instructions here included no such "expansive
gloss," *id.*; rather, they required the jury to find that the evidence satisfied
§ 201(a)(3)'s plain language. Op. 51, 54-55.

business ventures." *Jefferson*, 674 F.3d at 356 (distinguishing *Valdes*). And this Court's opinion does not create any split with the D.C. Circuit.[6]

Defendant's reliance on *Urciuoli* fares no better. The First Circuit found fault there with instructions that were much broader and more nebulous than those given here and defined official action as encompassing all actions taken "in an official capacity" or "under the cloak of his office." 513 F.3d at 295 n. 2. The instructions never tied back to § 201(a)(3)'s language. As this Court found, the district court included that requirement in its instructions to the jury here; *Urciuoli* thus presents no circuit split. *See* Op. at 59-60 n. 18 (distinguishing *Urciuoli*).

Nor does *Rabbitt*. The Eighth Circuit read *Rabbitt* narrowly in *Loftus*, a case much more analogous to defendant's. In doing so, the court emphasized that "[a]ctual authority over the end result" sought "is not controlling if [defendant], through his official position, had influence and authority over a means to that end." 992 F.3d at 796. This quotation from *Loftus* is nearly verbatim what the district

---

[6] Although defendant points to some differences between the district court's jury instructions in *Ring* and those given in this case, those differences are immaterial to the instant question for two reasons. First, the D.C. Circuit's opinion in *Ring* addressed Ring's *sufficiency* challenge to the official-act element of a gratuity conviction, not a jury instruction challenge to an official-act jury instruction. 470 F.3d at 468-70. Second, defendant's requested jury instructions here, as this Court found, were riddled with errors that were either not in the instructions given in *Ring*, were not squarely addressed in *Ring*, or were otherwise adequately covered by the district court's corrupt-intent and good-faith instructions. *See* Op. at 70-77.

court instructed (and the jury found) here.  *Rabbitt* thus creates no circuit split, either.

Finally, defendant's invocation of the Supreme Court's campaign-finance precedents does not show that the Supreme Court is likely to grant certiorari and reverse his convictions.  Defendant's chief argument in this respect is that the district court erred by not instructing the jury that "mere ingratiation and access are not corruption," A753, a phrase that defendant sought to import into the jury instructions here based on similar language in *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010).  But as this Court held, "[a]ffording the talismanic significance [defendant] assigns to this language ignores its context; *Citizens United*, a campaign-finance case, involved neither the honest-services statute nor the Hobbs Act.  Moreover, the *Citizens United* Court employed the 'ingratiation' language only after providing a much broader definition of corruption: 'The hallmark of corruption is the financial quid pro quo: dollars for political favors.'" Op. 72-73 (quoting *Citizens United*, 558 U.S. at 359 (internal quotations omitted)).

What is more, as this Court found, defendant's requested instruction was included in a much longer instruction that was riddled with other errors.  *See* Op. 70-73 ("Taken as a whole, Appellant's proposed instruction on the meaning of 'official act' failed to present the district court with a correct statement of law.  He cannot now argue that the court's refusal to give that instruction was an abuse of

discretion.").  And given the district court's extensive good-faith instruction,

defendant was "free to argue that he believed in good faith that any ingratiation or

access he provided Williams was entirely proper.  If the jury believed that, it would

have had no choice but to acquit him."  *Id.* at 73.[7]  In sum, there is nothing about

the official-action instructions in this case that is in tension or conflict with the

Supreme Court's campaign-finance decisions.[8]

### III. Defendant's motion mischaracterizes this Court's opinion rejecting his voir dire challenges, and that opinion presents neither a circuit split nor any conflict with Supreme Court precedent.

Defendant seeks to convert his heavily fact-bound arguments on voir dire

into ones that he claims will lead to Supreme Court review and reversal.  But his

arguments cannot be reconciled with the deference that the Supreme Court has

long accorded district courts in voir dire, and his claim that this Court's opinion

---

[7] That is why, of course, excluding any conduct that can be characterized as "access" from the definition of "official action" would lead to absurd results.  *See, e.g.*, *United States v. Carson*, 464 F.2d 424, 434 (2d Cir. 1972)  ("Apparently [Carson], and those bribing him, thought he had *access* to the Justice Department through his position that would enable him to alleviate, if not altogether quash, pending Justice Department action or bring about lenient post-conviction treatment." (emphasis added)).  A meeting with a prosecutor's supervisor about a pending matter is undoubtedly a form of "access," but such meetings are just as undoubtedly not "up for sale." *Rex v. Vaughan*, 98 Eng. Rep. 308, 310 (1769).

[8] Just as the district court's good-faith instruction vitiated any claim that the official-action instructions were in tension with the Supreme Court's campaign-finance jurisprudence, that same instruction defeats any claim that the district court's instructions regarding corrupt intent, or the *pro* in the *quid pro quo* exchange, were insufficient.  *See* Op. 74-77.

conflicts with those from six other circuits ignores critical facts that this Court invoked in upholding the voir dire in this case.

First, defendant claims that this Court held that he was "not entitled" to ask the venire about opinions formed from exposure to pretrial publicity. Def. Mot. 19. But this Court did no such thing. Rather, as this Court has already noted, the exact question defendant proposed for the questionnaire was faulty. *See* Op. 32-33 ("And while the jointly proposed jury questionnaire from which the final questionnaire was culled did, indeed, ask whether prospective jurors had 'formed' an opinion about the case, the wording was suspect. . . . So worded, this question invites respondents to deliberate on the defendant's guilt or innocence and to stake out a position . . . ."). And as this Court held, the district court "did a good deal more" than what defendant claims *post hoc* that it did. Op. 31. Taken as a whole, the district court's voir dire "was adequate to 'provide a reasonable assurance that prejudice would be discovered if present.'" *Id.* at 35 (quoting *United States v. Lancaster*, 96 F.3d 734, 740 (4th Cir. 1996) (en banc)).

Defendant then argues that that "every prior case to have addressed the issue" requires the trial court to ask the venire whether they have formed an opinion about guilt. Def. Mot. 19. He provides only one citation for this argument: *Mu'Min v. Virginia*, 500 U.S. 415 (1991). But just as defendant previously claimed that *Skilling v. United States*, 561 U.S. 358 (2010),

"purport[ed] to hand down commandments for the proper conduct of voir dire proceedings," Op. 30, he does the same with *Mu'Min*, Def. Mot. 19. *Mu'Min* does not require a trial court to question jurors about whether they have formed an opinion about guilt. As this Court already has recognized, the Supreme Court's decision in *Mu'Min* actually supports the trial court's decision *not* to ask the venire opinions about guilt. *See* Op. 33 n. 12 ("Indeed the court's decision not to pose Appellant's suggested question [about opinions of guilt] finds support in the Supreme Court's guidance on matters of pretrial publicity." (citing *Mu'Min*, 500 U.S. at 430; *Irvin v. Dowd*, 366 U.S. 717, 723 (1961))).

Indeed, defendant's argument defies longstanding Supreme Court precedent, under which "[n]o hard-and-fast formula dictates the necessary depth or breadth of *voir dire*." *Skilling*, 561 U.S. at 386. That is so "[p]articularly with respect to pretrial publicity," where the Supreme Court has "stressed the wide discretion granted to the trial court" and rejected any constitutional requirement of asking "questions specifically dealing with the content of what each juror has read." *Mu'Min*, 500 U.S. at 427, 431. Rather, "primary reliance on the [trial court's] judgment . . . makes good sense"; "that court sits in the locale where the publicity is said to have had its effect and brings to his evaluation . . . his own perception of the depth and extent of news stories that might influence a juror." *Id.* at 427.

Second, defendant claims that this Court's opinion conflicts with six other circuits, which he claims "hold that 'asking potential jurors to raise their hands if they could not be impartial [is] not adequate voir dire in light of significant pretrial publicity.'" Def. Mot. 19 (quoting *United States v. Pratt*, 728 F.3d 463, 471 (5th Cir. 2013)). This purported circuit split is premised on the proposition that voir dire regarding pretrial publicity in this case was limited to questioning the venire en masse. But again, this Court has already found this proposition to be false: "In his opening brief, Appellant accuses the district court of 'limit[ing] voir dire on this issue to asking the prospective jurors en masse to sit down if they felt they could be fair.' The [trial] court, though, did a good deal more than that." Op. 31 (quoting Def. Br. 65).

Specifically, voir dire began with a questionnaire, essentially drafted jointly by the parties, that was designed to uncover potential pretrial-publicity bias— including 9 media-consumption questions, 12 political-involvement questions, and 11 defense-connection questions. A584-92. It also included 14 pretrial-publicity and case-knowledge questions. A592-95. After the court and parties reviewed responses and made for-cause strikes, a 142-member venire appeared in court and answered questions in court for seven hours. A1553-65, A1572-1714. The court identified three whose questionnaire opinions raised concern; all were removed. A1639-41. The court also addressed publicity more directly per defense

requests.  The court posed general questions to the panel, but then—at defendant's

counsel's request—summoned jurors to the bench that defendant identified as

cause for concern and questioned each about his or her opinion of the case and

ability to remain impartial.  "When this process was complete, the court asked

Appellant's counsel whether there was 'anybody else' he wished to question.  'Not

on publicity,' counsel said."  Op. 34 (internal citation omitted).  Given the

extensive voir dire on pretrial publicity that occurred in this case, defendant cannot

persuasively argue that this Court's opinion splits with six other circuits, and his

fact-bound arguments do not justify Supreme Court review.

Finally, defendant's total failure to point to an actual biased juror being

seated renders Supreme Court review and reversal on voir-dire grounds highly

unlikely.  *See Skilling*, 561 U.S. at 425 ("[I]f no biased jury is actually seated, there

is no violation of the defendant's right to an impartial jury.") (Alito, J.,

concurring). The jurors who convicted defendant showed no signs of bias from

pretrial publicity or otherwise.  *See United States v. Maureen McDonnell*, No. 15-

4116, Doc. No. 33 (supplemental joint appendix) at 254-688 (4th Cir. June 11,

2015).  Nine followed Virginia politics "[n]ot closely at all" and three only

"[s]omewhat closely."  None reported attending any event with either defendant

present, participating in any campaign activity for or against Mr. McDonnell, or

that either defendant's actions had affected them in any personal way.  Moreover,

none reported having "expressed an opinion about" the case or "those involved to anyone"; two had not even heard about it. Seven followed the case "[n]ot at all," four "[n]ot very closely," and one "[s]omewhat closely." Moreover, the jury's actions showed their lack of bias, too. They acquitted on multiple counts against both defendants, including three corruption counts against defendant's wife, showing tangible impartiality the Supreme Court has found of "prime significance" in rejecting challenges like defendant's. *Skilling*, 561 U.S. at 383.

In sum, "the selection process successfully secured jurors who were largely untouched" by publicity before hearing the evidence and "paid scant attention to [case]-related news." *Skilling*, 561 U.S. at 389-90. *See also* Op. 35 ("Appellant does not contend that any actual juror bias has been discovered.") There is no reason to think defendant's voir-dire challenge will lead to Supreme Court review and reversal.

## Conclusion

In conclusion, defendant "received a fair trial and was duly convicted by a jury of his fellow Virginians. [This Court had] no cause to undo what has been done," Op. 89, and neither will the Supreme Court. As such, defendant's motion to stay this Court's mandate and grant defendant bail pending his petition for writ of certiorari to the Supreme Court should be denied.

Respectfully submitted,

Dana J. Boente
United States Attorney

Raymond Hulser
Chief, Public Integrity Section
Criminal Division
U.S. Department of Justice


By:_____/s/_____
    Richard D. Cooke
    Ryan S. Faulconer
    Michael S. Dry
    Jessica D. Aber
    David V. Harbach, II
    Counsel for the United States
    U.S. Attorney's Office
    600 E. Main Street, Suite 1800
    Richmond, VA 23219
    Phone: 804-819-5400
    Fax: 804-771-2316
Email:   richard.cooke@usdoj.gov
    ryan.faulconer2@usdoj.gov
    michael.s.dry@usdoj.gov
    jessica.d.aber@usdoj.gov

**Certificate of Service**

I certify that on August 14, 2015, I filed electronically the foregoing brief with the Clerk of the Court using the CM/ECF system, which will send notice of the filing to all counsel of record.

By: _____/s/_____
Richard D. Cooke
Assistant United States Attorney
Eastern District of Virginia
600 East Main Street, Suite 1800
Richmond, Virginia 23219
(804) 819-5400
richard.cooke@usdoj.gov